# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

VINCENT SYSTEMS GMBH,

      *Plaintiff,*

v.

FILLAUER COMPANIES, INC. and
MOTION CONTROL, INC.,

      *Defendants.*

Case No: 1:23-cv-00002-CEA-SKL

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.  INTRODUCTION ........................................................................................................... 1

II.  FACTS ............................................................................................................................ 2

   A.  Overview of the '666 Patent ................................................................................... 2

   B.  Prosecution History of the '666 Patent ................................................................... 3

   C.  The Accused Products ............................................................................................. 5

   D.  Claim Terms in Dispute .......................................................................................... 6

III.  ARGUMENT ................................................................................................................. 7

   A.  "Axially Movable" Means Movable. ....................................................................... 9

   B.  "Guided in the Axial Direction by Separate Guidances" Is Indefinite. ............................ 12

      1.  "Guided in the Axial Direction by Separate Guidances" Fails to Inform with Reasonable Certainty the Scope of the Invention. ........................................ 14

      2.  Alternatively, "Guided in the Axial Direction by Separate Guidances" Means "At Least Two Components Designed to Facilitate Movement of the Threaded Screw Along the Length of the Drive Shaft." .......................................... 17

   C.  "Servo Drive" Is A Known Term of Art ................................................................ 18

   D.  "Coupling Mechanism Between the First Hinge Connection and the Second Hinge Connection" Is a Structural Limitation Having the Plain Meaning Defendants Propose. 21

IV.  CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014)............................................................................... 11

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)............................................................................... 13

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)................................................................................. 21

*Capital Sec. Sys., Inc. v. NCR Corp.*,
   725 F. App'x 952 (Fed. Cir. 2018) ........................................................................ 17

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003)................................................................................................ 13

*Every Penny Counts, Inc. v. Am. Express Co.*,
   563 F.3d 1378 (Fed. Cir. 2009)................................................................................. 5

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005)............................................................................... 12

*In re GPAC, Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995)................................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)........................................................................... 7, 17

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
   450 F.3d 1350 (Fed. Cir. 2006)............................................................................... 11

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014)............................................................................... 13

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)............................................................................... 12

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)................................................................................. 7, 9

*Markman v. Westview Instruments, Inc.,*
517 U.S. 370 (1996)...........................................................................................7

*Merrill v. Yeomans,*
94 U.S. 568 (1877)............................................................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014)........................................................................................13

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)................................................................*passim*

*Renishaw PLC v. Marposs Societa' per Azioni,*
158 F.3d 1243 (Fed. Cir. 1998)....................................................................18

*Skky, Inc. v. MindGeek, s.a.r.l.,*
859 F.3d 1014 (Fed. Cir. 2017)....................................................................24

*Starhome GmbH v. AT&T Mobility LLC,*
743 F.3d 849 (Fed. Cir. 2014)......................................................................12

*Thorner v. Sony Computer Entm't America LLC,*
669 F.3d 1362 (Fed. Cir. 2012)....................................................................12

*TriMed, Inc. v. Stryker Corp.,*
514 F.3d 1256, (Fed. Cir. 2008)....................................................................24

*United Carbon Co. v. Binney & Smith Co.,*
317 U.S. 228 (1942).........................................................................................7

*Verve, LLC v. Crane Cams, Inc.,*
311 F.3d 1116 (Fed. Cir. 2002)....................................................................19

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996)....................................................................7, 8

*White v. Dunbar,*
119 U.S. 47 (1886)...........................................................................................8

Statutes

35 U.S.C. § 112.......................................................................13, 23, 24, 25

# I.    INTRODUCTION

Vincent did not invent prosthetic fingers. Rather, Vincent has a patent directed to a particular self-contained finger element in which the threaded screw is "axially movable" on the drive shaft. This is a limitation of every claim of the asserted patent. The accused prosthetic hands sold by Defendant Motion Control have threaded screws ***fixed*** to the drive shaft by either Loctite glue or a laser weld. Thus, to claim infringement over prosthetic fingers fundamentally different than those described and claimed in the '666 patent, Vincent argues the word "movable" means ***not*** movable.

The accused products are, in fact, so different from the claimed invention, that to claim infringement, Vincent must propose constructions that read-out numerous structural elements recited in the claims. For example, in addition to contending axially movable includes not movable, Vincent contends servo drive has a "plain and ordinary" meaning that encompasses any combination of electrical or mechanical parts. It then suggests construing the term in such a manner as to render the term superfluous in the claim. Vincent also contends that in the phrase the "coupling mechanism between the first hinge connection and the second hinge connection", the only recited structure is "mechanism." The rest is, according to Vincent, "abstract" and vaguely describes function. Ironically, "mechanism" is a term that the Federal Circuit calls a "nonce" word because it does not impart sufficient structure, meaning under Vincent's construction there is no structure at all. Finally, Vincent claims "guidances" is definite but cannot explain what one looks like and repeats the word in the proposed construction.

Vincent's proposed constructions not only violate numerous canons of patent law, but they are also inconsistent with the English language. Here, the plain meaning of "movable" is "movable". This is how Vincent distinguished its invention over the prior art "fixed" threaded screw configurations. As to the remainder of that claim element "guided in the axial direction by

1

separate guidances", the specification does not teach what it means by "guidance" or how the guidance is arranged to "guide" the threaded screw. As such, this limitation is indefinite. The remaining limitations mean what they say, and they *are* limitations. Vincent's attempt to broaden its patent to encompass what it did not invent should fail.

