# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| VINCENT SYSTEMS GMBH, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:23-cv-00002-CEA-SKL |
| | ) |
| v. | ) **REBUTTAL CLAIM** |
| | ) **CONSTRUCTION DECLARATION** |
| FILLAUER COMPANIES, INC. and | ) **OF STEVEN H. COLLINS, PH.D.** |
| MOTION CONTROL, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**TABLE OF CONTENTS**

I. Introduction ................................................................................................................... 3
II. Evaluation of Disputed Phrases in the '666 Patent ................................................... 3
    A.     "servo drive" (claim 1(d)) ....................................................................... 3
    B.     "a coupling mechanism between the first hinge connection and the second hinge connection" (claim 1(e)) ........................................................................... 5
    C.     "axially movable as well as guided in axial direction by separate guidances" (claim 1(f)) .................................................................................................... 6

## I. INTRODUCTION

I, Steven H. Collins, hereby declare:

1. I submit this declaration in response to the Declaration of Pinhas Ben-Tzvi in Support of Defendants' Proposed Claim Constructions, dated March 10, 2024 ("Ben-Tzvi Decl."). This declaration is based on my personal knowledge and, if called to testify, I could and would testify competently to the matters herein.

## II. EVALUATION OF DISPUTED PHRASES IN THE '666 PATENT

### A. "servo drive" (claim 1(d))

2. I have been informed by counsel that "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. . . . . The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. . . . Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

3. Dr. Ben-Tzvi acknowledges that "servo drive" is properly given its plain and ordinary meaning as understood by a person of ordinary skill in the art, stating in his report that: "The specification does not define 'servo drive' or use the term in a manner inconsistent with its plain and ordinary meaning." (Ben-Tzvi Decl., p. 15, ¶ 49.)

4. Dr. Ben-Tzvi nevertheless proposes that "servo drive" be construed, and proposes construing this term as "a self-contained feedback system that controls mechanical movement." This is not, however, the plain and ordinary meaning of the term as used in the '666 Patent, which is evident from the claim itself and the specification, and which is consistent with its plain and ordinary meaning to a person of ordinary skill in the art.

5. A person of ordinary skill in the art would understand the term "servo drive" to refer to an electrical or electromechanical system that can include various parts, such as an electric

motor, a gearbox, sensors, and other electronics hardware. The specific meaning of "servo drive" here is apparent from the patent claim language itself: "a servo drive for the first hinge connection <u>with a motor with a drive shaft</u>" (emphasis added). As described in more detail in my initial declaration, this text makes clear that "servo drive" means "motor and drive shaft" in this context.

6. This meaning is explained unambiguously within the patent specification. See, for example, 4:9-14: "The drive 11 encloses at least an electric motor as servo member, optionally also a gearing unit and/or for a use for instance as autarkic finger-prosthesis an electric voltage source as well as control electronics (battery, accumulator etc.), wherein in particular the latter components may be also arranged in the core 15 of the second phalanx 6." Here again, the "drive" is "at least" an "electric motor" and self-contained feedback elements are "optional".

7. This meaning is further reinforced by the model depicted in Figure 2 and appearing on the front of the patent. The image shows a cross-section of the prosthetic finger, allowing the reader to inspect its internal elements. To a person of ordinary skill in the art, it will be clear that the drive (11) in this computer-aided-design (CAD) image comprises an electric motor, a gear box, and a drive shaft, without any sensors or other electronic components for feedback control of position.

8. Dr. Ben-Tzvi notes, and it is also my understanding, that "the claims of an issued patent must be read in light of the patent specification, and that the specification is the single best guide to the meaning of a disputed term." (Ben-Tzvi Decl., p. 8, ¶ 30.)

9. In this case, the specification and claim are clear that the term "servo drive for the first hinge connection with a motor with a drive shaft" in claim 1(d) is used according to its plain and ordinary meaning and an express construction is unnecessary. If the court wishes to provide a construction of "servo drive," the phrase "a motor and drive shaft" would be appropriate, though redundant given the subsequent claim language.

10. It is additionally important to understand that feedback control of motor position is not needed for sophisticated use of a prosthetic device. Motor and finger movement in a prosthesis arise from a combination of both electrical stimulus and mechanical response from the

4

environment. For example, applying only a constant voltage to the motor could result in rapid movement of the finger if unresisted, or slow forceful movement if squeezing a compliant object, or forceful gripping without movement at a wide range of possible positions, with the position depending on the size and shape of the object being grasped. In this way, a wide range of desirable behaviors can be achieved from simple electrical input. Prosthetic devices often make use of this "mechanical intelligence" to reduce the complexity of the electrical control needed to achieve desired behavior. As such, a "self-contained feedback system that controls mechanical movement" is not necessary for a prosthesis to be useful.

