# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | |
|---|---|
| VINCENT SYSTEMS GMBH, | |
| *Plaintiff,* | |
| v. | Case No: 1:23-CV-00002-CEA-SKL |
| FILLAUER COMPANIES, INC. and MOTION CONTROL, INC., | |
| *Defendants.* | |

**DECLARATION OF PINHAS BEN-TZVI IN SUPPORT OF**
**DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS**

I, Pinhas Ben-Tzvi, hereby declare that the following is true and correct. I am over the age of 18, competent to make this declaration, and have personal knowledge of the facts set forth below. If called to testify, I could and would testify honestly, under oath, to the matters set forth herein.

## I.  INTRODUCTION

1.      I was retained on behalf of Motion Control, Inc. ("Motion Control"), as a technical expert in this proceeding before the United States District Court for the Eastern District of Tennessee. I have been asked to consider certain claim terms from the U.S. Patent No. 8,491,666 ("the '666 Patent") and to opine as to the meaning of the terms from the perspective of a Person Having Ordinary Skill in the Art ("PHOSITA").

2.      I am not an attorney, and I have not been asked to offer any legal opinions. I have been informed and understand the law to be applied for claim construction, which I explain in places below. I have applied the law told to me in developing my technical opinions in this declaration.

1

## II.  **BACKGROUND AND QUALIFICATIONS**

### a.  **Education and Work Experience**

3.  I have attached, as Exhibit A, a copy of my Curriculum Vitae, which outlines my educational and employment history.

4.  In 2000, I received a Bachelor of Science degree in Mechanical Engineering from the Technion—Israel Institute of Technology. I also received a master's degree in mechanical engineering from the University of Toronto in 2004 and obtained a Ph.D. in Mechanical Engineering from the University of Toronto in 2008. I have authored numerous technical books and articles in the field. *See* Ex. A. I've authored over 180 peer-reviewed articles in the field of engineering design and various mechanisms, including robotic exoskeletons for rehabilitation and therapy, and various biomechanical devices.

5.  I am currently a Professor in the Department of Mechanical Engineering at Virginia Tech in Blacksburg, Virginia. I am a tenured Professor of Mechanical Engineering and Electrical and Computer Engineering, and Founder and the Director of the Robotics and Mechatronics Lab at Virginia Tech. I am also a licensed Professional Engineer (P.E.).

6.  I am currently also a Program Director for the Established Program to Stimulate Competitive Research (EPSCoR), Office of Integrative Activities (OIA), Office of the Director (OD), National Science Foundation (NSF), Alexandria, VA on an Intergovernmental Personnel Act (IPA) assignment as detail to NSF. My views in this declaration are my own, and do not represent the NSF in any way or form.

7.  I am the named inventor on at least twelve U.S. patents and patent applications and a Canadian patent directed to various electromechanical devices.

8.  My expertise includes and interests span the areas of cyber-physical systems,

artificial intelligence, machine learning, robotics and intelligent autonomous systems, healthcare technologies, human-machine/robot interactions, multi-robot systems, systems dynamics and automated control systems and automation, mechatronics design, novel sensing and actuation, mechanical design, mechanism design, machine design, and product development and integration. I have additional knowledge in mobile robotics for military and police applications, microprocessor-based applications, and computer aided design (CAD).

9.      In my many years of engineering, manufacturing, and product development experience, I have personally been involved in the design of many types of electromechanical products, including many designs using drivers (e.g., gas pistons or springs, hydraulic drivers, electro-mechanical drivers/linear actuators). I am intimately familiar with the technology in this case.

10.      I am an experienced mechanical/electromechanical design engineer and technical expert with extensive experience with various types of drivers, linear motion control, and ergonomic industrial design. I have about 25 years of combined industrial and academic experience in mechanical design, testing, prototyping, developing, and machine/mechanism design, synthesis, analysis, manufacturing and integration. I have held numerous other positions in my about 25 years in the engineering field, as shown on my curriculum vitae. Not all have been discussed in detail in my declaration. My background demonstrates an expertise and strong understanding of prosthetics and robotics. Additionally, a list of cases in which I have provided testimony in the last five years is attached as Exhibit B.

### b. Engagement

11.      For present purposes, I have been asked to consider the '666 Patent and related evidence in this case and provide my independent opinions, from the perspective of a PHOSITA

at the time of the alleged invention, as to the proper understanding of certain disputed claim terms and limitations.

12.     Although I am being compensated for my services in this matter at my standard consulting rate of $560 per hour, my compensation is not contingent upon the opinions I render or the outcome of this proceeding. I have no financial interest in any of the parties, and I have no other interest in this proceeding.

13.     This report is based on information currently available to me. I reserve the right to amend or supplement my analysis in this report and/or to respond to any additional submissions prepared by or on behalf of Vincent. I also reserve the right to amend or supplement my opinions based on further discovery and information provided in the case.