## II.    FACTS

### A.    Overview of the '666 Patent

The sole asserted patent, U.S. Patent No. 8,491,666 ("the '666 patent") (attached hereto as Ex. A), entitled "Finger element," describes a single-finger-prosthesis that can be used alone or as a component of an artificial hand or arm-prosthesis. '666 patent, Abstract; Declaration of Pinhas Ben-Tzvi dated March 11, 2024 (attached hereto as Ex. B and referred to herein as "Ben-Tzvi Dec."), ¶ 38. As described in the background of the invention section of the patent, artificial finger elements for hand prostheses have been known since the time of the First World War. '666 patent, 1:11-16. The '666 patent states that prior known solutions included geared motors but that these solutions were generally not "autarkic driven finger elements" and thus, "not suited for the use as a single-finger-prosthesis." *Id.*, 1:28-33. Two single finger prior art references are identified in the patent, but the patent explains "in these finger elements, ***the worm gear is fixed permanently to the motor shaft***." *Id.*, 1:40-41. Unlike the fixed worm gear of the prior art, the patent states that the object of the '666 patented invention is achieved by a "threaded worm [that] is positively mounted ***axially movably on the drive shaft*** and axially guided through separate guides." *Id.*, Abstract.

The specification of the '666 patent is rife with awkward and unclear phrasings, typographical errors and a lack of detailed figures and descriptions. *See, e.g.,* '666 patent, 4:2-8 (reference to "fiction" instead of "friction"), 4:41-61 (inconsistent identification and reference to "finger element support 22", "hinge connection 22", and "finger element adaptors 22"); *see also,*

*e.g.,* Ex. C (Transcript of the April 5, 2024 Deposition of Steven Collins "Collins Tr."), 71:10-72:9, 138:19-24.[1] Emphasized throughout the patent, however, is the "axial movability" of the threaded screw. For example, the specification explains "***the axial movability of the drive shaft in the threaded screw has to be assured.***" '666 patent, 2:33-34 (emphasis added); *see also* 2:28-30 ("***An essential feature of the invention encloses a decoupling of drive shaft and threaded screw in axial direction to the drive shaft.***") (emphasis added); Abstract ("The object is achieved in that the threaded worm is positively mounted axially movably on the drive shaft and axially guided through separate guides.").

### B. Prosecution History of the '666 Patent

The '666 patent claims priority to a foreign application filed in Germany on November 8, 2008 (DE 10 2008 056 520). Ben-Tzvi Dec., ¶ 37; '666 patent, (30). The '666 patent went through the Patent Cooperation Treaty ("PCT") filing process; specifically, Vincent filed an application with the German patent office (in the native language) and, as part of the PCT "national phase" process, chose to submit an application to the United States Patent and Trademark Office ("USPTO") on August 26, 2011. Ben-Tzvi Dec., ¶ 37; '666 patent, (22), (86), (87). The USPTO examined the English-translated application, as well as amendments made during examination, and the '666 patent issued in the U.S. on July 23, 2013.

During prosecution of the German application, which shares the same specification as the '666 patent, Vincent made several admissions about the "axially movable" limitation at issue in this case. *See* Ex. D, VINCENT_004194; Ben-Tzvi Dec., ¶ 68. To get around the prior art cited by the German examiner, Vincent repeatedly noted the inventiveness of its "axially movable" threaded screw on the drive shaft and distinguished the prior art on the basis it allegedly only

---

[1] Indeed, Vincent's expert testified that he had to read this patent a staggering 20 times to proffer his opinions in this case. Collins Tr., 25:19-23.

taught a threaded screw permanently attached or mounted on the drive shaft in the prior art. *See* Ex. D, VINCENT_004233 (Vincent noting the "threaded worm which is axially movable on the drive shaft" is a characteristic feature of the invention); VINCENT_004235 (Vincent distinguishing reference E1 because it has a "threaded screw which is ***firmly attached*** to a drive shaft." Which differs from Vincent's patent claim requiring "a threaded screw which can move axially on the drive shaft."); VINCENT_004235 (Vincent distinguishing reference E4 because "the form in which the threaded worm is mounted with respect to the drive shaft" and "***[t]he axially movable bearing of the threaded worm on the drive shaft*** according to feature d) is also ***not disclosed***."). These arguments were presented to the German examiner, and apparently agreeing with Vincent's distinctions over the prior art, granted the foreign counterpart patent on June 30, 2017 (the "German Counterpart"). Ex. D, VINCENT_004272.

Vincent made similar statements to distinguish the German Counterpart from the prior art during a proceeding challenging its validity. *See, e.g.,* MC0003773 (distinguishing reference NK-01 on basis that "the worm 13 is <u>fixed</u> to the shaft 12); MC0003964 (distinguishing same reference on basis that "the threaded screw 13 is <u>fastened to</u> the shaft 12 … and thus just <u>not</u> axially movable …"); MC0003774 (distinguishing reference NK-13 on basis that "the threaded worm is designed as a so-called '*solid worm*' <u>in one piece with the shaft</u> …"); MC0003965 (distinguishing same reference on basis that "the threaded screw is made in one piece with the shaft or is mounted immovably on it."); *Id.* (distinguishing references NK-02 and NK-12 on basis neither teach a "*threaded screw mounted on the drive shaft so that it can move axially*").

During prosecution in the U.S. application, and as required by statute, Vincent submitted to the U.S. Patent Office the International Search Report and other documents from the PCT proceedings. The Examiner, having the benefit of the international phase documents, issued a first

4

office action allowance, stating the reason for the allowance was that the cited prior art did not disclose a threaded screw "axially movable" on the drive shaft: "The threaded screw 'supported on the drive shaft form fittingly and axially movable as well as guided in axial direction by separate guidances' (last three lines of claim 1) in the finger element as claimed is neither taught nor fairly suggested in the prior art." Ex. G, MC0001672 (3/20/2013 Notice of Allowability); Ben-Tzvi Dec., ¶ 67. The Examiner made record of prior art reference US 2009/0145254 ("Hirabayashi") as pertinent to the patentability of the claims. Ex. G, MC0001673. Hirabayashi discloses "a finger joint unit for a robot hand," specifically a "worm gear type finger joint unit" with a worm screw (i.e., threaded screw) "coaxially *fixed to a worm shaft*." Ex. H, ¶¶ [0001], [0002].