11. Additionally, it is important to understand the difference between control of motor torque and motor position. Motor torque, and thereby finger-joint torque and fingertip contact force, are controlled by setting the amount of current flowing through the motor, without the need to measure or control motor position or velocity. Feedback control of motor movement requires additional sensors to measure motor position. That is, to achieve desired tactile or fingertip forces does not require "a self-contained feedback system that controls mechanical movement".

### B. "a coupling mechanism between the first hinge connection and the second hinge connection" (claim 1(e))

12. As I explained in my initial report, the phrase "a coupling mechanism between the first hinge connection and the second hinge connection" as used in the '666 Patent would be understood by one of ordinary skill in the art according to its plain and ordinary meaning: as a component that couples, or a set of components that couple, the two hinge connections in a mechanical way.

13. Dr. Ben-Tzvi appears to agree that this phrase should be afforded its plain and ordinary meaning, stating that: "To a PHOSITA this claim language denotes a mechanical relationship between components." (Ben-Tzvi Decl., p. 16, ¶ 54.) However, he then proposes a construction that is inconsistent with that meaning: "a component connecting and positioned within the space separating the first and second hinge connections." There are three ways in which this construction is inconsistent with the ordinary meaning of the phrase, one having to do with

5

the word "connecting," the second with the word "between," and the third having to do with the meaning of the phrase "hinge connection".

14. First, as described in my initial declaration, the phrase "coupling between" is commonly used in mechanical systems and signifies that two or more elements are constrained to, or designed to be constrained to, move together in some way. In this context, the word coupling does not describe or require a direct physical connection between two components.

15. Second, the word "between" as used in the claim language does not imply a spatial positioning of the mechanical elements that produce the coupling; it specifies an abstract or relative linkage between the elements such that they move in relation to one another.

16. Third, the term "hinge connection" in the '666 Patent refers to the joint or rotational degree of freedom between finger segments. As explained in my declaration, this is consistent with typical usage of the term. In his declaration, Dr. Ben-Tzvi redefines the term as describing a specific component. This redefinition is most clear in the annotated version of Figure 1a that appears in his declaration:

 

(Fig. 1a with my annotations.)      (Fig. 1a with Dr. Ben-Tzvi's annotations.)

17. Figure 1a depicts the first and second phalanx (items 5 and 6), a first hinge axis (item 2), a second hinge axis (item 7), a carrier component (item 1), and a coupling mechanism (item 8), among other elements. In the annotated version of Figure 1a provided by Dr. Ben-Tzvi, sections of the carrier component and second phalanx have been highlighted blue and given the labels "first hinge connection" and "second hinge connection". These highlights and labels do not appear in the '666 Patent, and are, in my opinion, misleading. None of the components are called

a "hinge connection" by the '666 Patent. Instead, a set of components act together to form the rotational degree of freedom referred to as the "hinge connection". In this case, those components are the carrier component, the hinge axis, and the first phalanx, each of which are labeled in Figure 1a. None these components is called the "hinge connection".

18. Additionally, there is some evidence that Dr. Ben-Tzvi may not have fully understood the example embodiment described in the '666 Patent. In the annotated version of Figure 1a provided by Dr. Ben-Tzvi, the lower portion of the first phalanx is highlighted in yellow and labeled as part of the "coupling mechanism". This is incorrect. Instead, the coupling component in the example embodiment taught in the '666 Patent is the "elastic spring bar connection", labeled as 8 in Figure 1a and highlighted in green in the annotated version of Figure 1a provided in my declaration and shown again above. The spring bar forms the fourth link in a 'four-bar linkage', which causes the second hinge connection (or finger joint) to rotate as the first hinge connection (or finger joint) rotates. This can be seen in the progression of joint positions between Figures 1a, 1b, and 1c. This progression also shows that the region highlighted by Dr. Ben-Tzvi would vary with finger pose, which is inconsistent with the idea that it depicts a component.

19. This claim term "a coupling mechanism between the first hinge connection and the second hinge connection" as used in the '666 Patent would be understood by one of ordinary skill in the art according to its plain and ordinary meaning. Dr. Ben-Tzvi's proposed construction is contrary to how one of ordinary skill would understand this claim language and not supported by the patent specification or any intrinsic or extrinsic evidence cited. Accordingly, it is my opinion that this claim should not be construed, including as he proposes.

**C.** **"axially movable as well as guided in axial direction by separate guidances" (claim 1(f))**

20. While Dr. Ben-Tzvi opines separately on the terms "axially movable" and "guided in axial direction by separate guidances," it is my opinion that the terms are better understood in

7

the context of the full phrase in which they appear in the claim: "axially movable as well as guided in axial direction by separate guidances."