14.     I reserve the right to create any additional summaries, tutorials, demonstrations, charts, drawings, tables, and/or animations that may be appropriate to supplement and demonstrate my opinions as necessary.

15.     All of the opinions stated in this report are based on my own personal knowledge and professional judgment.

### III.     <u>MATERIALS CONSIDERED</u>

16.     I have reviewed a number of materials in support of my opinions contained herein. A list of those materials is attached as Exhibit C.

17.     It is my understanding that discovery is yet ongoing. Should any additional information be brought to my attention between now and the time of any hearing or trial, I reserve the right to supplement the statements, conclusions and opinions set forth in this report to address such information.

18.     If asked to testify at any hearing or at trial in this case, I would expect to refer to

the information and items that I have considered in preparing this report as well as any exhibits presented by the parties including demonstrative exhibits to the extent that such exhibits are presented. If requested, I further reserve the right to provide a tutorial or demonstration to the court or jury on the art, technology or opinions discussed in this report.

## IV.   LEGAL PRINCIPLES

### a. Level of Ordinary Skill in the Art

19.     I have been informed that patents are considered from the perspective of a person having ordinary skill in the art, and that this is a hypothetical person who is presumed to know the relevant prior art, thinks along conventional wisdom in the art, and is a person of ordinary creativity. I understand that this hypothetical PHOSITA is considered to have the normal skills and knowledge of a person in the technical field.

20.     I have been informed that the following five factors inform the analysis for determining the level of ordinary skill in the art: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) rapidity with which innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field. I have also been informed that in a given case, every factor may not be present, and one or more factors may predominate. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

21.     I have knowledge relevant to what a person having ordinary skill in the art at the time of the invention would understand and do. In 2008, at the priority date of the '666 Patent, I had almost a decade of experience in this field and was a person having ordinary skill in the art.

22.     The field of the invention here is prosthetic devices, and more specifically, the fingers of prosthetic hands. Traditionally, prosthetics are aimed at replicating basic limb structures to restore some level of physical function. The emphasis in the early ages of prosthetics was

primarily on mechanical designs, offering limited dexterity and sensory feedback. However, with the invention of robotics and advancements in mechatronics, the field of prosthetics has undergone a paradigm shift towards more sophisticated and technologically integrated solutions. The integration of robotics into prosthetic fingers represents a marked departure from conventional designs, introducing a new era of functionality and adaptability.

23.     Prosthetics and robotics are closely related fields due to their shared focus on enhancing and restoring human mobility and functionality. Prosthetics involve the design and creation of artificial limbs or body parts to replace those lost or impaired due to injury, illness, or congenital conditions. Robotics, on the other hand, encompasses the development of intelligent machines using design principles that are being adapted in the design of prosthetic devices. The intersection of these fields occurs in the development of robotic prosthetics, where advanced robotics technology is integrated into artificial limbs. This synergy allows for the creation of prosthetic devices that can mimic natural movements, respond to neural signals, and provide users with a more seamless and functional experience. The incorporation of robotics into prosthetics contributes to improved mobility, enhanced adaptability, and a closer approximation to natural human movement.

24.     Modern robotic prosthetic fingers leverage advanced sensor technologies, artificial intelligence, and intricate control systems to replicate the intricate movements and tactile sensations of natural fingers. These innovations are informed by a deeper understanding of biomechanics and neural interfaces, allowing for more intuitive and responsive prosthetic control. Neural interfaces, for instance, enable direct communication between the prosthetic device and the user's nervous system, translating neural signals into precise and coordinated movements. Furthermore, the incorporation of robotics in prosthetic fingers has facilitated the development of

versatile grip patterns and the ability to manipulate objects with varying shapes and sizes. This increased dexterity is particularly crucial in enhancing the user's overall quality of life by enabling a more natural and nuanced interaction with the environment.

25.     In recent years, the field has seen a surge in research and development, leading to prosthetic fingers that not only mimic the form but also the function of natural fingers. Artificial intelligence algorithms contribute to predictive and adaptive control mechanisms, allowing the prosthetic to anticipate user intentions and adjust its movements accordingly.

26.     It is my opinion that a PHOSITA relating to the subject matter of the '666 Patent would have an engineering or design background and experience designing, developing, manufacturing, and studying the types of mechanisms found in prosthetic devices or robotic exoskeletons, or other similar mechanisms. More particularly, a hypothetical PHOSITA would be a person with at least a bachelor's degree in engineering or a similar technical degree or equivalent work experience and at least about 3-5 years' experience designing, developing, manufacturing, or studying the types of mechanisms found in prosthetic devices or robotic exoskeletons, or other similar mechanisms.

27.     I have about 25 years of combined industrial and academic experience in product design, testing, prototyping, developing, machine/mechanism design, synthesis, analysis, manufacturing, and integration, including development of robotic exoskeletons and various precision mechatronic and robotic devices for medical applications. I would consider myself to be a PHOSITA of the field of technology of the Asserted Patent, and I certainly would understand how a PHOSITA would interpret or understand the Asserted Patent.