### C.    The Accused Products[2]

In this case, Vincent contends that certain prosthetic hands manufactured by a New Zealand-based company called TASKA Prosthetics ("TASKA"), and sold by Defendant Motion Control, infringe the '666 patent. ECF No. 24. Motion Control began selling the first iteration of TASKA's prosthetic hand, the Generation 1 Hand ("Gen 1"), in 2018. ECF No. 62-01. The second iteration of the TASKA prosthetic hand, the Generation 2 Hand ("Gen 2"), was released in the U.S. in 2021. Ex. I, MC0003124. The "CX" hand, which is the latest product manufactured by TASKA and sold by Motion Control, was launched in early 2023. Ex. J, MC0003122. While the Gen 2 and CX hands remain available for purchase today, the Gen 1 hand has not been sold in the U.S. since August 2021. ECF No. 62-01.

As indicated above, the claims of the '666 patent require that the threaded screw of the prosthetic finger be "axially movable" on the drive shaft. The Gen 1 hands and early versions of

---

[2] Although claims are not to be construed based on the accused products, the Federal Circuit has recognized that awareness of the accused products may provide "meaningful context" for claim construction. *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

the Gen 2 hands had finger elements wherein a threaded screw was *glued* to the drive shaft of the motor using Loctite adhesive preventing movement of the threaded screw in the axial direction. ECF No. 62-05, Response to Vincent's Interrogatory No. 2. Later productions of the Gen 2 hands (i.e., the version currently made and sold), as well as all CX hands, include a laser weld between the threaded screw and the drive shaft in lieu of glued bonding. *Id*.

**D.    Claim Terms in Dispute**

All the terms at issue appear in Claim 1 of the '666 patent and are italicized in the full claim reproduced below:

1.    A finger element, comprising:

    a)  a carrier component
    b)  a first phalanx with a first hinge connection to the carrier component,
    c)  a second phalanx with a second hinge connection to the first phalanx,
    d)  ***a servo drive*** for the first hinge connection with a motor with a drive shaft and a worm gearing with a threaded screw and a cog segment that engages to the threaded screw, and
    e)  ***a coupling mechanism between the first hinge connection and the second hinge connection***, wherein
    f)  the threaded screw is supported on the drive shaft form fittingly and ***axially movable*** as well as ***guided in axial direction by separate guidances***.

Given the importance of the "axially movable" claim limitation—both in the context of the invention and to resolution of this dispute—Defendants address subpart (f) of claim 1 first. Starting with the "axially movable" phrase in subpart (f), Defendants contend this requires the threaded screw be *movable* in the axial direction. In addition to axial mobility, the claim recites the threaded screw as "guided in the axial direction by separate guidances." "Guidances" are not shown or explained in the patent, and even to a person having ordinary skill in the art ("PHOSITA")[3] it is unclear in what way they "guide" the axial mobility of the screw. For this reason, Defendants

_____

[3] The Federal Circuit has held that a person of skill in the art is "a hypothetical person who is presumed to know the relevant prior art." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). The parties do not appear to have a material dispute regarding the level of ordinary skill in the art.

contend the claim is indefinite and include the law of indefiniteness in Section B below. Two other additional terms are also at issue: "servo drive" (Section C) and "a coupling mechanism between the first hinge connection and the second hinge connection" (Section D).

## III.    ARGUMENT

"The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public." *Markman v. Westview Instruments, Inc*., 517 U.S. 370, 390 (1996) (citation omitted). Otherwise, a "'zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field,' *United Carbon Co. v. Binney & Smith Co*., 317 U.S. 228, 236 (1942), and '[t]he public [would] be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights.'" *Id*. (*quoting Merrill v. Yeomans*, 94 U.S. 568, 573 (1877)).

Providing this notice as to the scope of rights is the role of the claims. It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004) and citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves ... to define the scope of the patented invention")); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). Consistent with this public-notice policy, "it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms'." *Phillips,* 415 F.3d at 1312 (quoting *White v. Dunbar*, 119 U.S. 47, 52 (1886)).

7

For these reasons, "[t]he words of a claim 'are generally given their ordinary and customary meaning'." *Id*. This is the meaning of the claim terms to a person of ordinary skill in the art at the time of the invention. *Id.* at 1313. In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent, "and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 Other times, terms may have "a particular meaning in a field of art." *Id*. The question is how the claim would be understood to one of skill in the art considering "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art'." *Id.* (citations omitted).

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification could reveal a "special definition given to a claim term" or "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. Hence, claims are read in light of the specification. *Id.*

The file history is also "often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. According to the Federal Circuit, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Where appropriate, the Federal Circuit has also authorized reliance on "extrinsic evidence"

in construing claim terms, so long as that evidence does not contradict the meaning of claim terms ascribed in the intrinsic record. *See Phillips*, 415 F.3d at 1317-18. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (citing *Markman* 52 F.3d at 980).