21. Dr. Ben-Tzvi proposes that "axially movable" be construed as "the threaded screw is able to move along the length (or axis) of the drive shaft in a straight line direction." It is my opinion that this construction is incomplete; additional context is needed to interpret "able to move". As described in my prior declaration, some resistance to movement is always present, and movability requires an understanding of the force required to cause motion. In this case, the purpose of the axial movability of the threaded screw on the drive shaft is to protect the motor from damage, meaning that the amount of axial force under which movement should occur is any value up to the force that would damage the motor during the lifetime of the device.

22. This force criterion is discussed in the Background Art section of '666 Patent, which distinguishes that prior art on the basis of its not having addressed such load issues. For example, 1:43-44: "[a]n early drive- or motor-damages as well as a blocking of the work drive under load is abetted therewith"; 1:49-50: "[a]lso in this case early overload symptoms have to be expected"; 1:56-62 "and therefore a mechanic load revealing of the last named is disclosed, but in connection with additional components and/or a larger construction volume".

23. While I maintain that the construction I proposed in my original report includes the correct construction of the term "axially movable"—for reasons including that this construction is taken verbatim from the patent specification—if Dr. Ben-Tzvi's construction were adopted it would have to be clarified, at a minimum, to read as "the threaded screw is able to move along the length (or axis) of the drive shaft in a straight line direction **when under an axial load of magnitude less than or equal to the value that would damage the motor.**"

24. Dr. Ben-Tzvi opined that the meaning of "guided in axial direction by separate guidances" is indefinite, or alternatively that it should be construed as "at least two components designed to facilitate movement of the threaded screw along the length of the drive shaft." It is my opinion that a person of ordinary skill in the art will not find the language in claim 1(f) indefinite. Further, it is my opinion that a person of ordinary skill in the art will understand from the '666

Patent that the guidances described in claim 1(f) are features on the first phalanx that prevent the threaded screw from moving axially relative to the first phalanx, while allowing the threaded screw to rotate relative to the first phalanx.

25. Dr. Ben-Tzvi's construction of axially movable as "able to move" is necessary to support his further construction of the second part of the phrase, "as well as guided in axial direction by separate guidances." His proposed construction of this portion of the claim language as "[a]t least two components designed to facilitate movement of the threaded screw along the length of the drive shaft," however, is incorrect and contrary to the '666 Patent's teachings.

26. The '666 Patent repeatedly explains the purpose and form of the axial guidances. The Patent first reviews prior art that describes prosthesis finger joints driven by worm gears (*e.g.,* 1:36). A person of ordinary skill in the art will understand the basic function of worm gear transmissions, in particular that the threaded screw, or worm, experiences a large axial load when a torque is applied. The '666 Patent explains that in prior prosthesis designs using worm gears this axial force led to "an early drive- or motor-damage" (1:43). A person of ordinary skill in the art will know that this is because electric motors are not designed to withstand large axial loads. The Patent explains that "an essential feature of the invention encloses a decoupling of drive shaft and threaded screw in axial direction" (2:28-29). A person of ordinary skill in the art will understand that this will prevent damage to the motor, but will leave the need to somehow prevent axial movement of the threaded screw relative to its housing. The Patent explains that "the motor does not serve via the drive shaft as axial guidance of the threaded screw, but separate guidances … arranged preferably in the form of sliding guidances at both front edges of the threaded screw" (2:35-38). A person of ordinary skill in the art will understand that these guidances are the features that prevent axial movement of the threaded screw relative to the finger segment.

27. Dr. Ben-Tzvi notes several points of possible confusion regarding the interpretation of this claim. It is my opinion that none of these items would lead to confusion for a person of ordinary skill in the art.

9

28. Dr. Ben-Tzvi notes that the term "guidances" is unusual. It is my opinion that a person of ordinary skill in the art will readily understand that the '666 Patent uses this term to mean a mechanical "guide", which is a term often used in mechanical systems.

29. Dr. Ben-Tzvi, in the alternative, suggests that the guidances must "facilitate" movement of the threaded screw in the axial direction along the drive shaft. However, as explained in my initial declaration, a mechanical guide constrains movement rather than inducing it. A person of ordinary skill in the art would therefore not infer that the guidances cause axial movement. Instead, the '666 Patent is clear that the guidances allow rotational movement of the threaded screw but prevent axial movement of the threaded screw relative to the phalanx.

30. Dr. Ben-Tzvi indicated confusion as to the reasons for "sliding" occurring at the guidances, but in my opinion the reason will be clear to a person of ordinary skill in the art: to allow rotational movement of the threaded screw relative to the first phalanx. This form of constraint is common to all worm-gear transmissions; the threaded screw must be allowed to rotate but prevented from moving axially relative to its housing, in this case the first phalanx.