**b.   Claim Construction**

28.     The following reflects my understanding of the principles of claim construction:

The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). This is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id.*

29.     "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "The specification is always highly relevant to the claim construction analysis." *Id.* at 1315 (quotation marks omitted). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal citation and quotation marks omitted).

### c.  Intrinsic and Extrinsic Evidence

30.     I have been informed by counsel that the claims of an issued patent must be read in light of the patent specification, and that the specification is the single best guide to the meaning of a disputed term. I have also been informed that the prosecution history can inform the meaning of the claim language by demonstrating how the inventor and the United States Patent and Trademark Office understood the invention. I have also been informed that, if a claim term has a commonly understood meaning to those in the field, then that plain meaning is how the claim term should be construed in the absence of evidence to the contrary.

31.     I have been informed by counsel that evidence to the contrary may be either intrinsic evidence (evidence contained within the prosecution history of the patent itself) or extrinsic evidence (everything else, such as dictionary definitions). I have been informed that the strongest evidence of a claim term's meaning is the words of the claim itself and the context in which the claim term is used, followed by any definition or explanation given in the patent's specification, followed by any definition or explanation given in the patent's prosecution history.

I have been informed that other claims, either asserted or unasserted, can also be valuable sources for claim construction. For example, differences among claims can be a useful guide in understanding a claim term's meaning.

32.     I have been informed by counsel that extrinsic evidence is evidence from outside the patent's prosecution history, which may include expert testimony, other literature defining the term or terms, and the like. I have been informed by counsel that dictionary definitions are also extrinsic evidence, although they may be used to inform what the plain and ordinary meaning of a claim term is.

### d.  Indefiniteness

33.     As I understand the Patent Act, Section 112(b) requires a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b). Because of this statutory requirement, if a claim fails to particularly point out and distinctly claim the invention, the claim is indefinite and thus invalid. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). Whether a claim is invalid for indefiniteness requires determining whether a skilled artisan would understand what is claimed when the claim is read in view of the specification. *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).

34.     "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent."

*Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996)); *Morton Int'l, Inc.,* 5 F.3d at 1470. Claim language cannot be "ambiguous, vague, incoherent, opaque, or otherwise unclear in describing and defining the claimed invention." *In re Packard,* 751 F.3d 1307, 1311 (Fed. Cir. 2014). A claim must be comprehensible to the ordinary skilled artisan and precise enough to provide clear notice of what is claimed; otherwise, the claims are indefinite. *Nautilus*, 134 S.Ct. at 2129 (quoting *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 373 (2002)).

35.     When a person of skill in the art would be unable to determine objective boundaries of a claim limitation, the claim is invalid for indefiniteness. *See Berkheimer v. HP Inc.,* 881 F.3d 1360, 1363-64 (Fed. Cir. 2018) (the term "minimal redundancy" rendered claim indefinite when the specification provided "no point of comparison for skilled artisans to determine an objective boundary of 'minimal' …"); *In re Walter,* 698 F. App'x 1022, 1026-27 (Fed. Cir. 2017) (the term "block-like" was indefinite because "nothing in the intrinsic record offers 'objective boundaries' for ascertaining whether a given shape falls into either category [of 'block-like' or not]").

## V.     Overview of the '666 Patent

36.     I have read and considered the '666 Patent, issued July 23, 2013, as well as its prosecution history.

37.     I understand that the '666 Patent claims priority to a foreign application, specifically one filed in Germany on November 8, 2008 (DE 102 008 056 520). I also understand that the '666 Patent went through the Patent Cooperation Treaty ("PCT") filing process. As I understand it, the PCT filing process is a worldwide patent filing system that allows an inventor to file a single international application that will be recognized by each member country. Here, I understand Vincent, the applicant, filed an application with the German patent office (in the native

language) and in the national phase chose to submit an application to the USPTO on August 26, 2011. The USPTO examined the English-translated application and the amendments made during examination, and the '666 Patent issued on July 23, 2013.

38.     It is my understanding that the '666 Patent relates, broadly speaking, to a finger element that can be used in an artificial single-finger-prosthesis or as a component of an artificial hand or arm-prosthesis. '666 Patent at Abstract. It describes a finger element with a carrier component, a first phalanx, a second phalanx, a servo drive, and a coupling mechanism, as well as a worm gear with a threaded worm and a toothed segment. *Id.*

39.     It is my opinion that numerous portions of the specification of the '666 patent are unclear and ambiguous such that it is difficult, even for a PHOSITA, to understand what the Asserted Patent actually discloses and claims. As described more below, it is my opinion that the claims are indefinite, particularly as to the requirement of "***guided in axial direction by separate guidances***." However, even as to other claim elements, the specification is riddled with awkward and unclear phrasings, typographical errors and a lack of detailed figures and descriptions, such that interpretation is extremely difficult. I have interpreted the meaning as I believe a PHOSITA would based on what is disclosed, to the best of my ability.