### A. "Axially Movable" Means Movable.

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| The threaded screw is able to move along the length (or axis) of the drive shaft in a straight line direction | is pushed onto the drive shaft as well as limited in its axial movement by separate guidances preferably without play[4] |

The parties do not appear to dispute that "axially" means "along the length (or axis) of the drive shaft in a straight line direction." *See* Ben-Tzvi Dec., ¶¶ 63, 70 (Defendants' expert opining that "[a] PHOSITA would generally understand the term 'axial' to mean along an axis or along the length of a straight line about which a body rotates."); Collins Tr., 80:17-81:4 (Vincent's expert agreeing that "axially" means along "the length or axis of the drive shaft in a straight line direction" and no dispute regarding this word's meaning exists). The parties, therefore, only dispute the meaning of "movable." Defendants contend this term means "able to move," whereas Vincent contends this term means immovable or restricted in movement.

It is axiomatic that the claims of a patent are generally given their plain and ordinary meaning absent a special definition provided in the specification or a disavowal of claim scope, neither of which applies here. *Phillips*, 415 F.3d at 1312-1313. As explained by Dr. Ben-Tzvi, a PHOSITA would understand "movable" means "able to move or capable of movement." Ben-Tzvi Dec., ¶¶ 62-63. When "the ordinary meaning of claim language as understood by a person of skill of the art [is] readily apparent even to lay judges, [] claim constriction in such cases involves little

---

[4] Vincent proposes a single construction for the entire limitation 1(f).

more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.* Dr. Ben-Tzvi's understanding of the customary meaning of "movable" is consistent with general purpose dictionaries. *See, e.g.,* Ex. K, MC0006419 ("Possible to move"); MC0006425 ("that can be moved"); MC0006428 ("capable of being moved); MC0006431 ("capable of being moved"). In view of the foregoing, the plain and ordinary meaning of "axially movable" is "the threaded screw is able to move along the length (or axis) of the drive shaft in a straight-line direction." Ben-Tzvi Dec., ¶ 64.

The specification of the '666 patent does not redefine "axially movable" and repeatedly uses the term according to its plain and ordinary meaning. Ben-Tzvi Dec., ¶ 65. For example, as set forth above, the '666 patent emphasizes the "axial movability" of the threaded screw on the drive shaft is "an essential feature" of the invention that "has to be assured":

> An essential feature of the invention encloses a decoupling of drive shaft and threaded screw in axial direction to the drive shaft. The threaded screw is preferably attached to the drive shaft and is in rotation direction form-fittingly coupled to the drive shaft, for instance via a cogging or a matched joint. Therefore, the axial movability of the drive shaft in the threaded screw has to be assured.

'666 patent at 2:28-34. A PHOSITA would understand this passage teaches the threaded screw rotates **with** the drive shaft (via cogging or a matched joint connection, for example), but moves in the axial direction **relative to** the drive shaft. Ben-Tzvi Dec., ¶ 66.

In fact, the '666 patent expressly distinguishes and criticizes "worm gear[s] [] fixed permanently to the motor shaft." '666 patent, 1:36-44. The construction of "axially movable" should not be construed to encompass what is taught by the prior art and distinguished from the claimed invention, especially when such a construction would be at direct odds with its plain and ordinary meaning. *See Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,* 450 F.3d 1350, 1354-

55 (Fed. Cir. 2006) (construing claim to encompass what the specification emphasized as important to the invention but not broadly enough to ensnare features of prior art distinguished by the specification even when plain language arguably broad enough to encompass both).

The prosecution history confirms "axially movable" must be construed according to its plain and ordinary meaning. The U.S. Examiner allowed the claims of the '666 patent based on the axial movability of the threaded screw on the drive shaft and found Hirabayashi—which teaches "worm gear type finger joint unit" with a worm screw "coaxially fixed to a worm shaft"—as pertinent to allowance of the claims. Ex. H, ¶¶ [0001], [0002]; Ben-Tzvi Dec., ¶ 67. Additionally, during both prosecution and defense of the validity of the German Counterpart application, to which the '666 patent claims priority, Vincent repeatedly distinguished the prior art on the basis the threaded screw is "fixed," "firmly attached," "fastened" "mounted immovably" or not mounted "so that it can move axially" on the drive shaft." Ex. D, VINCENT_004233; VINCENT_004235; Ex. E, MC0003773-3774; Ex. F, MC0003964-3965; Ben-Tzvi Dec., ¶ 67. Courts consider "statements made before a foreign patent office when construing claims if they are relevant and not related to unique aspects of foreign patent law." [5] *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1312-1313 (Fed. Cir. 2014), *overruled in part by Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015) (considering statements made during prosecution of Japanese counterpart because they were "made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention," "the two patents are related and share a familial relationship," "they both claim priority to the same PCT application," "[b]oth specifications are the same," and "the construction supported by the specification is also supported

---

[5] Despite the relevance of prosecution of the German Counterpart and its identification in Defendants' claim construction exchanges with Vincent, Dr. Collins admitted in deposition that he "skimmed it, but I did not read it carefully." Collins Tr., 104:21-105:1.

by Motorola's statements before the Japan patent office."); *see also Starhome GmbH v. AT&T Mobility LLC,* 743 F.3d 849, 858 (Fed. Cir. 2014) (considering patentee's statements before European Patent Office as "yet another indication" supporting court's construction); *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (finding "blatant admission" before European Patent Office supported the court's construction).