31. Dr. Ben-Tzvi indicated confusion as to why low-friction materials should be desirable for the guidances, but in my opinion a person of ordinary skill in the art will understand that low-friction materials will reduce resistance to rotation of the threaded screw relative to the first phalanx. The axial force on the threaded screw will lead to a normal force on the guidances, which will in turn lead to a friction force that resists rotation. This "Coulomb friction" or "dry friction" is a common phenomenon in geared transmissions, often necessitating the use of low-friction materials. Each of these concepts will be familiar to a person of ordinary skill in the art.

32. Dr. Ben-Tzvi indicated confusion as to which component was meant by the term "guidances", but it will be clear to a person of ordinary skill in the art, as they are described in the specification and indicated by label 14 in Figure 2, that the guidances are the surfaces that contact the threaded screw on each end.

33. Dr. Ben-Tzvi indicated confusion as to the meaning of "preferably without play" but I believe a person of ordinary skill in the art will readily understand the meaning of this term:

10

the gap between the guidances should be as close as possible to the length of the threaded screw so as to limit the axial movement of the threaded screw relative to the phalanx to the greatest extent possible. This concept is further explained by the '666 Patent specification when it describes "small axial play" ('666 Patent, 2:38-42). Contrary to Dr. Ben-Tzvi's position that this language is inconsistent, in my opinion it is consistent and explains the concept clearly to a person of ordinary skill in the art. A person of ordinary skill in the art would understand that if the gap between guidances were too small, the threaded screw could not be inserted or would be difficult to rotate. If the gap between guidances were too large, however, this would lead to "play" or "backlash" or "slop". These terms are all commonly used in mechanical systems to refer to a small separation between components that leads to a brief decoupling of movement upon reversal of the drive direction. In this case, if the gap were oversized, the threaded screw would need to shift to the other side of the gap before engaging the other guidance and causing rotation of the phalanx about its hinge connection.

34. Dr. Ben-Tzvi indicated confusion as to the meaning of the labeled guidances as they appear in Figure 2, but I believe this figure will be clear to a person of ordinary skill in the art. It can be seen that the threaded screw (13) cannot move axially because the guidances (14) prevent movement in the axial direction.

35. Additionally, Figures 1a, 1b, and 1c will be instructive to a person of ordinary skill in the art as to the relative movements of the threaded screw and guidances. As the first hinge joint rotates, the threaded screw remains hidden within the first phalanx. This is because the guidances maintain its axial position relative to the first phalanx. If the guidances instead somehow facilitated or caused axial movement, this would be apparent in the sequence of poses.

36. Additionally, a person of ordinary skill in the art will understand that the threaded screw need not move substantially in the axial direction relative to the drive shaft to achieve the goal of preventing large axial forces being transmitted to the motor. The fact that the threaded screw will move before sufficiently large axial forces are applied will prevent damaging forces from being transmitted to the motor.

11

37. Additionally, a person of ordinary skill in the art will understand that the threaded screw is fully constrained by complementary means of the drive shaft and the guidances. The drive shaft prevents rotation of the threaded screw relative to the drive shaft, but allows axial movement relative to the drive shaft. The guidances prevent axial movement relative to the phalanx but allow rotation relative to the phalanx. In this way, the threaded screw is fully constrained and a functional worm-gear transmission is formed, while protecting the motor from damaging axial loads.

Signed this March 27, 2024 in Stanford, California.

_____
Steven H. Collins

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, I caused the foregoing to be served electronically to the following:

> Catherine Dorvil
> Chambliss, Bahner & Stophel, PC
> Liberty Tower
> 605 Chestnut Street, Suite 1700
> Chattanooga, TN 37450
> cdorvil@chamblisslaw.com
>
> *Attorney for Defendants Fillauer Companies, Inc. and Motion Control, Inc.*
>
> Andrea L. Shoffstall
> Husch Blackwell LLP
> 1801 Wewatta Street, Suite 1000
> Denver, CO 80202
> andrea.shoffstall@huschblackwell.com
>
> Daisy Manning
> Kara Rene Fussner
> Rudolph A Telscher , Jr
> Husch Blackwell LLP
> 8001 Forsyth Boulevard, Suite 1500
> St. Louis, MO 63105
> daisy.manning@huschblackwell.com
> rudy.telscher@huschblackwell.com
> kara.fussner@huschblackwell.com
>
> *Attorneys for Defendant Motion Control, Inc.*

Executed on March 27, 2024        */s/ Keeley I. Vega*
                                                Keeley I. Vega