40.     All the terms at issue and discussed in this declaration appear in Claim 1 of the '666 Patent (emphasis added):

A finger element, comprising:
    a) a carrier component
    b) a first phalanx with a first hinge connection to the carrier component,
    c) a second phalanx with a second hinge connection to the first phalanx,
    d) ***a servo drive*** for the first hinge connection with a motor with a drive shaft and a worm gearing with a threaded screw and a cog segment that engages to the threaded screw, and
    e) ***a coupling mechanism between the first hinge connection and the second hinge connection***, wherein
    f) the threaded screw is supported on the drive shaft form fittingly and ***axially***

*moveable* as well as ***guided in axial direction by separate guidances***.

**VI.**  **State of the Art**

41.     One of the earliest prosthetic hand dates back to ancient civilizations, with early examples including simple wooden and metal limbs. These devices were often basic in design and aimed primarily at restoring a semblance of physical appearance rather than advanced functionality. During the Renaissance, there were notable improvements in prosthetic design, featuring more intricate craftsmanship. The Industrial Revolution saw the introduction of materials like leather and metal, enabling the production of more durable and adjustable prosthetic limbs.

42.     The two World Wars marked significant milestones in prosthetic development. The demand for functional limbs for war veterans prompted innovations, leading to the creation of more functional and adjustable prosthetics. After World War II, advancements in materials and technology in the post-war era allowed for the development of more lightweight and realistic-looking prosthetics. However, these devices still lacked the sophisticated functionality seen in modern prosthetics. The integration of robotics into prosthetics gained momentum in the late 20th century. The application of mechatronics and advanced control systems enabled more natural and responsive movements.

43.     As I previously discussed, prosthetics and robots are closely related fields due to their shared focus on enhancing and restoring human mobility and functionality. The convergence of prosthetics and robotics is evident in the shared objective of restoring or augmenting human functionality. This relationship has strengthened over the years due to several factors:

   a.   <u>Technological Integration</u>: Robotics has allowed for the incorporation of advanced sensors, actuators, and control systems into prosthetic devices, enabling more natural and intuitive movements.

b. <u>Neural Interfaces</u>: Developments in neural interfaces have facilitated direct communication between prosthetics and the human nervous system, enhancing the precision and responsiveness of prosthetic movements.

c. <u>Biomechanical Understanding</u>: Advancements in biomechanics and material science have contributed to the development of prosthetics that not only resemble natural limbs but also replicate their intricate movements and sensory feedback.

d. <u>Artificial Intelligence</u>: The integration of artificial intelligence algorithms has enabled prosthetics to adapt to users' intentions, providing a higher level of functionality and customization.

44.    In conclusion, the history of prosthetics has witnessed a gradual progression from basic designs to sophisticated, technologically integrated solutions. The close relationship between prosthetics and robotics has been pivotal in driving these advancements, with innovations continually pushing the boundaries of what is possible in restoring and enhancing human mobility.

## VII.    PROPOSED CONSTRUCTIONS

### a. "Servo drive"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| A self-contained feedback system that controls mechanical movement | Plain and ordinary meaning |

45.    The term "servo drive" appears in limitation (d) of claim 1 of the '666 Patent: "***a servo drive*** for the first hinge connection with a motor with a drive shaft…."

46.    "Servo drive" is a specific type of device that has, and had at the time of the invention, a customary meaning readily understood by a PHOSITA. A "servo drive" refers to a physical device comprised of both mechanical and electrical components. Although there are

several types of servo drives, they generally comprise a servo motor actuated by a servo controller. In other words, a servo motor is generally an electric motor controlled by a servo controller (i.e., an electronic circuit) so that continuous determination of precise position, speed, and torque can be made to more precisely control mechanical movement of the component the servo motor is driving. Servo drives are self-contained systems that monitor command signals (i.e., electrical signals) to continually adjust for deviations from expected mechanical movement and are therefore able to control mechanical movement using its self-contained or closed-loop feedback system. This feedback mechanism is the primary difference between a servo drive and actuators or simple electric motors, as the former is capable of positional control based on an input signal and the latter only recognizes "on" or "off" and are incapable of positional control.