Vincent's proposed construction of "axially movable", on the other hand, is fundamentally inconsistent with its plain and ordinary meaning and otherwise nonsensical. The first part of the construction—"pushed onto the drive shaft"—improperly invokes a method of assembly step into an apparatus claim. *See IPXL Holdings, LLC v. Amazon.com, Inc.,* 430 F.3d 1377, 1384 (Fed. Cir. 2005) (it is improper to mix different statutory classes of invention in a single claim and doing so will render the claim indefinite); *see also* Ben-Tzvi Dec., ¶ 69. And, the second part of the construction—"as well limited in its axial movement by separate guidances preferably without play"—is the exact *opposite* of "axially movable." Ben-Tzvi Dec., ¶ 69. If an inventor wishes to act as its own lexicographer and provide a definition for a claim term that departs from its plain and ordinary meaning, he "must clearly express an intent to redefine the term." *Thorner v. Sony Computer Entm't America LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotations omitted). The inventor of the '666 patent did not suggest, let alone "clearly express an intent to redefine" "axially movable" to mean *im*movable.

### B. "Guided in the Axial Direction by Separate Guidances" Is Indefinite.

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Indefinite or in the alternative: At least two components designed to facilitate movement of the threaded screw along the length of the drive shaft. | is pushed onto the drive shaft as well as limited in its axial movement by separate guidances preferably without play |

The fundamental *quid pro quo* of the "patent bargain," is that in exchange for the limited-

term monopoly that a patent grant affords, the patentee makes public disclosure of the invention. *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1345 (Fed. Cir. 2010). As the U.S. Supreme Court explained "immediate disclosure is not the objective of, but is exacted from, the patentee. It is the price paid for the exclusivity secured." *Eldred v. Ashcroft*, 537 U.S. 186, 216 (2003).

Consistent with this design, the Patent Act—now and at the time of the '666 patent—requires that the specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a) (formerly § 112 ¶ 1). The same section further requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter" which the inventor regards as the invention. 35 U.S.C. § 112(b) (formerly § 112 ¶ 2). If clear and convincing evidence establishes that the claim language, "read in light of the specification delineating the patent, and the prosecution history, *fail[s] to inform, with **reasonable certainty**, those skilled in the art about the scope of the invention*", it does not conform with the statutory requirement, and the claim is invalid for indefiniteness. *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1369-1370 (Fed. Cir. 2014).

Here, the claims recite that the axially movable threaded screw is "guided in the axial direction by separate guidances." The question, then, is what is a "guidance" and what does it mean for the guidances to "guide[]" the threaded screw "in the axial direction." This must be understood with "reasonable certainty," else the patentee has not fulfilled the patentee's end of the bargain to put the public on notice as to the content and scope of the invention.

1. **"Guided in the Axial Direction by Separate Guidances" Fails to Inform with Reasonable Certainty the Scope of the Invention.**

Dr. Ben-Tzvi explains that "guidances" is "not a known mechanical term" in the industry, nor is the phrase "guided in the axial direction" something that he would understand "without illustration or explanation." Ben-Tzvi Dec. ¶¶ 71-72. Vincent's expert, Dr. Collins, contends a "mechanical guide" is a term "often used in mechanical systems," but when asked about the physical structure, he conceded "a guide or guidance doesn't signify one particular structure…" Collins Tr., 117:4-14; *see also* 117:16-23, 118:11-24 and 119:3-120:18 (unable to give an example of a guidance or describe structure). In other words, without context and illustration, a "guidance" is not a known term to persons in this field, and a skilled artisan would not know how the structure is "guid[ing] in the axial direction." As shown below, that needed context and illustration is lacking in the '666 patent. Ben-Tzvi Dec., ¶ 73.

First, the patent figures label the "guidances" 14, but do not show these components. For example, in Fig. 2 shown below, there are two number 14s and a line pointing to what the patentee contends are "guidances," but the lines do not point to discernible structure. *See* Fig. 2; Ben-Tzvi Dec., ¶ 74.



Nor does the description of guidances in the specification inform with reasonable certainty what is meant to be claimed. In its first reference to guidances, the '666 patent states, "***the motor***

*does not serve via the drive shaft as axial guidance of the threaded screw, but separate guidances*. They are arranged preferably in form of **sliding guidances** at both front edges of the threaded screw." *Id.*, 2:35-38. While this disclosure provides some information about the guidances, it also raises questions: How do the guidances serve as axial guidance instead of the drive shaft? Are they between the drive shaft and the threaded screw? What is the connection and operation of the guidances? The patent goes on to state that, "[i]t proved to be advantageous, to combine the guidances and the threaded screws to an assembly. For instance, ***both guidances are realized by a stiff preferably single-part frame, in which the screw is inserted with a small axial play***." *Id.*, 2:39-42. The "single-part frame" is not shown in the '666 patent, and according to Dr. Ben-Tzvi, this disclosure does not inform as to the nature and role of the guidances, albeit this again indicates the threaded screw is axially movable as inserted within the single-part frame. Ben-Tzvi Dec., ¶¶ 75-76.

The next reference to "guidance" in the specification states: "the threaded screw is in its guidances and not only supported in axial direction but also in radial direction, whilst the spacer is fixed permanently with the guidances." '666 patent, 2:59-62. The "spacer" is not labeled in the figures, and it is unclear how the spacer, guidances, single-part frame, drive shaft and threaded screw are structured, positioned, and operating. Collins Tr., 125:24-126:11 (Dr. Collins was unable to even determine whether the spacers are separate structures from the guidances).