47.     Servo drives come in a variety of shapes and sizes, are suitable for applications across many industries including prosthetics and robotics, and are commercially available off-the-shelf. In a prosthetic hand—or more specifically, a prosthetic finger—the purpose of a servo drive is to control the speed, position, and torque of the motor in the finger and therefore the finger itself. Employing a servo drive in a prosthetic hand, as opposed to a basic actuator or motor, offers a heightened degree of sophistication crucial for replicating the intricate functions of the human hand. The precision control facilitated by servo drives is particularly vital in enabling nuanced movements, such as delicate grasping or manipulating objects with varying levels of force. One of the key advantages lies in the incorporation of feedback mechanisms, like encoders or sensors, ensuring continuous real-time monitoring and adjustment of finger positions. This not only enhances the accuracy of movements but also serves as a protective measure against potential damage to the prosthetic hand's delicate components. The efficient torque management inherent in servo drives is pivotal for delicate tasks, preventing excessive force that might otherwise

jeopardize the structural integrity of the prosthetic fingers. Moreover, the adaptability and responsiveness of servo drives make them versatile for a spectrum of activities, contributing significantly to user confidence and safety. In contrast, the absence of precise control and feedback in basic actuators or motors could compromise user comfort, potentially leading to unintended movements or discomfort. In essence, the implementation of servo drives in prosthetic hands represents a solution that aligns seamlessly with the complexities of human hand movements, prioritizing not only precision but also user safety and overall comfort in various functional scenarios.

48.     The language of claim 1—"a servo drive for the first hinge connection with a motor with a drive shaft and a worm gearing with a threaded screw and a cog segment that engages to the threaded screw"—is consistent with the customary meaning of "servo drive" explained above. The servo drive uses a servo controller (i.e., an electronic circuit) to control the servo motor, which rotates a drive shaft which in turn rotates the threaded screw and cog segment, which causes actuation of the first hinge connection.

49.     The specification does not define "servo drive" or use the term in a manner inconsistent with its plain and ordinary meaning. For example, the specification teaches a "servo *drive encloses a motor* with or without integrated gear transmission to a drive shaft." '666 Patent at 2:13-16 (emphasis added). It further describes "[t]he *drive 11 encloses at least an electric motor as servo member* …" '666 Patent at 4:9-10 (emphasis added). A PHOSITA would understand this description is of a standard servo drive that includes electronic circuitry to control the electric motor. The "electric motor" is described as a "servo member" because it is part of the servo drive 11 and claimed in claim 1.

50.     The specification of the '666 Patent also describes an "optional tactile sensor"

integrated into the fingertip and/or core 15, and/or a resistance strain gauge attached to one of the phalanges. '666 patent at 4:19-21. If the "servo drive" of claim 1 is interpreted as only an electric motor without control circuitry (i.e., a servo controller), then there would be no reason to include a tactile sensor or resistance strain gauge as there would be no circuitry to receive the signals and factor them into the commands sent from the servo controller to the servo motor.

51.　　It is my opinion that Defendants' proposed construction is consistent with a PHOSITA's understanding of what a "servo drive" is, as well as well-understood definitions for "servo." *See, e.g,* MC0006458; MC0006434; MC0006446; MC0006452; MC0006455.

52.　　It is my understanding that Vincent proposes "servo drive" be given its plain and ordinary meaning. I do not understand what Vincent means by the "plain and ordinary" meaning of this term or whether the parties have a dispute regarding its construction because I believe Defendants' proposed construction of "servo drive" *is* the plain and ordinary meaning of the term as understood by a PHOSITA now and at the time of the claimed invention.

53.　　It is therefore my opinion that the term "servo drive" in Claim 1 of the '666 Patent should be construed as "a self-contained feedback system that controls mechanical movement."

### b. "A coupling mechanism between the first hinge connection and the second hinge connection"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| A component connecting and positioned within the space separating the first and second hinge connections | Plain and ordinary meaning |

54.　　The term "a coupling mechanism between the first hinge connection and the second hinge connection" appears in limitation (e) of claim 1 of the '666 Patent. To a PHOSITA this claim language denotes a mechanical relationship between components.

55.　　The purpose of any coupling mechanism is to connect at least two mechanical

components together. The plain meaning of the phrase "a ***coupling mechanism between*** the first hinge connection and the second hinge connection" would be understood by a PHOSITA as a mechanical component that is attached at one end to the first hinge connection and attached at the other end to the second hinge connection and extends within the space separating the first and second hinge connections. This interpretation is also consistent with general dictionary definitions of "coupling" and "between." *See, e.g.,* MC0006353-6355 ("coupling" defined as "[a] device that links or connects."); MC006356-6358 ("coupling" defined as "a device for connecting two parts or things"); MC0006368-6370 ("coupling" defined as "a device that serves to connect the ends of adjacent parts or objects"); MC0006371-6373 ("coupling" defined as "a flexible or rigid mechanical device or part for joining parts together, as two shafts"); MC0006332-6334 ("between" defined as "in or through the position or interval separating"; "connecting spatially"); MC0006335-6337 ("between" defined as "in the interval separating"; "in an intervening space or interval"); MC0006353-6355 ("between" defined as "in or through the space that separate (two things)"; "that connects or relates to"; "along a course that connects").