In a later part of the patent, it states "[t]he threaded screw is in the embodiment guided in radial direction onto the drive shaft, but is limited in its axial movability by two guidances 14 preferably without play." '666 patent, 3:67-4:1. Vincent cites this portion of the specification as support for its claim construction, but it is unclear what the term "without play" modifies. Ben-Tzvi Dec., ¶ 77. The '666 patent repeatedly emphasizes that the threaded screw must be axially

15

movable and previously describes the threaded screw as having "small axial play" when the screw is inserted in the guidances. *Id.*; '666 patent, 2:38-42. It is possible the patent is referring to the guidances themselves as not moving, although as discussed above, the patent refers to preferably "sliding guidances" so it remains unclear what the guidances are, where and how they are connected, and, most critically, what they are doing in terms of the axial mobility of the threaded screw. *Id.*

In the only other part of the specification discussing the guidances, the patent explains "the threaded screw comprise[s] in comparison to the materials of the guidances preferably a low sliding f[r]iction coefficient as well as high abrasive durabilities." *Id.*, 4:2-4. For instance, "the threaded screw is because of the expected high load of the servo drive made of brass or steel, the guidances are preferably made of dry lubricating slide bearing bushing material like a PTFE-material or a slide bearing bronze." *Id.*, 4:4-8. This indicates that whatever the "guidance" is, it is of a material that slides more easily than the threaded screw. Ben-Tzvi Dec., ¶ 78. So are the guidances sliding with the threaded screw? Is the threaded screw moving between stationary "guidances" (whatever those may be)? The patent does not answer these questions. Ben-Tzvi Dec., ¶¶ 71-72, 79.

The bargained-for exchange of patent rights requires reasonably certain claiming. Yet, here, how would someone make a device according to the claimed invention? What component would be used for the "guidances" and what would it be doing to guide the threaded screw in the axial direction? Stated from another perspective, how would one know if a product contains a "guidance" and whether it is "guid[ing] in the axial direction? Tellingly, neither Vincent nor Dr. Collins ever affirmatively define or describe the structure of a "guidance" as that term is used in the '666 patent. Instead, Vincent proffers a construction that again uses the word "guidances."

Because the term "guidance" does not have an accepted meaning in the art and none of the intrinsic evidence indicates what is meant by "guidance" or how the threaded screw is "guided in the axial direction" by the guidances, a person of skill in the art would not know the scope of this term with reasonable certainty, thus, the term is indefinite. *Capital Sec. Sys., Inc. v. NCR Corp.*, 725 F. App'x 952, 959 (Fed. Cir. 2018) (term indefinite because it "has no commonly-accepted definition and its scope is unclear"); *see* Ben-Tzvi Dec., ¶¶ 71-72.

### 2. Alternatively, "Guided in the Axial Direction by Separate Guidances" Means "At Least Two Components Designed to Facilitate Movement of the Threaded Screw Along the Length of the Drive Shaft."

For the reasons explained above, Defendants contend the phrase "guided in the axial direction by separate guidances" fails to inform with reasonable certainty the scope of the claim and is thus invalid for indefiniteness. However, if the term "guided in the axial direction by separate guidances" is determined not to be indefinite, Vincent's proposed construction should not be adopted. Vincent proposes that "guided in the axial direction by separate guidances" means "limited in its axial movement by separate guidances preferably without play." In addition to providing no clarity to the term "guidances," the term "limited" is very nearly the opposite of "guided." Ben-Tzvi Dec., ¶ 83. Certainly, the phrase is not how one of skill in the art would claim a limit or restriction of movement if that were what was intended. *Id.*, ¶ 84. Moreover, nothing in the claim language indicates "preferably without play." "Preferably" is a word often used in specifications, not in claims, as it does not convey boundaries. Also, a component is "without play" and relative to what other component? Ben-Tzvi Dec., ¶ 85. Vincent is importing language from the specification, that is itself unclear. Importing from the specification is, in any event, not proper claim construction. *Innova*, 381 F.3d at 1116 ("claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as

his invention'."

If not found to be indefinite, Defendants propose the following construction: "at least two components designed to facilitate movement of the threaded screw along the length of the drive shaft." This is a plain English construction of the terms. Ben-Tzvi Dec., ¶ 81. Dictionaries most commonly define "guidance" as something that guides. *See, e.g.,* Ex. L, MC0006416. And the most common definition of "guide" is to lead or direct, for example, along a certain path or course (i.e., guide the movement of the threaded screw in the axial direction along the drive shaft). *See, e.g.,* Ex. L, MC0006395, MC0006401, MC0006407, MC0006416; Ben-Tzvi Dec., ¶ 81. The language of the claim itself means there must be movement of the threaded screw in the "axial direction," so the most plausible construction requires that movement is facilitated in some manner by the guidances. Additionally, this construction would account for the lower sliding friction coefficient of the guidances, i.e., this perhaps facilitates the axial movement of the threaded screw. Ben-Tzvi Dec., ¶ 82. The Federal Circuit instructs that "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). This is the construction offered by Defendants.

### C.     "Servo Drive" Is A Known Term of Art

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| A self-contained feedback system that controls mechanical movement | Plain and ordinary meaning |

The Federal Circuit has "made clear … the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention …" *Phillips,* 415 F.3d at 1313. In some cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning

in a field of art." *Id.* at 1314. This is because "[p]atent documents are written for persons familiar with the relevant field; the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field." *Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1119 (Fed. Cir. 2002). For example, a screw is a simple, well-known mechanical part that does not require a detailed explanation, unless the inventor wants to depart from its customary meaning. *Id.* Like "axially movable," the inventor of the '666 patent did not redefine "servo drive." A PHOSITA would understand it refers to a well-known, commercially available, off-the shelf device; specifically, and in general terms, "a self-contained feedback system that controls mechanical movement." Ben-Tzvi Dec., ¶¶ 46-47, 53.