56. The '666 Patent teaches "a finger element with a carrier component, a first phalanx that is articulated thereon via a first hinge connection as well as a second phalanx that is articulated via a second hinge connections to the first phalanx." '666 Patent at 2:9-12. "[T]he finger element includes a coupling mechanism between the first and second hinge connection." *Id.* at 2:20-21. "The coupling mechanism consists further preferred of one or two spring bar connections … that engage eccentrically to the rotation axes of the first and second hinge connections to the respectively adjacent carrier components and second phalanx respectively." *Id.* at 3:6-11. The '666 Patent further explains that the "carrier component 1" has a "first hinge axis 2" that "serves at the same time as support of the gear segment and as rotation axis for the first phalanx 5." *Id.* at 3:40-

46. "The first phalanx 5 is in return connected with the second phalanx 6 via a second hinge connection, wherein the second hinge axis 7 forms the rotation axis for the second phalanx." *Id.* at 3:46-49. The "coupling mechanism encloses in the example embodiments two elastic spring bar connections 8 that are arranged in parallel to each other at both sides of the first phalanx 5, wherein the spring bar connections 8 each engage at the carrier component and at the second phalanx pivotably in an according bearing bore 9 and 10 respectively eccentrically to the first 2 and second 7 hinge axis respectively." *Id.* at 3:52-57.

57. In other words, as shown below in annotated Figure 1*a*, the first hinge connection (annotated in blue) has an axis of rotation at the first hinge axis 2 and is attached to one end of the coupling mechanism (annotated in yellow) at bearing bore 9, which is located "eccentrically" (i.e., off-center) to the first hinge axis 2. Similarly, the second hinge connection (annotated in blue) has an axis of rotation at the second hinge axis 7 and is attached to the other end of the coupling mechanism (annotated in yellow) at bearing bore 10, which is located "eccentrically" (i.e., off-center) to the second hinge axis 7. Thus, the coupling mechanism is attached to the first and second hinge connections and is positioned only within the space separating the first and second hinge connections.



58.     Annotated Figures 1*b* and 1*c* show different perspectives of the coupling mechanism between the first and second hinge connections.



59.     In view of the foregoing, I believe the specification supports and is consistent with Defendants' proposed construction.

60.     I understand that Vincent proposes "a coupling mechanism between the first hinge connection and the second hinge connection" be given its plain and ordinary meaning. In my view,

the definition proposed by Defendants *is* the plain and ordinary meaning of "a coupling mechanism between the first hinge connection and the second hinge connection." Any argument by Vincent that the coupling mechanism as claimed need not connect or be only in the space between the hinges is not the plain and ordinary meaning of the term to a PHOSITA.

61.     It is therefore my opinion that the term "a coupling mechanism between the first hinge connection and the second hinge connection" in claim 1 of the '666 Patent should be construed as "a component connecting and positioned within the space separating the first and second hinge connections."

### c. "axially movable"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| The threaded screw is able to move along the length (or axis) of the drive shaft in a straight line direction | is pushed onto the drive shaft as well as limited in its axial movement by separate guidances preferably without play[1] |

62.     The term "axially moveable" appears in limitation 1(f) in claim 1 of the '666 Patent. A PHOSITA would understand the plain and ordinary meaning of "axially moveable" to be "the threaded screw is able to move along the length (or axis) of the drive shaft in a straight-line direction."

63.     A PHOSITA would generally understand the term "axial" to mean along an axis or along the length of a straight line about which a body rotates. A PHOSITA would also understand axial movement to mean a change in position along the length of a straight line about which a body rotates. This movement contrasts with rotational movement, which would be understood to a PHOSITA as a change in position *around* an axis or a straight line about which a body rotates.

---

[1] Vincent proposes a single construction for limitation 1(f)—"the threaded screw is supported on the drive shaft form fittingly and axially movable as well as guided in axial direction by separate guidances."

The term "moveable" would be understood to a PHOSITA as able to move or *capable* of movement. Accordingly, the plain and ordinary meaning of "axially movable" means able to move along the length (or axis) of a body in a straight-line direction. This customary meaning is consistent with general dictionary definitions. *See* MC0006308, MC0006311, MC0006314, MC0006317, MC0006320, MC0006323, MC0006326, MC0006329; MC0006419, MC0006422, MC0006425, MC0006428, MC0006431.



64.    In view of the foregoing and in the context of claim 1 of the '666 patent, "axially moveable" refers to the threaded screw's movement along the length of the drive shaft and relative to the drive shaft. In other words, "axially movable" means "[t]he threaded screw is able to move along the length (or axis) of the drive shaft in a straight-line direction."



65.     The specification of the '666 patent does not define "axially movable" or otherwise indicate the patentee departed from the plain and ordinary meaning of "axially movable." Although portions of the specification are somewhat unclear (likely due to translational issues or errors), including to some extent the phrase "axially movable," the specification is generally consistent with the plain and ordinary meaning of the term.