A servo drive is generally comprised of an electronic motor (i.e., servo motor) whose precise position, speed, and torque is controlled by an electronic circuit (i.e., servo controller). Ben-Tzvi Dec., ¶¶ 46-47. An essential characteristic of a servo drive is that it is a self-contained or closed-loop feedback system that monitors command signals to continually adjust for changes in mechanical movement. *Id*; *see also* Ex. M, MC0006458 ("servomechanism" is "an electrical and/or mechanical closed-loop control system which automatically controls the position and/or speed of a device, piece of equipment, transducer. apparatus, system, or mechanism. One or more feedback mechanisms enable monitoring and automatically keeping specified parameters within the desired limits, with servo-motors usually being utilized to drive the load"); MC0006434 ("servomechanism" is "1. A feedback mechanism that consists of a sensing element, amplifier, and ser-vomotor, used in the automatic control of a mechanical device. 2. A self-regulating feedback system."); MC0006452 ("servomechanism" is "an automatic control system in which the output is constantly or intermittently compared with the input through feedback so that the error

or difference between the two quantifies can be used to bring about the desired amount of control."). This feedback mechanism differentiates a servo drive from an actuator or simple electric motor, as the former is capable of positional control based on an input signal and the latter only recognizes "on" or "off" and is incapable of positional control. *Id.* The feedback system of a servo drive, as a PHOSITA would readily know, enables the delicate grasping and manipulating of objects with varying levels of force in a prosthetic finger. Ben-Tzvi Dec., ¶¶ 47-49.

Nothing in the specification suggests a deviation from the plain meaning of "servo drive." For example, the specification teaches a "***servo drive encloses a motor*** with or without integrated gear transmission to a drive shaft" and "[t]he ***drive 11 encloses at least an electric motor as servo member*** …" '666 patent, 2:13-16, 4:9-10 (emphasis added); Ben-Tzvi Dec., ¶ 49. A PHOSITA would understand, based on this description, that the servo drive must include electronic circuitry to control the electric motor (i.e., feedback control), and that the "electric motor" is described as a "servo member" because it is a part of the claimed "servo drive." *Id.*

Vincent proposes the term "servo drive" be given its plain and ordinary meaning, and its expert testified it is "a system that has ***any*** combination of electrical, electromechanical, or mechanical elements that are ***suitable for use in a system,*** often a mechanical or robotic system that ***could*** be used to control position or velocity of some portion of that system." Collins Tr., 33:2-18 (emphasis added). Dr. Collins unsupported construction of "servo drive" imparts no boundaries to the term "servo drive" at all – it is simply any combination of electrical, electromechanical, or mechanical elements suitable for use in any system that "could" optionally be used to control position or velocity. [6] Dr. Collins, however, *also* opines that in the context of the '666 patent and

---

[6] Dr. Ben-Tzvi provides corroborating evidence to support his testimony on "servo drive" (Ben-Tsvi Dec., ¶ 51), but Dr. Collins does not provide any support for his opinions, rendering them

the language of claim 1, "servo drive" "refers to a system that has at least a motor with a drive shaft, so just those elements" *Id.*, 34:23-35:3. But this construction would render "servo drive" superfluous because the claim already requires "a motor with a drive shaft" '666 patent, claim 1. Such a construction is improper as a matter of law. "Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration." *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim.").

**D.** **"Coupling Mechanism Between the First Hinge Connection and the Second Hinge Connection" Is a Structural Limitation Having the Plain Meaning Defendants Propose.**

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| A component connecting and positioned within the space separating the first and second hinge connections | Plain and ordinary meaning |

The coupling mechanism of the '666 patent is a structural limitation. It is a mechanical arrangement that "couples", i.e., connects, and it is physically positioned in the space between the first and second hinge connections. This is described in the specification and shown in the figures. The '666 patent teaches that "the finger element includes a coupling mechanism between the first and second hinge connection." '666 patent, 2:20-21. "***The coupling mechanism consists further preferred of one or two spring bar connections … that engage eccentrically to the rotation axes of the first and second hinge connections*** to the respectively adjacent carrier components and second phalanx respectively." *Id.*, 3:6-11. The '666 patent further explains that the "carrier

---

less reliable. "[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips,* 415 F.3d at 1318.

component 1" has a "first hinge axis 2" that "serves at the same time as support of the gear segment and as rotation axis for the first phalanx 5." *Id.*, 3:40-46. "The first phalanx 5 is in return connected with the second phalanx 6 via a second hinge connection, wherein the second hinge axis 7 forms the rotation axis for the second phalanx." *Id.*, 3:46-49. The "***coupling mechanism encloses in the example embodiments two elastic spring bar connections 8*** that are arranged in parallel to each other at both sides of the first phalanx 5, wherein the spring bar connections 8 each engage at the carrier component and at the second phalanx pivotably in an according bearing bore 9 and 10 respectively eccentrically to the first 2 and second 7 hinge axis respectively." *Id.*, 3:52-57.

Figure 1 of the patent, annotated below, shows the physical spring bar between the hinge connections.



As shown above, the patent does not label the "hinge connections", only the first and second "hinge axis", the spring bar, and the bearing bores. But as described by Dr. Ben-Tzvi, the hinge connections, based on the description of the patent, are best understood as the parts in blue in the figure above. Ben-Tzvi Dec., ¶¶ 57-58. As can be seen in the figure, the spring bar 8 connects at the bearing bores 9 and 10, and is positioned between the first and second hinge connections. This is the basis for Defendants' proposed construction.

Vincent asserts the claim should be given its "plain and ordinary meaning" but contends

that there is no structure to the limitation. Vincent's expert, Dr. Collins asserted in deposition that "coupling" "is not itself a physical structure." Collins Tr., 61:3-62:15. He also claimed that "hinge connection" was not a physical component but rather a "way of connecting components together." *Id.*, 65:14-66:8, 66:21-67:24. Similarly, "between" is, according to Dr. Collins, an "abstract" linkage. *Id.*, 72:10-74:4. In short, under Vincent's "construction" the only structural limitation in the whole phase is "mechanism": a ~~coupling~~ mechanism ~~between the first hinge connection and the second hinge connection~~. Vincent invites the Court to adopt this "plain and ordinary" meaning that excludes any structure and references vague "abstract" functions.