66.     The specification emphasizes "an essential feature" of the claimed invention is the axial movability of the threaded screw relative to the drive shaft:

> An essential feature of the invention encloses a decoupling of drive shaft and threaded screw in axial direction to the drive shaft. The threaded screw is preferably attached to the drive shaft and is in rotation direction form-fittingly coupled to the drive shaft, for instance via cogging or a matched joint. Therefore, the axial movability of the drive shaft in the threaded screw has to be assured.

*Id.* at 2:28-34. A PHOSITA would understand this paragraph teaches the threaded screw does *not* move in the rotational direction relative to the drive shaft (i.e., the threaded screw rotates *with* the drive shaft), but it *does* move in the axial direction relative to the drive shaft.

67.     The prosecution history is also consistent with the plain and ordinary meaning of "axially movable." During prosecution, the Examiner stated the reason for the allowance was the cited prior art did not disclose a threaded screw "axially movable" on the drive shaft:

> The threaded screw "supported on the drive shaft form fittingly and axially movable as well as guided in axial direction by separate guidances" (last three lines of claim 1) in the finger element as claimed is neither taught nor fairly suggested in the prior art.

*See* MC0001408 at MC0001672 (3/20/2013 Notice of Allowability). The Examiner distinguished claim 1 from prior art reference US 2009/0145254 ("Hirabayashi"), which discloses "a finger joint unit for a robot hand," specifically a "worm gear type finger joint unit" with a worm screw (i.e., threaded screw) "coaxially ***fixed to a worm shaft***." Hirabayashi (MC0001111) at ¶ [0002].

68.     Further, during prosecution of the German counterpart patent, I understand Vincent made various admissions that in my opinion support Defendants' proposed construction for "axially moveable." Vincent repeatedly distinguished the prior art cited by the Examiner on the basis that the threaded screw was permanently attached or mounted on the drive shaft. *See* VINCENT_004233 (Vincent noting the "threaded worm which is axially movable on the drive shaft" is a characteristic feature of the invention); VINCENT_004235 (Vincent distinguishing reference E1 because it has a "threaded screw ***firmly attached*** to a drive shaft"); VINCENT_004235 (Vincent distinguishing reference E4 because "the form in which the threaded worm is mounted with respect to the drive shaft" and "***the axially moveable bearing of the threaded worm on the drive shaft*** according to feature d) is also ***not disclosed***." ); VINCENT_004235 (Vincent stating that reference E1 has "a threaded screw which is firmly attached to a drive shaft", which differs from Vincent's patent claim requiring "a threaded screw which can move axially on the drive shaft.").

69.     It is my opinion that Vincent's proposed construction—"pushed onto the drive shaft and axially movable by separate guidances without play"—is nonsensical. Vincent proposes the Court construe "axially moveable" to mean "not moveable"—the exact opposite of what is claimed. In fact, the specification of the '666 patent disparages finger elements where the threaded screw is fixed (or immovable) on the drive shaft. '666 patent, 1:36-44. And Vincent's inclusion of "pushed onto the drive shaft" in its proposed construction appears to be a method of assembly and not a self-contained, finished product. Regardless of how the threaded screw is placed on the drive shaft, what is important is that *the claim requires the threaded screw be axially moveable*. Vincent's construction which completely turns the well-understood meaning of moveable on its head is indefensible and, in my opinion, should be rejected.

70.     Therefore, it is my opinion that the term "axially moveable" in claim 1 of the '666 Patent should be construed as "the threaded screw is able to move along the length (or axis) of the drive shaft in a straight line direction."

### d. "guided in the axial direction by separate guidances"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| Indefinite<br><br>or in the alternative:<br><br>At least two components designed to facilitate movement of the threaded screw along the length of the drive shaft. | is pushed onto the drive shaft as well as limited in its axial movement by separate guidances preferably without play |

71.     The term "guided in the axial direction by separate guidances" appears in limitation (f) in claim 1 of the '666 Patent. The specification of the '666 Patent does not expressly define "guided in the axial direction by separate guidances," and the disclosure is so unclear as to render this term indefinite in my opinion.

72.     In my opinion, the term "guided in the axial direction by separate guidances" does not have a single, plain and ordinary meaning that would be understood by a PHOSITA. The term "guidances" is not a known mechanical term in this context, nor is the phrase "guided in the axial direction" something that would be readily understood without illustration or explanation.

73.     The specification of the '666 Patent is ambiguous and confusing in its descriptions of the mechanical arrangement between the threaded screw, the drive shaft, and the "guidances" (which are not defined), and the specification never explains or shows what it means for one component to "guide" another component in the axial direction.

74.     The figures of the '666 Patent label the "guidances" 14, but do not show these components. For example, in Fig. 2 shown below, there are two number 14s and a line assumingly pointing to what the patentee contends are "guidances," but the component(s) it points to cannot

be seen sufficiently to discern what it is meant to be:



75.     The specification also does not provide any explanation of what constitutes a "guidance." In its first reference to guidances, the '666 Patent states "***the motor does not serve via the drive shaft as axial guidance of the threaded screw, but separate guidances***. They are arranged preferably in form of ***sliding guidances*** at both front edges of the threaded screw." *Id.* at 2:35-38. I cannot discern what the patent means when it says that the drive shaft does not serve as axial guidance for the thread screw, but instead, separate guidances serve this function. This lack of clarity brings about many questions. For example: Are the guidances between the screw and the drive shaft? What are they and what are they doing? How do the "guidances" guide the threaded screw?