This interpretation cannot be correct as a matter of law. In patent law a claim limitation that does not impart structure is subject to special claim construction limitations; namely, the claim is limited to the corresponding structure described in the specification and "equivalents thereof." See 35 U.S.C. § 112(f) (formerly § 112 ¶ 6) (stating a claim limitation "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, *and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof*.") Vincent seeks to construe the claim as having no structure, but at the same time avoid limiting its claim to what is described in the specification—no doubt because the accused products have nothing like the spring bar mechanism described.

Vincent invites reversable error. Either the claim should be construed structurally as proposed by Defendants, or it should be construed under 35 U.S.C. § 112(f) based on Vincent's arguments. Vincent will likely contend that Section 112(f) is not implicated, because the phrase does not use the magic words "means for." There is a rebuttal presumption that § 112(f) applies in those cases (and does other otherwise apply), but use of so-called "nonce words" that fail to impart

structure overcome any presumption and also invoke the section. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) ("the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."). According to Vincent, the only "structural" limitation in the phrase is "mechanism." Collins Tr., 61:3-62:15, 65:14-66:8, 66:21-67:24, 72:10-74:4. "Mechanism" is a classic nonce word. *Id.* ("Generic terms such as '**mechanism**,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure'" and therefore may invoke § 112, para. 6).

Defendants contend, on the other hand, that the context of the claim imparts structure, i.e., the mechanism connects and is physically within the space between the physical hinge connections. In such cases, even though a nonce word is used, the claim imparts structure to the word such that § 112(f) does not apply. *Id.*; *see generally TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259–60, (Fed. Cir. 2008) ("Sufficient structure exists when the claim language specifies the exact structure that performs the functions in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure"); *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014 (Fed. Cir. 2017) (finding § 112 ¶ 6 inapplicable because full context connotes structure). But Vincent would read out the structural context of coupling between the hinge connections, leaving only a "mechanism" and a recitation of "abstract" function. *See* Collins Tr., 61-72. If this is the "plain meaning" of the phrase, then the phrase must be construed consistent with § 112(f) and the claim limited to what is shown in the specification and equivalents thereof.

Alternatively, this Court could construe the claim in a way that imparts structure as Defendants propose. The coupling mechanism is a mechanical component that is attached at one end to the first hinge connection and attached at the other end to the second hinge connection and extends within the space separating the first and second hinge connections. This is how Dr. Ben-Tzvi understands the limitation. Ben-Tzvi Dec., ¶ 55. This interpretation is also consistent with general dictionary definitions of "coupling" and "between." *See, e.g.,* Ex. N, MC0006356-6358 ("coupling" defined as "[a] device that links or connects."); MC0006359-6361 ("coupling" defined as "a device for connecting two parts or things"); MC0006371-6373 ("coupling" defined as "a device that serves to connect the ends of adjacent parts or objects"); MC0006374-6376 ("coupling" defined as "a flexible or rigid mechanical device or part for joining parts together, as two shafts"); Ex. O, MC0006332-6334 ("between" defined as "in or through the position or interval separating"; "connecting spatially"); MC0006335-6337 ("between" defined as "in the interval separating"; "in an intervening space or interval"); MC0006353-6355 ("between" defined as "in or through the space that separate (two things)"; "that connects or relates to"; "along a course that connects"). Given Vincent's failure to identify and argue this as a term under § 112(f) but at same time attempt to strip the limitation of all structure, Defendants' proposed construction is the one that should prevail.

## IV.    CONCLUSION

For the foregoing reasons, the claim term "guided in axial direction by separate guidances" should be found indefinite under 35 U.S.C. § 112(b) and the remaining claim terms at issue should be construed consistent with Defendants' proposed constructions herein.

25

Dated: April 24, 2024                          Respectfully Submitted,

                                               */s/ Rudolph A. Telscher, Jr.*
                                               Rudolph A. Telscher, Jr., 41072MO*
                                               Daisy Manning, 62134MO*
                                               Kara Fussner, 54656MO*
                                               **HUSCH BLACKWELL LLP**
                                               8001 Forsyth Boulevard
                                               Suite 1500
                                               St. Louis, MO 63105
                                               (314) 480-1500 Telephone
                                               (314) 480-1505 Fax
                                               rudy.telscher@huschblackwell.com
                                               daisy.manning@huschblackwell.com
                                               kara.fussner@huschblackwell.com

                                               Andrea Shoffstall, 56241CO*
                                               **HUSCH BLACKWELL LLP**
                                               1801 Wewatta Street,
                                               Suite 1000
                                               Denver, CO 80202 6318
                                               (303) 749-7203 Telephone
                                               (303) 749-7272 Fax
                                               andrea.shoffstall@huschblackwell.com
                                                *admitted pro hac vice*

                                               ***Attorneys for Defendant Motion Control, Inc.***

                                               */s/ Cathy S. Dorvil (with permission)*
                                               Cathy S. Dorvil
                                               **CHAMBLISS, BAHNER & STOPHEL, P.C.**
                                               Liberty Tower
                                               605 Chestnut St., Suite 1700
                                               Chattanooga, TN 37450
                                               cdorvil@chamblisslaw.com

                                               ***Attorney for Defendant Fillauer Companies,
                                               Inc. and Defendant Motion Control, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April, 2024, I caused the foregoing to be filed electronically with the Clerk of the Court, and therefore served upon all counsel of record.

*/s/ Rudolph A. Telscher, Jr.*

27