76.     The '666 Patent in the very next paragraph states that "[i]t proved to be advantageous to combine the guidances and the threaded screws to an assembly. For instance, both guidances are realized by a stiff preferably single-part frame, in which the screw is inserted with a small axial play." *Id.* at 2:38-42. The single-part frame is not shown in the '666 Patent, and it is

unclear to me what is meant. "Small axial play" implies to me that there is a space between the guidances and the screw allowing a small amount of movement, but this still does not sufficiently reveal the nature or function of the "guidances."

77.     The '666 Patent later states that "[t]he threaded screw is in the embodiment guided in radial direction onto the drive shaft, but is limited in its axial movability by two guidances 14 preferably without play." *Id.* at 3:67-4:1. I understand Vincent cites this portion of the specification as support for its claim construction, but it is unclear to me what "without play" modifies. As indicated above, the '666 Patent previously described "small axial play" when the screw was inserted in the guidances. The patent could be referring to the guidances themselves as not moving, although as discussed above, the patent refers to preferably "sliding guidances" so it is unclear what or where has "no play." This also could refer to an unclaimed embodiment that is different than what is otherwise described, but this is similarly unclear.

78.     The next sentence talks about the material of the guidances and explains "the threaded screw comprise in comparison to the materials of the guidances preferably a low sliding fiction coefficient as well as high abrasive durabilities." *Id.* at 4:2-4. For instance, "the threaded screw is because of the expected high load of the servo drive made of brass or steel, the guidances are preferably made of dry lubricating slide bearing bushing material like a PTFE-material or a slide bearing bronze." *Id.* at 4:4-8. This indicates to me that whatever the guidance is, it is of a material that slides more easily than the threaded screw.

79.     The specification provides no further explanation regarding what the guidances are or how they relate to or impact the axial movement of the threaded screw relative to the drive shaft.

80.     It is therefore my opinion that "guided in the axial direction by separate guidances" is indefinite, because a PHOSITA cannot determine with reasonable certainty what "guidances"

are or what "guided in the axial direction by separate guidances" means in the context of the '666 Patent. A PHOSITA cannot identify the bounds of the purported invention with reasonable certainty.

81.     I have also been asked, in the alternative, to consider the most plausible construction that could be given to the term "guided in the axial direction by separate guidances" in the context of the '666 Patent in the event it is determined not to be indefinite. In my opinion, the meaning of "guided in the axial direction by separate guidances" that is most applicable to the subject matter disclosed in the '666 Patent is "at least two components designed to facilitate movement of the threaded screw along the length of the drive shaft." Dictionaries most commonly define "guidance" as something that guides. *See, e.g.,* MC0006416. And the most common definition of "guide" is to lead or direct, for example, along a certain path or course (i.e., guide the movement of the threaded screw in the axial direction along the drive shaft). *See, e.g.,* MC0006395, MC0006401, MC0006407, MC0006416.

82.     The language of the claim itself means there must be movement of the threaded screw in the "axial direction," so the most plausible construction requires that movement is guided by the guidances. Additionally, that this construction would account for the lower sliding friction coefficient of the guidances, i.e., this facilitates the axial movement of the threaded screw.

83.     Vincent's proposed construction of "limited in its axial movement by separate guidances preferably without play" makes no sense and is contradicted by the plain language of the claim for at least two reasons.

84.     ***First***, Vincent's proposed construction requires the guidances limit the axial movement of the threaded screw. While I understand Vincent is relying on language in the specification for its definition, nothing in the claim language states there is limitation or restriction

of movement of the threaded screw, which is what I would expect if that was indeed the claimed invention. Claim 1 simply states the guidances guide the threaded screw. Vincent's inclusion of "limited in its axial movement" in its proposed construction narrows the scope of the claim and imports a limitation that does not exist in the claim language.

85.     **Second**, Vincent's inclusion of "preferably without play" also adds an additional limitation that narrows the scope of the claim with no explanation. Nothing in the claim language states or implies anything about "play" and it is unclear in Vincent's proposed construction what component(s) are "without play." Is Vincent referring to the separate guidances? The guidances and the drive shaft? The guidances and the threaded screw? There are many possibilities. Therefore, in my opinion, Vincent's proposed construction is ambiguous and the claim does not provide reasonable certainty to a PHOSITA as to its scope.

\*       \*       \*

I hereby declare that all statements made of my own knowledge are true and that all statements made on information and belief are believed to be true. I further declare that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code.

Executed on: March 10, 2024

DR. PINHAS BEN-TZVI