# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| VINCENT SYSTEMS GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:23-CV-2-CEA-MJD |
| | ) | |
| FILLAUER COMPANIES, INC., and | ) | |
| MOTION CONTROL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on three separate motions: (1) Defendants Fillauer

Companies, Inc. ("Fillauer") and Motion Control, Inc.'s ("Motion Control," and together with

Fillauer, "Defendants") Motion for Sanctions for Spoliation of Evidence and Discovery

Misconduct [Doc. 181 (the "Sanctions Motion")];[1] (2) Plaintiff Vincent Systems GMBH's

("Vincent") Motion to Exclude the Opinion of Defendants' Damages Expert Glenn W. Perdue

---

[1] Each pending motion is associated with a number of sealed filings. The Court has endeavored to provide citations to the redacted, publicly accessible versions of any such filings when possible, or to provide additional citations/internal page numbers. Additionally, as discussed in the final Conclusion section, the Court will direct the Clerk to *temporarily* file this Memorandum and Order under seal in its entirety, and will allow the parties fourteen days propose a redacted version suitable for filing in the public record.

Relevant docket entries for the Sanctions Motion include: Doc. 181 (Sanctions Motion); Doc. 183 (sealed Sanctions Motion brief); Doc. 184 (sealed declaration and sealed exhibits F–R & X); Doc. 185 (exhibits A–E & S–W); Doc. 192 (sealed brief); Doc. 192-1 (sealed declaration); Doc. 194 (redacted brief); Doc. 195 (redacted declaration); Doc. 196-1 (Vincent's redacted response, with redacted declarations attached); Doc. 197 (sealed response, with sealed declarations attached); Doc. 198 (response exhibits 1–11); Doc. 201 (Defendants' sealed reply); and Doc. 229 (redacted reply).

[Doc. 248 (the "Perdue Motion")];[2] and (3) Vincent's Motion to Strike and Exclude Portions of the Reports and Testimony of Dr. Elliot J. Rouse on Non-Infringement and Invalidity [Doc. 249 (the "Rouse Motion")].[3] The motions are fully briefed, and the Court conducted a hearing on May 6, 2026 (the "Hearing").

## I.      THE SANCTIONS MOTION

Defendants ask the Court to sanction Vincent for, *inter alia*, failing to preserve documents generated by a third-party defendant in prior litigation involving U.S. Patent No. 8,491,666 (the "Patent"), which issued on July 23, 2013, to Vincent's founder and CEO, Dr. Stefan Schulz ("Dr. Schulz") [Doc. 24 at Page ID # 130]. The Court provides the following summary of the litigation history regarding the Patent and its foreign counterpart (the "Foreign Patent") to contextualize the parties' respective positions.

### A.      BACKGROUND

On November 24, 2016, Vincent sued third-party Össur Americas, Inc. and Össur hf (collectively, "Össur") in Germany, alleging Össur's prosthetic hands infringed the Foreign Patent (the "Össur German Litigation") [Doc. 196 at Page ID # 4633–34 (Sanctions Motion brief at pp.

---

[2] Relevant docket entries for the Perdue Motion include: Doc. 227 (redacted Perdue Motion, with redacted Perdue Report, Ex. A, attached); Doc. 248 (sealed Perdue Motion, replacing Doc. 203, with sealed Perdue Report, Ex. A, attached); Doc. 205 (Zweig Affidavit regarding Perdue Report); Doc. 231 (Defendants' sealed response); Doc. 241 (redacted response); Doc. 245-1 (Vincent's redacted reply); and Doc. 246 (sealed reply).

[3] Relevant docket entries for the Rouse Motion include: Doc. 228 (redacted Rouse Motion, with redacted Rouse Invalidity Report, Ex. B, attached); Doc. 249 (sealed Rouse Motion, replacing Doc. 204, with sealed Rouse Rebuttal Non-Infringement Report, Ex. A, and sealed Rouse Invalidity Report, Ex. B, attached); Doc. 206 (Zweig Affidavit re: Rouse docs); Doc. 206-1 (Rouse deposition excerpt, Ex. C); Doc. 232 (Defendants' sealed response); Doc. 242 (redacted response); Doc. 245-2 (Vincent's redacted reply); and Doc. 247 (sealed reply).

2

2–3)]. Years later, while the Össur German Litigation was still pending, Vincent "became aware" of the prosthetic hand at issue in this dispute (the "Accused Product"), which is manufactured by non-party TASKA Prosthetics Ltd. ("TASKA").

Specifically, Vincent discovered the Accused Product at a symposium in Las Vegas, Nevada on February 2, 2018 [Doc. 185-2 at Page ID # 4449–50 (Ex. C at pp. 9–10)]. Approximately eighteen months later, Dr. Schulz borrowed the Accused Product from a customer, disassembled it, and photographed it [*id.*]. Dr. Schulz testified at his deposition in this case that he believed the Accused Product was an "absolute copy" of Vincent's hand [Doc. 184-9 at Page ID # 4203 (Ex. N, sealed, Schulz Depo. at pp. 138–39)].

Shortly after Dr. Schulz's discovery, Vincent filed two more infringement actions: (1) on November 8, 2019, Vincent sued Össur in the United States, alleging infringement of the Patent (the "Össur American Litigation"); and (2) on December 3, 2019, Vincent sued TASKA in Germany, alleging infringement of the Foreign Patent (the "TASKA Litigation") [Doc. 145-8; Doc. 194 at Page ID # 4633 (Sanctions Motion brief at p. 2)]. Thus, the record reflects that by the end of 2019, Vincent had filed lawsuits enforcing both the Foreign Patent in Germany (the Össur German Litigation and the TASKA Litigation) *and* the Patent in the United States (the Össur American Litigation). The Össur American Litigation serves as the contextual centerpiece for the Court's analysis of the Sanctions Motion.

In that action, Össur and Vincent agreed to and were bound by a protective order that allowed them to designate material as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" (the "Protected Material") [Doc. 185-6 (the "Össur Protective Order") at Page ID # 4476 (Ex. T at p. 2)]. The Össur Protective Order provided clear guidance regarding the parties' obligations once the lawsuit resolved:

> Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving **Party must return all Protected Material to the Producing Party or destroy such material**. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. **Notwithstanding this provision, Counsel are entitled to retain an archival copy** of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. **Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 [.]**

[*Id.* at Page ID # 4492–93 (Ex. T at pp. 18–19) (emphasis added)]. Thus, the parties were *required* to destroy the producing party's Protected Material, but were *permitted* to retain an archival copy of such material.

From January 2020 through September 2020, Vincent and Össur exchanged several letters regarding potential resolution of the Össur American Litigation (the "Össur Settlement Correspondence"). [*See* Doc. 184-3; Doc. 184-4; Doc. 184-5; Doc. 184-6; Doc. 184-7; Doc. 184-8 (Ex. H though Ex. M, sealed)].[4] The Össur Settlement Correspondence reflects that Vincent was aware of ███████████████████████████████████████ [Doc. 184-3 (Ex. H, sealed)], and knew of ██████████████████████████████ ████████████████ [Doc. 184-5 at Page ID # 4189 (Ex. J, sealed)].[5] The

---

[4] The Court previously addressed the Össur Settlement Correspondence in its Order on October 15, 2025 [Doc. 169 at Page ID # 4013–14)].

[5] Vincent's counsel explains the nature of an IPR petition: "An IPR petition is a document, like a summary judgment brief, in which an attorney presents arguments challenging the validity of an issued patent based on patent and printed publication prior art to the Patent Trial and Appeals Board

4

parties continued to negotiate, and on August 7, 2020,

[Doc. 184-6 (Ex. K, sealed)]. Vincent

responded a week later, stating that

[Doc. 184-7 at Page ID # 4194–95

(Ex. L, sealed)].[6] The parties eventually settled the Össur American Litigation by way of a

settlement agreement [Doc. 184-11 (the "Össur Settlement") (Ex.

P, sealed)].

The Össur Settlement resolved Vincent's only lawsuit claiming infringement of the Patent

in the United States. "In December 2020, following settlement of the Össur Litigation, [Vincent's]

counsel complied with the [Össur] Protective Order in that case by deleting Össur Confidential

Information." [Doc. 196-1 at Page ID # 4683 (response at p. 3); *see also* Doc. 185-7 (Ex. U)].[7]

They did not, however, destroy *everything* related to the Össur American Litigation. Specifically,

---

of the United States Patent & Trademark Office, to be decided by a panel of three administrative
judges." [Doc. 196-2 at Page ID # 4709 (Seraphine Dec. at p. 2)]. Defendants do not contest this
description in their briefing, but Defendants' counsel disagreed with the comparison between an
IPR petition and a summary judgment brief during the Hearing.

[6] This record seemingly conflicts with Defendants' representations during the Hearing that Vincent
significantly reduced its demand immediately upon receipt of the Össur IPR.

[7] Defendants assert that "Vincent provided a certification to Össur after settlement of that case
explaining that it had, in fact, retained 'archival copies as permitted by Section 15.'" [Doc. 194 at
Page ID # 4644 (Sanctions Motion brief at p. 13)]. The referenced letter asserts that "Vincent
Systems has destroyed any of Össur's Protected Material that Vincent Systems received in this
action and has not retained such materials, except for archival copies as permitted by Section 15."
[Doc. 185-7 (Ex. U)]. The Court notes that, "[e]ven after final disposition of th[e Össur Litigation],
the confidentiality obligations imposed by th[e Össur Protective Order] shall remain in effect until
a Designating Party agrees otherwise in writing or a court order otherwise directs." [Doc. 185-6 at
Page ID # 4478, 4492–93 (Ex. T at pp. 4, 18–19)].

5

Vincent's counsel represents that "based on the documents that were archived and ultimately produced, it appears that what was kept were the direct communications between the parties regarding settlement and the ultimate settlement agreement, both permitted exceptions to the Protective Order, and that other Confidential information was deleted." [Doc. 196-1 at Page ID # 4691 (response at p. 11)]. Vincent's counsel in this case avers that at the time they destroyed Össur's Protected Material under the Össur Protective Order, they were unaware of the TASKA Litigation or any anticipated litigation against Defendants [Doc. 196-1 at Page ID # 4683–84 (response at pp. 3–4); Doc. 196-2 at Page ID # 4712 (Seraphine Decl. at p. 5); Doc. 196-3 at Page ID # 4721 (Vega Decl. at p. 4); Doc. 196-4 at Page ID # 4728 (Zweig Decl. at p. 4)].

 [Doc. 197 at Page ID # 4744 (response at p. 3, sealed); *see also* Doc. 197-1 at Page ID # 4776 (Seraphine Dec. at p. 8, ¶ 26, sealed)]. Vincent's counsel did not recall [Doc. 197-1 at Page ID # 4776 (Seraphine Decl. at p. 8, ¶ 26, sealed)]. Vincent's counsel also [*id.*]. This summary is not inconsistent with the testimony of Össur's corporate representative in this case, who could not recall the manner in which

6



[Doc. 184-10 at Page ID # 4213, 4215–16 (Ex. O, Össur 30(b)(6) Depo. at pp. 62:16–63:2; 69:3–9; 74:12–21, sealed) (objections omitted); *see also* Doc. 197 at Page ID # 4744 (response at p. 3, sealed)].

Nearly two years after resolving the Össur American Litigation, Vincent set its sights on Defendants. On August 31, 2022, Vincent sent Fillauer a cease-and-desist letter (the "C&D Letter") disclosing both the pending TASKA Litigation and the resolved Össur American Litigation: (1) "Vincent Systems' specific infringement claims regarding the TASKA Hand are set forth in ongoing litigation between Vincent Systems and TASKA [] in Germany[;]" (2) Vincent "has previously enforced its '666 Patent in the US against Össur Americas, Inc., in a complaint filed in the United States District Court for the Central District of California in November 2019[;]" and (3) "[t]hat case was resolved by a Settlement and License Agreement between the parties."

7

[Doc. 185 at Page ID # 4362–63 (Ex. A at pp. 1–2)]. The record therefore reflects that as of August 31, 2022, Fillauer was aware of both the German TASKA Litigation *and* the existence of the Össur Settlement.

On July 21, 2023, Motion Control served its first set of interrogatories and requests for production, to which Vincent responded on September 20, 2023 [Doc. 195 at Page ID # 4659–60 (Telscher Decl. at ¶¶ 5–6); Doc. 185-1 (Ex. B, responses to requests for production); Doc. 185-2 (Ex. C, responses to interrogatories)]. Several of Defendants' requests for production pertained to "prior art and invalidity analyses, prior litigations, [and] design alternatives." [Doc. 195 at Page ID # 4660 (Telscher Decl. at ¶ 7) (citing RFP Nos. 10, 22, 23, and 31–33)]. Defendants also specifically identify the following interrogatory and response in the Sanctions Motion:

> **INTERROGATORY NO. 6**
> Describe all investigations, analyses, or discussions relating to the validity, patentability or scope of the Asserted Patent that occurred prior to the filing date of this lawsuit, including any prior art (other than that cited on the face of the Asserted Patent) recognized or considered, and for each state the date, identify all persons involved, describe the subject matter and scope, the location (if a physical location), and identify any documents relating to each described investigation, analysis or discussion.

> **RESPONSE TO INTERROGATORY NO. 6**
> Subject to its General Objections above, Vincent Systems objects to Interrogatory No. 6 as seeking the disclosure of information that is protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, immunity, or protection.

[Doc. 185-2 at Page ID # 4447 (Ex. C at p. 7)].

On September 29, 2023, Motion Control's counsel sent Vincent's counsel a letter outlining several alleged discovery deficiencies, including the referenced response:

> Interrogatory No. 6: Vincent refuses to substantively respond to this interrogatory. Interrogatory No. 6 states: "[d]escribe all investigations, analyses, or discussions relating to the validity, patentability or scope of the Asserted Patent that occurred prior to the filing date of this lawsuit, including any prior art (other than that cited on the face of the Asserted Patent) recognized or considered, and for each state the

8

date, identify all persons involved, describe the subject matter and scope, the location (if a physical location), and identify any documents relating to each described investigation, analysis or discussion." This interrogatory pertains directly to the validity of the Asserted Patent, and all responsive non-privileged information must be produced. To the extent Vincent objects to producing certain information on the basis of privilege, please confirm that Vincent will be identifying all said information on a privilege log.

[Doc. 185-3 at Page ID # 4457–58 (Ex. D at pp. 2–3) (citations omitted)]. On October 13, 2023, Vincent responded with the following:

Second, with respect to Vincent Systems' response to Interrogatory No. 6, **there is no nonprivileged responsive information other than certain documents Vincent Systems has already produced from the international application to which the '666 Patent claims priority**. Vincent Systems will amend its response to Interrogatory No. 6 to identify these documents by Bates number.

[Doc. 185-4 at Page ID # 4464 (Ex. E at p. 1) (emphasis added)]. Vincent's response says nothing about any specific documents pertaining to the Össur American Litigation, including, but not limited to, the Össur IPR.

The parties thereafter exchanged rolling productions through November 2025 (Vincent's last production) and December 2025 (Defendants' last production) [Doc. 196-1 at Page ID # 4684 (response at p. 4)]. During that period of time, Motion Control filed several motions to compel. The first, filed on November 15, 2023, focused only on "Interrogatory Nos. 9, 10, and 15," and did not assert that Vincent had failed to produce the Össur Settlement referenced in the C&D Letter Vincent sent more than a year earlier [Doc. 59]. The second, filed on January 16, 2025, was again silent regarding the sufficiency of Vincent's responses to Interrogatory No. 6 regarding Össur-related documents and instead focused on Vincent's obligation to "produce[] all non-privileged documents relating to its expert's testing of the accused TASKA finger elements." [Doc. 109 at Page ID # 2595].

9

Defendants then focused their discovery on Össur. On February 21, 2025, Motion Control served Össur with a subpoena (the Össur Subpoena"). [*See* Doc. 229 at Page ID # 9188 (reply at p. 4)]. On March 11, 2025, prior to receiving any response from Össur, Motion Control served on Vincent several additional requests for production aimed at the Össur American Litigation and the Össur Settlement [Doc. 198-2 (Ex. 3)]. Less than a week later, "Össur serve[d] objections to [the] subpoena representing they either do not have the documents or responding that Motion Control should get them from Vincent." [Doc. 229 at Page ID # 9188 (reply at p. 4)]. There is no dispute that, by the time of the Hearing, Defendants had never followed up with Össur regarding its objections to the Össur Subpoena.

On April 29, 2025, Vincent produced documents evidencing ███████████ [Doc. 201 at Page ID # 4873 (reply at p. 4)], and on June 26, 2025, Vincent produced redacted versions of the Össur Settlement Correspondence (the "Redacted Settlement Documents"). [*See* Doc. 145-17; *see also* Doc. 194 at Page ID # 4640 (Sanctions Motion brief at p. 9)]. One of these documents, a letter dated August 14, 2020, expressly referenced ███████████ [Doc. 184-7 at Page ID # 4195 (Ex. L, sealed)]. The version of the August 14 letter filed in the record under seal [Doc. 184-7 (Ex. L, sealed)] highlights the portions that were redacted when the letter was produced, but the phrase ███████████ does not appear highlighted. Therefore, it appears Defendants received information regarding the existence of an IPR petition on June 26, 2025. [*See* Doc. 145-17 at Page ID # 3467 (June 26 transmittal email of the Redacted Settlement Documents)].[8] On July 11, 2025, Vincent's counsel notified Defendants' counsel that "our firm had culled our files from the Össur Litigation pursuant

---

[8] During the Hearing, Defendants' counsel stated that neither he nor any members of his team were aware of the reference to ███████████ in Exhibit L.

to the Protective Order in that matter and we no longer had all of the material from the Össur Litigation." [Doc. 196-4 at Page ID # 4729 (Zweig Dec. at ¶ 16)]. Defendants' counsel simply says he "does not recall that statement." [Doc. 229 at Page ID # 9197].

On August 19, 2025—nearly three years after the C&D advised Defendants of the Össur Settlement—Motion Control filed its third motion to compel, which sought "production of documents related to the assertion and licensing of the [Patent] against a third-party entity known as Össur." [Doc. 145 at Page ID # 3342]. In response, Vincent asserted the existence of a settlement negotiation privilege.[9] The Court held the settlement negotiation privilege inapplicable and ordered Vincent to produce unredacted versions of the Redacted Settlement Documents by October 24, 2025 [Doc. 169 at Page ID # 4018].

Vincent complied with the order, at which point Defendants discovered, for the first time, Össur's transmittal of the Össur IPR more than five years earlier.[10] Defendants requested Vincent produce a copy of the Össur IPR, and Vincent advised it no longer possessed the document on October 27, 2025 [Doc. 196-1 at Page ID # 4685–86 (response at pp. 5–6)]. Defendants did not thereafter file a fourth motion to compel or otherwise raise the issue with the Court. Nor did

---

[9] Defendants assert that the first time Vincent raised the privilege was in its supplemental response to Motion Control's Third Requests for Production of Documents on May 9, 2025 [Doc. 195 at Page ID # 4662–63 (Telscher Decl. at ¶¶ 26–27)]. Vincent disagrees, and argued during the Hearing that its objection to Motion Control's First Requests for Production on the grounds of "any other applicable privilege, immunity, or protection" encompassed the settlement negotiation privilege. [*See* Doc. 185-1 (Ex. B)].

[10] Defendants assert that "*all references to the IPR petition were redacted from the produced documents*." [Doc. 195 at Page ID # 4664 (Telscher Decl. at p. 6, ¶ 37) (emphasis in original)]. For purposes of clarity, the Court notes that Vincent did not selectively redact only references to the Össur IPR. Rather, it appears Vincent redacted *all* information *other than* references to the basis of ▮▮▮▮▮▮ discussed during the negotiation.

11

Defendants take any steps to follow up with Össur, which had objected to the Össur Subpoena on the grounds that Defendants should obtain discovery from Vincent first.

And when Defendants deposed two corporate representatives for Vincent and a corporate representative for Össur on December 2, 2025, Defendants did not ask *any* of those witnesses a *single* question about the Össur IPR. Instead, on December 5, 2025, Defendants' counsel wrote Vincent's counsel a detailed email making many of the very same arguments raised in the Sanctions Motion [Doc. 184-12 (Ex. Q, sealed)]. Vincent's counsel responded on December 9, 2025, confirming that they did not have the Össur IPR or any additional written correspondence with Össur in their possession, custody, or control [*id.*]. Again, Defendants did not bring these disputes to the Court's attention. Instead, the parties had a meet-and-confer on December 23, 2025, during which Vincent again advised that it did not have the Össur IPR or any additional correspondence with Össur [Doc. 184-13 (Ex. R, sealed)]. Again, Defendants did not raise the issue with the Court.

Instead, Defendants filed the Sanctions Motion on February 13, 2026, more than two months after the close of discovery.

## B.    ANALYSIS

### 1.    *Timeliness of the Sanctions Motion*

Defendants invoke several Federal Rules of Civil Procedure in their extensive briefing. Conspicuously absent is Rule 16, which memorializes the Court's necessary power to manage litigation through issuance of scheduling orders. The operative scheduling order, issued on July 10, 2025, sets a close of all fact discovery for December 2, 2025, and contains the following admonition: "After that date, the parties may conduct discovery by agreement, ***but the Court will***

12

*not involve itself in any disputes that may arise*." [Doc. 137 (the "Scheduling Order") at Page ID # 3316 (emphasis added)]. Yet that is exactly where the Court finds itself.

As set forth above, Defendants have known about the Össur Settlement since before this lawsuit began, and they have known about the existence of the Össur IPR and the fact that Vincent no longer possessed it since late October 2025. Instead of following up with Össur, questioning Vincent's and Össur's corporate representatives, requesting an extension of discovery, or otherwise bringing this issue to the Court's attention so that the alleged "litigation misconduct" could potentially be addressed, Defendants allowed the discovery deadline to pass, requested a meet-and-confer that took place on December 23, 2025, threatened sanctions, and then waited until February 13, 2026, to file the Sanctions Motion.

During the Hearing, Defendants' counsel argued that he never requested additional time for discovery to address this issue because, *inter alia*, he assumed the Court would deny his request. That is quite the assumption, especially considering Defendants' willingness to file a contested motion to amend the scheduling order on January 16, 2026, weeks after the meet-and-confer identifying all of the issues raised in this Sanctions Motion [Doc. 173 (the "Motion to Amend")]. There, Defendants rightly noted the Court's Judicial Preferences that " . . . the Court will fairly consider requests for reasonable extensions of deadlines supported by good cause[]" in seeking additional time for expert disclosures [Doc. 173 at Page ID # 4052]. Vincent opposed the Motion to Amend [Doc. 176], and Defendants filed a reply [Doc. 177]. The Court granted the Motion to Amend on January 23, 2026 [Doc. 178]. It therefore strains credulity to believe that Defendants' decision to not raise this issue earlier was driven by a fear that the Court would refuse to consider an amendment to the scheduling order.

Further, a motion to amend a scheduling order is not in and of itself a remarkable or unique filing in a complex patent case like this one. What *is* remarkable, however, is that Defendants—who spend most of their briefing explaining how case-critical the Össur IPR is—knew about *everything* in the Sanctions Motion at the time they filed the Motion to Amend: (1) Vincent advised it culled the Össur documents on July 11, 2025; (2) Vincent confirmed it no longer had the Össur IPR on October 27, 2025; (3) Defendants outlined the issues addressed in the Sanctions Motion in an email to Vincent on December 5, 2025; and (4) the parties discussed all of these issues during a meet-and-confer on December 23, 2025. All of this took place *well before* Defendants filed their Motion to Amend [Doc. 184-12 (Ex. Q, sealed); Doc. 184-13 (Ex. R, sealed)]. For whatever reason, Defendants chose not to address the issue at any time prior to filing the Sanctions Motion.

While Rule 37 "does not provide a time limit for the filing of motions for sanctions pursuant to its provisions, Courts have routinely held that 'unreasonable delay may render such a motion untimely.'" *Williams v. Nationwide Ins. Co.*, No. 12-13904, 2014 WL 2873274, at *4 (E.D. Mich. April 29, 2014) (citing cases). Under the circumstances of this particular discovery dispute, the Court finds Defendants' delay to be unreasonable. Defendants have not cast the Sanctions Motion as a motion to compel and reopen discovery, and it is not entirely clear whether they are seeking any additional discovery. [*See* Doc. 194 at Page ID # 4655 (Sanctions Motion brief at p. 24) ("Even reopening discovery, and ordering Vincent to produce what it still has, does not fully remedy the harm, and has the distinct disadvantage of further delaying and increasing the cost of the litigation." (footnote omitted)); *see also id.* at Page ID # 4655 n.10 (listing discovery Defendants contend Vincent should produce, "[w]ere discovery to be reopened")]. In any event, motions to compel filed after the close of discovery are plainly untimely. *See McGhee v. Buffaloe & Assocs., PLC*, No. 2:12-CV-333, 2013 WL 11478554, at *2 (E.D. Tenn. Dec. 20, 2013) (collecting cases

14

and finding that "[c]ourts, including courts in this circuit and in this district, have found that motions seeking court intervention in discovery disputes after the close of discovery are untimely."); *see also Ecolab, Inc. v. Ridley,* No. 1:22-cv-050-TRM-SKL, 2023 WL 11762603, at *2 (E.D. Tenn. May 5, 2023) (finding a motion to compel filed within days of the close of discovery is untimely and collecting cases).

Of course, whether the Sanctions Motion was untimely filed does not depend entirely on whether it is a motion to compel seeking additional discovery, and the Court's determination regarding its untimeliness applies to the Sanctions Motion as a whole. The Court notes the parties stipulated to an extended briefing schedule for the Sanctions Motion [Doc. 186], which meant the Sanctions Motion would not be ripe until March 27, 2026, shortly before the March 31 deadline for *Daubert* motions and the April 7 deadline for motions for summary judgment [Doc. 137; Doc. 178]. The timing of the Sanctions Motion, the nature of the accusations made therein, and the sheer volume of the relevant filings, all but guaranteed the parties' *Daubert* and summary judgment motions would be fully briefed before there could be any resolution to the Sanctions Motion. *See Harden v. Stangle*, No. 3:18-cv-00981, 2020 WL 6685525, at *6 (M.D. Tenn. Nov. 12, 2020) (citing cases and observing that "courts have held that spoliation motions must be brought as such in close proximity to the time when the party becomes aware of the alleged destruction of evidence").

The Court could deny the Sanctions Motion on the basis of its untimeliness alone. However, the Court finds the Sanction Motion also fails on the merits, as set forth below.

15

### 2. Merits of Sanctions Motion

#### a. Standards

As the source of the Court's authority to sanction Vincent for its alleged spoliation of evidence and other alleged litigation misconduct, including the failure to disclose certain documents and information in discovery, Defendants cite provisions of Federal Rule of Civil Procedure 37, 28 U.S.C. § 1927 ("Counsel's liability for excessive costs"), and the Court's "inherent authority." The relevant provisions of Rule 37 provide:

> 37(c)(1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> > (B) may inform the jury of the party's failure; and
> > (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).[11]
>
> ***
>
> 37(e) *Failure to Preserve Electronically Stored Information.* If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

---

[11] Defendants also cite Rule 37(b), but only for the list of available sanctions in subsection (b)(2)(A), which is referenced in Rule 37(c)(1)(C). Defendants do not contend Vincent has "fail[ed] to comply with a court order," as required by Rule 37(b). The sanctions listed in subsection (b)(2)(A) include: "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; [and] (vi) rendering a default judgment against the disobedient party[.]"

16

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

As mentioned, Vincent's alleged spoliation of the Ossur IPR is the gravamen of the Sanctions Motion, implicating Rule 37(e). Courts interpret Rule 37(e) as containing five elements that must be satisfied before the court can consider the scope of any sanctions ordered:

> (1) the purportedly lost evidence must be electronically stored information (ESI); (2) there must have been anticipated or actual litigation that triggered a preservation duty; (3) the relevant ESI should have been preserved; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery.

*Allergan, Inc. v. Revance Therapeutics, Inc.*, No. 3:23-CV-00431, 2025 WL 2182325, at *3 (M.D. Tenn. July 18, 2025) (citation omitted). Where a party is unable to demonstrate that evidence was actually spoiled (*i.e.*, it cannot be restored or replaced through additional discovery), sanctions are inappropriate. *Nat'l Lab. Rels. Bd. v. Bannum, Inc.*, 93 F.4th 973, 983 (6th Cir. 2024); *see also Allen v. Cam's Transp. Co.*, No. 3:22-CV-403-KAC-DCP, 2024 WL 3852133, at *12 (E.D. Tenn. Aug. 16, 2024) (refusing to impose spoliation sanctions and citing several cases supporting the proposition that sanctions are inappropriate absent a showing that the evidence cannot be restored or replaced). This Court has previously addressed the proper analysis:

> A step-by-step analysis under Rule 37(e) concerning the loss of the backup data copied to the hard drive involves the following determinations. First, was there a duty to preserve the data in issue? If not, the analysis ends. Second, were reasonable steps taken to avoid the loss of the data? If so, the analysis ends. Third, can the lost data be "restored or replaced" through additional discovery? If so, the analysis ends. Fourth, was the other party prejudiced by the loss of the data? If not, the analysis ends, but if there was prejudice, the court can impose "measures no greater than necessary to cure the prejudice." Such measures may include, allowing the injured

17

party to comment on or introduce evidence about the lost data at trial. If data were lost "with the intent to deprive another party" of the use of the lost data, prejudice is assumed and the court can allow a permissive or mandatory adverse inference or impose a case-terminating sanction.

*Yoe v. Crescent Sock Co.*, No. 1:15-CV-3-SKL, 2017 WL 5479932, at *9 (E.D. Tenn. Nov. 14, 2017).

Defendants also invoke the Court's inherent authority to sanction a party for spoliation of evidence, which the Sixth Circuit Court of Appeals has described as follows:

A district court may sanction a litigant for spoliation of evidence if three conditions are met. First, the party with control over the evidence must have had an obligation to preserve it at the time it was destroyed. Second, the accused party must have destroyed the evidence with a culpable state of mind. And third, the destroyed evidence must be relevant to the other side's claim or defense. The party seeking the sanction bears the burden of proof in establishing these facts.

*Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 383–84 (6th Cir. 2013) (citations omitted).

Finally, Defendants seek sanctions under 28 U.S.C. § 1927, which provides: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Although "[d]istrict courts have broad discretion in crafting a proper sanction for spoliation," that sanction must "serve both fairness and punitive functions." *Arch Ins. Co. v. Broan–Nutone, LLC,* No. 11–6221, 509 F. App'x. 453, 2012 WL 6634323 (6th Cir. Dec. 21, 2012) (citation omitted). Dismissal should rarely be imposed and only when significant prejudice results from the evidence's destruction. *Byrd*, 518 F. App'x at 385–86. The Court's decision is subject to an abuse of discretion standard, and its "factual determinations giving rise to the spoliation finding

18

are reviewed for clear error." *Id.* at 383; *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010).

Importantly, for sanctions due to spoliation or other litigation misconduct under any of the aforementioned vehicles, the party seeking sanctions bears the burden of proof. *See Byrd*, 518 F. App'x at 383–84 (regarding sanctions ordered pursuant to court's inherent authority: "The party seeking the sanction bears the burden of proof in establishing [the relevant] facts."); *Scott v. Bank of Am., N.A.*, No. 21-11068, 2022 WL 4587939, at *12 (E.D. Mich. Sept. 29, 2022) ("The burden of proof is on the party seeking [sanctions] under § 1927." (citation omitted)); *Marietta Health Care Physicians, Inc. v. Yoak*, No. 2:19-cv-5626, 2021 WL 1310335 (S.D. Ohio Apr. 8, 2021) (holding that "Rule 37(c) sanctions are not justified" where the moving party "failed to meet its burden to show that Defendant violated Rule 26(e)"); *Yoe*, 2017 WL 5479932, at *9 (in case involving Rule 37(e) sanctions for alleged spoliation of ESI, finding that the "party alleging spoliation has the burden of proof.").

### b. Conduct at issue

To properly apply the foregoing standards, the Court must identify the precise nature of the asserted misconduct. Although Defendants broadly accuse Vincent of making "frivolous arguments," "misleading statements," and "spurious privilege objections" in order to "continue the concealment of damaging information," it was made clear during the Hearing that Defendants' request for sanctions is based on three things: (1) Vincent's failure to preserve the Össur IPR;[12] (2)

---

[12] During the Hearing, Defendants also argued for the first time that sanctions were warranted due to Vincent's failure to preserve Össur's invalidity contentions from the Össur American Litigation. According to counsel, Defendants only learned about the existence and destruction of the Össur invalidity contentions when Vincent's counsel (attorney Jacob Zweig) filed his declaration in support of Vincent's response to the Sanctions Motion on March 13, 2026 [Doc. 196-4 at Page ID # 4730 (Zweig Dec. at pp. 5–6, ¶ 17)]. Defendants' reply nevertheless focuses on the Össur IPR, the alleged ███████████████, and Evolution 1 and 2. [*See, e.g.,* Doc. 201 at Page ID #

Vincent's alleged failure to produce documents relating to the ███████████ and (3) Vincent's alleged failure to produce documents and provide information pertaining to the "Evolution 1" and "Evolution 2" products. The gravamen of the Sanctions Motion is Vincent's alleged failure to preserve the Össur IPR, and the Court addresses issues related to the alleged spoliation of this document last.

███████████████████

As for Vincent's alleged failure to produce documents pertaining to ███████████████ the Court notes the legitimate dispute regarding whether any such documents ever existed. Defendants' counsel asserts that during the deposition of Össur's corporate representative on December 2, 2025, Motion Control "learned of correspondence between Össur and Vincent about ███████████ [Doc. 184 at Page ID # 4146 (Telscher Dec. at ¶ 55, sealed)]. This representation is based on the following testimony of Össur's corporate representative:



_____

4870 (reply at p. 1, sealed)]. As far as the Court can tell, the invalidity contentions are not addressed in the unredacted Össur Settlement Correspondence, and Defendants have not demonstrated the contentions' significance separate and apart from the Össur IPR. Mr. Zweig's Declaration makes clear the invalidity contentions were deleted pursuant to the Össur Protective Order, just like the Össur IPR [Doc. 196-4 at Page ID # 4730 (Zweig Dec. at pp. 5–6, ¶ 17)]. Moreover, and also like the Össur IPR, Defendants inquired about Össur's "invalidity positions" in the Össur Subpoena, which Defendants elected not to pursue over Össur's objections [*id.* at Page ID # 4731–32 (Zweig Dec. at ¶¶ 22–26)]. Accordingly, the Court declines to separately address the Össur invalidity contentions in this memorandum and order.



[Doc. 184-10 at Page ID # 4213, 4215–16 (Ex. O, Össur 30(b)(6) Depo. at pp. 62:16–63:2; 69:3–9; 74:12–21, sealed) (objections omitted)]. Therefore, the record reflects Össur's representative



In turn, Vincent's counsel does not recall any written communications regarding

, but her recollection leaves open the possibility that Össur had provided

[Doc. 197-1 at Page ID # 4776 (Seraphine Dec. at ¶ 26, sealed)].

Simply put, this record does not clearly reflect that the information Defendants seek was ever actually created or transmitted to Vincent. If anything, the parties to such communications recall that the lawyers verbally discussed ██████████████████████ that Össur sent ██████████████████████████████ which Vincent does not currently possess, and that Vincent's counsel ██████████████████ ████████████████████████████████ Finally, even if Defendants have proven the existence of written correspondence between Össur and Vincent regarding ████████████ (they have not), they have not shown that the allegedly spoliated documents cannot be restored or replaced with additional discovery. It is undisputed Defendants did not follow up with Össur to determine whether Össur possessed any correspondence about ██████████████, even though they rely almost entirely on the testimony of Össur's corporate representative in support of their argument that Vincent should be sanctioned for failing to produce the alleged correspondence.

Accordingly, the Court **DENIES** the Sanctions Motion as it pertains to the ██████████.

### d.     The Evolution 1 and 2

Next, the Court addresses Defendants' contention that Vincent improperly and in bad faith failed to disclose the existence of Evolution 1 and Evolution 2 in response to Defendants' Interrogatory No. 1, which asked Vincent to identify which of its products practiced the Patent [Doc. 183 (sealed) at Page ID # 4121–22 (Sanctions Motion brief at pp. 12–13)].

Vincent's counsel clarified during the Hearing that Vincent was selling the Evolution 1 product outside the United States when it received a cease-and-desist letter from a third party called Touch Bionics claiming infringement of certain patents not at issue in this case. Vincent responded by withdrawing Evolution 1 from the market and pivoting to Evolution 2, which undisputedly did not practice the Patent. Vincent's counsel further clarified during the Hearing that the Patent at

22

issue in this case had not yet been issued by the time Vincent stopped selling Evolution 1, such that Evolution 1 could not have practiced the Patent. After the patents upon which Touch Bionics had relied expired, the Patent was issued to Vincent (in 2013), and Vincent then launched the "Evolution 3," which was the first product to practice the Patent. As far as the Court can tell, Defendants have not pointed to any other discovery responses as evidence of Vincent's alleged misconduct concerning Evolution 1 and 2 in support of their request for sanctions.

In light of these uncontested representations that neither Evolution 1 nor Evolution 2 practiced the Patent, the Court finds the Sanctions Motion should be **DENIED** with regard to the nondisclosure of Evolution 1 and 2 in response to Interrogatory No. 1.

### e. The Össur IPR

The record paints a clearer picture with regard to the Össur IPR. There is no dispute that the Össur IPR was stored electronically and would therefore be considered ESI. There is also no dispute that the Össur IPR was lost because Vincent failed to take reasonable steps to preserve it. In fact, Vincent acknowledges that the Össur IPR was intentionally destroyed under the terms of the Össur Protective Order. The crux of the Court's analysis, therefore, is whether Vincent had a duty to preserve the Össur IPR, whether the Össur IPR has been spoiled, and whether Defendants are prejudiced by the spoliation.

### 1. Was there a Duty to Preserve?

The parties agree that "a party can only be sanctioned for destroying evidence if it had a duty to preserve it." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). "Thus, 'spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Id.*

(quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Id.*

During the Hearing, Defendants relied heavily on *Micron*, which describes the notion of "reasonable foreseeability" as a fact-intensive inquiry:

> When litigation is "reasonably foreseeable" is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry. This standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation. However, it is not so inflexible as to require that litigation be "imminent, or probable without significant contingencies," as Rambus suggests. Rambus's proposed gloss on the "reasonably foreseeable" standard comes from an overly generous reading of several cases. *Burlington* merely noted that imminent litigation was sufficient, not that it was necessary for spoliation, and on the easy facts of *Trask–Morton,* it was decided that the alleged spoliator did not even "suspect" litigation. This court declines to sully the flexible reasonably foreseeable standard with the restrictive gloss proposed by Rambus in light of the weight of contrary authority and the unnecessary generosity that such a gloss would extend to alleged spoliators. Moreover, it would make little sense to enjoin document destruction only when the party clears all the hurdles on the litigation track, but endorse it when the party begins the race under the reasonable expectation of clearing those same hurdles. Thus, the proper standard for determining when the duty to preserve documents attaches is the flexible one of reasonably foreseeable litigation, without any additional gloss.

*Id.* at 1320–21 (citations omitted); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1344–46 (Fed. Cir. 2011) (noting the determination of when the duty to preserve begins is "informed by a number of policy considerations, including 'the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth,' and must balance the reality that 'litigation is an ever-present possibility in American life,' with the legitimate business interest of eliminating unnecessary documents and data." (citations omitted)).

24

The *Micron* court found no clear error in the district court's conclusion that litigation was reasonably foreseeable at the time of destruction in that case for five reasons: (1) the destruction was not part of a long-standing policy motivated by business needs, but by the patentee's desire to get "battle ready" for future litigation over its patent; (2) the patentee was on notice of potentially infringing activities by specific manufacturers; (3) the patentee "took several steps in furtherance of litigation prior to" destroying the documents, including the development of a litigation strategy; (4) it was "more reasonable for a party in [the patentee's] position as a patentee to foresee litigation that does in fact commence, than it is for a party in the manufacturers' position as the accused[;]"[13] and (5) the patentee and manufacturers did not have a previously longstanding and mutually beneficial relationship that usually makes litigation less foreseeable. *Id.* at 1322–25. Of specific import to this case is the second factor:

> Second, Rambus was on notice of potentially infringing activities by particular manufacturers. Once the patent issued, the gun was loaded; when the targets were acquired, it was cocked; all that was left was to pull the trigger by filing a complaint. While it may not be enough to have a target in sight that the patentee believes may infringe, the knowledge of likely infringing activity by particular parties makes litigation more objectively likely to occur because the patentee is then more likely to bring suit.

*Id.* at 1323.

Based on the record as a whole, the Court concludes that Vincent had a duty to preserve evidence pertaining to the Patent at the time they received the Össur IPR. As noted above, Vincent had already taken steps to enforce the Patent in the United States by filing the Össur American Litigation. Further, Vincent was aware the Accused Product was in the United States as early as

---

[13] Rambus is the defendant in the *Micron* case discussed herein. However, as the *Micron* decision explains, the spoliation at issue in that case took place as part of Rambus' strategy (as patentee) to file patent infringement lawsuits against manufacturers of certain types of computer memory chips. *See Micron*, 645 F.3d at 1315–19.

25

February 2018 (symposium in Las Vegas) and August 2019 (Dr. Schulz disassembling and photographing the Accused Product). And Vincent had identified TASKA as the manufacturer of the Accused Product, and initiated litigation against TASKA in Germany (which is where Vincent had originally sued Össur before filing suit in the United States). Based on these facts, the Court finds that litigation regarding the Accused Product in the United States was reasonably foreseeable.

### 2. Did the duty extend to the Össur IPR?

The question then becomes whether Vincent had an obligation to preserve the Össur IPR, specifically. In support of their argument, Defendants cite a litany of cases in which a party to litigation destroyed or failed to preserve relevant evidence that the destroying party itself created and/or purchased. *See Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 38 (6th Cir. 2013) (homeowner failed to preserve stove top that allegedly caused fire in claim against insurance company); *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540 (6th Cir. 2010) (destruction of investigative folder that contained a roster of all prison employees' personal information and served as direct evidence of alleged improper disclosure under Privacy Act claim); *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (prison's destruction of color photographs and video footage of alleged assault by a corrections officer against state prisoner); *Micron Tech.*, 645 F.3d at 1317–19 (company destroyed thousands of its own documents and backup email tapes); *Hargis v. Overton Cnty.*, No. 2:22-cv-00011, 2023 WL 8604139 (M.D. Tenn. Dec. 12, 2023) (county jail failed to preserve video footage of underlying incident from the county jail's security system); *Bistrian v. Levi*, 448 F. Supp. 3d 454 (E.D. Pa. 2020) (Federal Detention Center's failure to preserve surveillance video footage of incident involving plaintiff); *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768 (E.D. Mich. 2019) (store failed to preserve exterior video evidence, assistant store manager's incident report, and door involved in accident); *EPAC Techs.,*

26

*Inc. v. HarperCollins Christian Publ'g, Inc.*, Case No. 3:12-cv-00463, 2018 WL 1542040 (M.D. Tenn. Mar. 29, 2018) (defendant's failure to preserve more than 48,000 allegedly defective books and samples that it previously purchased from plaintiff); *Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, 897 F. Supp. 2d 599 (S.D. Ohio 2012) (defendant destroyed fueling system that failed at the time of accident involved in the case); *John B. v. Goetz*, 879 F. Supp. 2d 787 (M.D. Tenn. 2010) (defendant's failure to preserve its own documents responsive to plaintiff's search terms after filing of litigation).

The Össur IPR is unquestionably distinct from the types of information at issue in these cases. Defendants explain that "IPRs are proceedings before the U.S. Patent Trial and Appeal Board (which is part of the U.S. Patent Office) ('PTAB') challenging the validity of an issued U.S. patent based on publicly available 'prior art' patents and printed publications." [Doc. 194 at Page ID # 4634 (Sanctions Motion brief at p. 3)]. Vincent agrees, but provides further clarity:

> An IPR petition is not 'evidence,' but attorney argument challenging the validity of a patent. Only publicly available prior art (patents and printed publications) can be relied on in an IPR petition. An IPR petition is a document, like a summary judgment brief, in which an attorney presents arguments challenging the validity of an issued patent based on patent and printed publication prior art to the Patent Trial and Appeals Board of the United States Patent & Trademark Office, to be decided by a panel of three administrative judges.

[Doc. 196-2 at Page ID # 4709 (Seraphine Dec. at p. 2, ¶ 7)]. The Össur IPR "was prepared by Knobbe Martens Olson & Bear, LLP, a firm known for its expertise in this area. The fees and costs just to prepare an IPR petition are estimated at over $300,000." [Doc. 183 at Page ID # 4112 n.2 (Sanctions Motion brief at p. 3 n.2, sealed)].

Thus, Defendants ask the Court to sanction Vincent for failing to preserve a document that: (1) was prepared by a non-party's counsel at substantial expense more than five years ago; (2) contained information that was at the time, and remains, undisputedly public; (3) was transmitted

27

by the non-party's counsel during the course of settlement discussions in an effort to facilitate resolution of prior litigation; and (4) was governed by the terms of the Össur Protective Order that required its destruction. Defendants fail to cite a single analogous case creating an obligation to preserve such material.

The facts of this case stand in stark contrast to those in *Micron*, to which Defendants counsel cited heavily during the Hearing. Vincent did not embark on a formal campaign to get "battle ready" for litigation by hosting "shredding parties" at which the company destroyed "between 9,000 and 18,000 pounds of documents in 300 boxes." *Micron*, 645 F.3d at 1318. Nor did Vincent destroy any documents that would have made Defendants' defenses "illuminated by evidence of a non-public nature, e.g. by internal [Vincent] documents," as there is no question the document at issue was, by its nature, replete with publicly available information. *Id.* at 1328. Further, whereas Rambus had identified targets of litigation at the time it destroyed documents, the Sanctions Motion does not contain any information sufficient to identify the moment in time where Vincent became aware of *Defendants'* allegedly infringing activity.[14] Finally, the Össur IPR was destroyed in accordance with the terms of the Össur Protective Order, which *required* the destruction of Össur's Protected Material [Doc. 198 at Page ID # 4803 (Ex. 1 at p. 1); Doc. 185-6 (Ex. T at pp. 18–19)].[15]

---

[14] During the Hearing, Defendants' counsel argued that knowledge of TASKA's infringing conduct was sufficient because Defendants and TASKA are essentially one and the same. The Court notes this stands in stark contrast to the position Defendants assumed in opposition to Vincent's prior motion to compel, in which Defendants argued that "TASKA and Motion Control are 'independent parties' with no 'agent, employee or representative' relationship created[,]" and asserted that they "have no legal right to access any, much less all, of TASKA's documents, and no legal basis to demand TASKA produce documents responsive to requests served by Vincent on Defendants." [Doc. 129 at Page ID # 3097].

[15] Defendants repeatedly overlook this requirement of the Össur Protective Order, focusing instead on the fact that the document *permitted* Vincent to retain an archival copy of Protected Material.

28

The Court therefore finds that Vincent was under no obligation to preserve the Össur IPR under the unique circumstances of this case.

### 3. Could the Össur IPR be restored or replaced through additional discovery?

Even if Vincent *were* under an obligation to preserve the Össur IPR, the Court finds sanctions would be inappropriate, for two reasons. First, Defendants have failed to carry their burden of proving the Össur IPR has in fact been spoiled. As noted above, Defendants served the Össur Subpoena in February 2025. Össur objected on several grounds, including its position that Defendants should seek the documents from Vincent. The record reflects that: (1) Defendants learned on July 11, 2025, that Vincent had culled all of Össur's Protected Material; and (2) Vincent advised Defendants it no longer had the Össur IPR on October 27, 2025.

Armed with that knowledge, Defendants—who argue that the Össur IPR is potentially the single most important document in this case—did *nothing*. They took no steps whatsoever to ascertain whether Össur—who Defendants estimate spent approximately $300,000 to generate the Össur IPR—still had a copy of the document. They never followed up on the Össur Subpoena. They never contacted Össur to informally inquire. They never asked Össur's corporate representative a single question about the Össur IPR during her deposition on December 2, 2025, despite having clearly indicated their intent on October 20, 2025, to ask about "Össur's noninfringement positions taken in the California Litigation and German Litigation" with Vincent and the "invalidity defenses asserted in the California Litigation and German Litigation, including

---

The fact that Defendants chose not to retain an archival copy even though they were permitted to do so does not change the Court's analysis, nor does it demonstrate that Vincent "selectively destroyed . . . damaging documents," as Defendants argue [Doc. 194 at Page ID # 4646 (Sanctions Motion brief at p. 15)].

29

all prior art considered or asserted in the California Litigation and German Litigation" and "[t]the positions taken by the parties during royalty rate negotiations between Össur and Vincent regarding license and settlement of the California Litigation and German Litigation." [Doc. 198-3 at Page ID # 4824–25 (Ex. 4)]. They did not raise the issue with the Court in December. They did not raise the issue with the Court in January, when they filed the Motion to Amend. Instead, they waited until February 13, 2026, to file the Sanctions Motion. And when asked during the Hearing whether Össur still had a copy of the Össur IPR, Defendants' counsel answered honestly that he had no idea.

Because Defendants have failed to carry their burden of proving the Össur IPR has been spoiled (*i.e.*, is no longer available from any source), the Sanctions Motion is **DENIED**.

### 4. Are Defendants prejudiced by the absence of the Össur IPR?

Defendants' prejudice argument is essentially that obtaining and copying the Össur IPR would have made it easier and less expensive to defend this case [Doc. 194 at Page ID # 4635 (Sanctions Motion brief at p. 4) ("Had the [Össur IPR] been produced in this litigation, as called for in discovery requests served in July 2023, Motion Control could have filed the [Össur IPR] with the PTAB and sought a stay of these proceedings without incurring the high initial costs of preparing its own IPR petition while concurrently litigating this case."); *see also* Doc. 229 at Page ID # 9198 (reply at p. 14) (arguing that the Össur IPR "would have been a huge benefit to Motion Control in defending this case.")]. Defendants do not cite any authority supporting the proposition that their inability to access a third-party's aggregation of publicly available data constitutes prejudice, let alone rises to a level justifying the imposition of sanctions. Further, as discussed above, any such prejudice has been compounded by Defendants' failure to timely raise the issue with Össur and/or the Court.

30

Finally, the Court notes that Defendants' prejudice argument is premised upon two assumptions: (1) the contents of the Össur IPR (which Defendants have not seen) differed substantially from ███████████████████████████████ (which Defendants have seen); and (2) the Össur IPR was the single precipitating factor in the Össur Settlement. Neither assumption is supported by the record. Specifically, Vincent argues the document was largely duplicative of ██████████████ and notes that it learned of Össur's intent to file the Össur IPR months before receiving the draft. Further, Vincent's response to the Össur IPR was ███████████████████████████████ ████████.

Under the unique circumstances of this case, the Court finds the Defendants' alleged prejudice is insufficient to warrant the imposition of sanctions.

## C. CONCLUSION

For these reasons, the Court **DENIES** the Sanctions Motion [Doc. 181]. Given the current record, the Court finds that an award of attorney's fees and expenses in favor of Vincent is not justified, however. *See* Fed. R. Civ. P. 37.

## II. PERDUE MOTION

Vincent moves to exclude portions of Mr. Perdue's expert report concerning damages, and any related testimony at trial, pursuant to Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "[R]ejection of expert testimony is the exception rather than the rule," *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008), and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact," *Burgett*, 579 F. App'x at 376 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping

function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").[16]

Pursuant to 35 U.S.C. § 284, damages for patent infringement should be "adequate to compensate for the infringement but **in no event less than a reasonable royalty** for the use made of the invention by the infringer, together with interest and costs as fixed by the court." (Emphasis added). Mr. Perdue opines to a range of reasonable royalty rates, which he contends "properly considers market royalty rate evidence, apportionment, and the profitability of the Defendants." [*Id.*]. He contends that the opinion of Vincent's damages expert, Dr. Katie Grace, is "unreliable" for purposes of calculating a reasonable royalty rate, because it "fails to consider critical information while overstating the nature of competition between the parties without sufficient support." [*Id.*].

Vincent argues that in forming his opinions, Mr. Perdue improperly relied on royalty rates from license agreements "that relate to entirely different and non-comparable technologies." [Doc. 227 at Page ID # 8848 (Perdue Motion at p. 1)]. Vincent asks the Court to exclude the portions of the Perdue Report that "discuss and rely on" any such license agreements (*i.e.*, those license agreements "for which no economic or technical comparability have been shown"), which include: (1) pages 18–20 of the Report; (2) exhibits 9–11 of the Report; (3) Mr. Perdue's conclusion regarding market royalty rates at page 25 of the Report; (4) the "Royalty Rates" and "Royalty

---

[16] The parties agreed during the Hearing that Federal Circuit precedent is binding as to the Perdue Motion and the Rouse Motion. The Court includes the language in the foregoing paragraph, from Sixth Circuit cases, because it is generally applicable in the Rule 702/*Daubert* context and it does not conflict with the authorities the parties have cited and relied on.

Amounts" at pages 27–28 of the Report; and (5) Mr. Perdue's summary of his ultimate opinions on page 4, paragraph 12(ii) of the Report. [*See* Doc. 245-1 at Page ID # 9507–08 (reply at pp. 4–5)]. The gravamen of Vincent's argument is that Mr. Perdue failed to conduct *any* analysis regarding economic and technical comparability, which Vincent argues is required in every patent case.[17]

"A reasonable royalty derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citation and quotation marks omitted). Although determining a reasonable royalty is "a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge[,]" the "analysis requires a court to hypothesize, not to speculate." *Id.* at 869 (citations omitted). "Thus, the trial court must carefully tie proof of damages to the claimed invention's footprint in the market place." *Id.* (citations omitted).

"[A]n accepted method of calculating a reasonable royalty comes from *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), which set forth 15 factors 'to provide a reasoned economic framework for a hypothetical negotiation[.]'" *J&M Indus., Inc. v. Raven Indus., Inc.*, 457 F. Supp. 3d 1022, 1056 (D. Kan. 2020). The parties agree the dispute concerning Mr. Perdue's opinion is limited to his reliance on *Georgia-Pacific* Factor 12:

> Mr. Perdue refers to a total of 33 license agreements in his expert report: first, under *Georgia-Pacific* Factor 1 (royalties for licensing the patent-in-suit) two agreements licensing the Asserted Patent here, and second under *Georgia-Pacific* Factor 2 (royalties paid by the licensee for patents comparable to the patent-in-suit) two

---

[17] In other words, Vincent challenges the reliability of Mr. Perdue's opinions, not their relevance or whether Mr. Perdue is qualified to offer them. *See In re Scrap Metal*, 527 F.3d at 528–29 (requirements for admissibility of expert opinion testimony under Rule 702 are: (1) "the witness must be qualified by knowledge, skill, experience, training, or education"; (2) "the testimony must be relevant, meaning it will assist the trier of fact to understand the evidence or to determine a fact in issue[;]" and (3) "the testimony must be reliable.").

33

Fillauer licenses. Vincent does not object to Mr. Perdue's reliance on these opinions in his expert report (although Vincent does disagree with his expert opinions regarding them).

Vincent does object, though, to Mr. Perdue's reliance on information he obtained from public databases regarding the 29 additional license agreements and other transactions. Mr. Perdue cites these agreements as relevant under *Georgia-Pacific* Factor 12, which considers the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions. The inquiry under factor 12 is whether there is a customary royalty rate for analogous inventions in this industry. While licenses examined under *Georgia-Pacific* Factor 12 do not need to be quite as closely related to the specific patents-in-suit as under Factor 2, they nevertheless still need to be within a "comparable business" with "analogous inventions."

[Doc. 227 at Page ID # 8851–52 (Perdue Motion at pp. 4–5) (citations, brackets, and quotation marks omitted)].

Vincent argues that "a comparable license must have both technological and economic comparability to the hypothetical license[,]" and asserts that in order to satisfy Rule 702, an expert opinion "must account for differences in the technologies and economic circumstances of the contracting parties." [Doc. 227 at Page ID # 8849–50 (Perdue Motion at pp. 2–3) (quoting *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, No. 21-339-RGA, 2024 WL 2258127, at *3 (D. Del. May 17, 2024)].

But the *Fundamental* opinion cites to cases dealing with Factors 1 and 2, which pertain to royalties paid for the patent-in-suit or patents comparable to the patent-in-suit. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2011) (stating "use of past patent licenses under [*Georgia-Pacific*] factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties"); *ResQNet*, 594 F.3d at 873 (holding district court erred by not considered "technological and economic differences" in a Factor 1 case).

Conversely, several cases addressing Factor 12 suggest that the comparability analysis deemed so critical under Factors 1 and 2 is not as stringently applied. Take, for example, *Optolum,*

34

*Inc. v. Cree, Inc.*, No. 1:17CV687, 2021 WL 5908939 (M.D.N.C. Dec. 14, 2021), which involved a patent dispute regarding LED bulbs. In his consideration of Factor 12, the plaintiff's expert "relied on a Licensing Economics Review article on royalty rates from [28] years' worth of licensing agreements, broken down by industry[]" to determine median royalty rates for the "Electrical and Electronics" industry and the "Consumer Goods, Retail, and Leisure industry[.]" *Id.* at *8. The defendant argued the article was not sufficiently tied to the facts of the case. *Id.* The court acknowledged the breadth of the categories in the expert's Factor 12 analysis, but nonetheless denied the motion to exclude the expert's opinion:

> This court finds the Licensing Economics Review article is sufficiently tied to the facts of this case. Although consumer goods and electrical and electronics may be broad categories that encompass other technology than LEDs, this is not a case where the subject matter of the licenses is not ascertainable from the evidence. That the licenses relied on by [the plaintiff's expert] concern a broader category of patentable technology is not sufficient, as a matter of law, to warrant exclusion.

*Id.* at *8.

Similarly, in *J&M Industries,* 457 F. Supp. 3d 1022, the court addressed a *Daubert* challenge to a reasonable royalty-rate opinion from the defendant's damages expert, Michael Lewis, which included a Factor 12 analysis. The patent-in-suit in that case was for "a storage system for covering a pile of bulk material such as grain." *Id.* at 1033. The plaintiff argued Lewis's royalty-rate opinion should be excluded because, *inter alia*, Lewis had "improperly considered royalty rates for a number of patent licenses in the field of agri-business generally without knowing or verifying that they were in fact comparable to the business and technology at issue in this case." *Id.* at 1057. The court disagreed:

> Plaintiff has not shown that Lewis's method of resorting to agricultural industry ("agri-business") and relating industry license data, in the absence of specific data on the technology at issue, was improper or renders his opinions unreliable. Lewis acknowledged the differences between the specific and general data, used the broader market data to the limited extent he found it relevant, applied it to the facts

35

of the case, and thoroughly explained his method and reasons for doing so. Lewis's report also shows that he did not use this data to determine a specific royalty rate, but rather to identify a range of royalties within agricultural and related industries, and to thereby confirm the reasonableness of his opinion as to the proper royalty. "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder. The method used by Lewis in this regard is both reasonable and sufficiently tied to the facts of the case, at least insofar as data related to agri-business licensing is concerned. The motion to exclude such opinions is denied both as to the royalty data noted above and Lewis's ultimate opinions as to a reasonabl[e] royalty.

*Id.* at 1058 (citation omitted).

In *Xodus Medical, Inc. v. Prime Medical, LLC*, No. 3:18-cv-413-JPM, 2021 WL 5832785 (E.D. Tenn. Dec. 6, 2021), the court addressed a dispute regarding a patent "related to patient slippage within the [] context of the Trendelenburg position for surgery—when using a viscoelastic foam." *Id.* at *1. The plaintiff moved to exclude the testimony of the defendant's damages expert on reasonable royalties, arguing that the agreements on which the expert relied, including one referred to as the "Bittar Agreement," were "not comparable to the technology of the patents-in-suit." *Id.* at *2 (brackets and citation omitted). The court disagreed, finding that the expert "had a concrete, factual basis for using the Bittar Agreement: the technical experts with whom he consulted found that this license was 'technologically comparable, because [it is] **directed generally to patient support/positioning products**.'" *Id.* at *3 (emphasis added). More importantly for purposes of the Perdue Motion, the court went further and addressed the flexibility inherent in the Factor 12 analysis, ultimately holding that because the patents-in-suit and the patent(s) at issue in the Bittar Agreement all related to a general category of "patient-positioning products," the expert's royalty-rate analysis was not excludable:

Further, it is worth noting that his use of this agreement in his opinion is not within the context of the second *Georgia-Pacific* factor, but rather the twelfth: "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." Because these licenses were not examined under the second factor, which requires the licenses to be more closely related to the patents at issue in the case compared to the twelfth factor, they do not need to be quite as closely related to the specific patents-in-suit and instead need to be within a "comparable business" with "analogous inventions." As both the patents-in-suit and the Bittar Agreement relate to the patient-positioning products, there is a "discernable link to the claimed technology," and exclusion would not be justified.

*Id.* at *3 (quoting *Georgia-Pacific Corp.*, 318 F. Supp. at 1120 for first three quotations; quoting *ResQNet*, 594 F. 3d at 870 for fourth quotation). Finally, the Federal Circuit has recently clarified that the absence of "perfect identity" between licensed and asserted patents does not mandate exclusion:

A market approach does not require perfect identity between licensed and asserted patents to be reliable; it requires a reasoned explanation of why the licensed technology is sufficiently similar to inform value. Here, trial testimony and Ms. Riley's expert report provided such an explanation. Even if Ms. Riley could have provided a "more fulsome explanation" on why these licenses were comparable, we agree with the district court that "the failure to do so in this case was not so egregious as to invalidate her analysis entirely."

*Willis Elec. Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1384 (Fed. Cir. 2026) (citations omitted).

Vincent cites to a number of cases, including *Lighting Defense Group LLC v. Shanghai Sansi Electronic Engineering Company Limited*, No. CV-22-01476-PHX-SMB, 2024 WL 4837011 (D. Ariz. Nov. 20, 2024), and *TV Interactive Data Corp. v. Sony Corp.*, 929 F.Supp.2d 1006 (N.D. Cal. 2013). These cases are nonbinding and, in any event, distinguishable.

In *Lighting Defense Group*, the plaintiff/patentee Lighting Defense Group ("LDG") offered a damages expert (Dr. Thomas McGahee), who opined that "under a hypothetical negotiation, the parties would have agreed to [a] running per-unit royalty license for the infringing products sold, imported, and inventoried during the period of infringement." *Lighting Defense*

37

*Group*, 2024 WL 4837011, at *1. In doing so, Dr. McGahee relied only on seven of LDG's actual licenses of patents-in-suit; he excluded from his analysis an additional 16 licenses which used a "lump sum" royalty payment structure. *Id.* at *5–6. The defendant, SANSI, moved to exclude Dr. McGahee's opinion, arguing that he improperly ignored the 16 lump-sum-payment-structure licenses due to "his predetermined conclusion that the parties would negotiate to a running royalty license." *Id.* at *6.

Regarding Factor 12, the court noted Dr. McGahee relied on "a 'Signify licensing program,' which involved Signify publicly offering licenses for its patent portfolio at royalty rates calculated by a percentage of net revenues." *Id.* at *5. Dr. McGahee opined that the Signify licensing program reflected an "industry practice of offering a running royalty payment structure," which supported his opinion that LDG and SANSI would similarly have negotiated "a running royalty payment structure." *Id.* Dr. McGahee "fatally opined," however, that the Signify patents were not "technologically comparable" to the patents-in-suit." *Id.* at *6.

The court concluded Dr. McGahee's opinion was unreliable and granted SANSI's motion to exclude it. The court reasoned, in relevant part:

> Regarding the Signify licensing program, Dr. McGahee failed provide any conceivable link of an industry practice of offering running royalty licenses that applies to LDG. Instead, Dr. McGahee recites running royalty figures that he opined supported his theory "from an economic perspective." He does not explain what that perspective is **or how that would induce the hypothetical negotiation to take on a running royalty structure that is contrary to LDG's historical practices**. Such a proposition would be wholly inconsistent with the evidence in this case. Further, Dr. McGahee's analysis of this evidence pertains to Factor 12, addressing "customary" rates charged in the "industry." *Georgia-Pacific*, 318 F. Supp. at 1120. **Dr. McGahee essentially uses the Signify licensing program as if it were a comparable license to opine industry practice suggests a running royalty structure. . . . [However,] Dr. McGahee conceded there was no technological comparability and made no effort to establish [a] link addressing economic comparability between the [Signify] program and the parties.** Therefore, his opinion on the Signify licensing program is untethered from the facts of the case and speculative.

38

*Id.* at *8 (other citations omitted) (emphases added). By contrast, in this case, there is no suggestion that the royalty rate structure opined to by Dr. Perdue is contrary to Vincent's historical practices, that Dr. Perdue cherry-picked exemplar licenses in order to "back in" to a particular type of licensing structure, or that he relied on a single licensing program as the basis for his opinion regarding industry standards while also conceding a lack of technological comparability.

In *TV Interactive Data Corp. v. Sony Corp.*, the plaintiff/patentee, TV Interactive Data Corp. ("TVI"), moved to exclude portions of testimony from the defendant's damages expert, Mr. Creighton Hoffman. 929 F. Supp. 2d at 1014. Regarding Factor 12, Mr. Hoffman explained that he relied on "patent pools" to arrive at his opinion that $0.07 per unit was a reasonable royalty rate. Mr. Hoffman explained that patent pools are collections of patents that "provide manufacturers of DVD and BD players rights to the patents necessary to manufacture DVD and BD players and discs." *Id.* at 1016. The royalty rates for the patent pools Mr. Hoffman relied on ranged from $2.50 to $9.00 per player. The court excluded Mr. Hoffman's opinion regarding Factor 12, reasoning that he "fail[ed] to explain the technological or economic comparability between **any one of the patents in the patent pools** and license that would have been reached had the hypothetical negotiation taken place." *Id.* at 1017 (emphasis added). By contrast, Mr. Perdue did not rely on royalty rates from licenses for patent pools; rather, he cites to royalty rates from license agreements/transactions for individual patents.

In his Factor 12 analysis, Mr. Perdue explains that he considered the license transactions from his Factors 1 and 2 analyses in addition to a number of license transactions he identified using two widely-accepted databases, RoyaltySource Rates and Markables Rates. He identified the relevant transactions from RoyaltySource by filtering for "Medical Device/Supply: Prosthetic Appliance Related" licensing transactions, and from Markables by filtering for the Central Product

39

Classification Code for "Prostheses." [Doc. 227-1 at Page ID # 8878–80 (Perdue Report at pp. 18–20)]. Mr. Perdue goes on to explain that, after identifying the licenses, he divided them into two different groups based on whether they resulted from "a licensing negotiation tainted by litigation or the threat of litigation." [*Id.* at Page ID # 8879 (Perdue Report at p. 19)]. He "disregarded" any such "tainted" licensing agreements [*id.*]. As for the remaining licensing transactions, he included "related summary statistics that [he] consider[s] to be relevant in the assessment of a reasonably royalty rate." [*Id.*]. Ultimately, he relied on these transactions, and other information as detailed in his report, to opine to a range of reasonable royalty rates, with a 7.7% royalty rate representing the 75th percentile; a 4.0% royalty rate representing the median; and a 2.0% royalty rate representing the 25th percentile. He then calculated damages using these rates applied to sales of the Accused Product [Doc. 248-1 at Page ID # 9574–75 & 9749–50 (Perdue Report at pp. 27–28 & Exhibit 11, Reasonable Royalty Analysis, sealed)].

Vincent attempts to distinguish *Optolum* and *J&M* by arguing that the experts in these cases "conducted *some* analysis regarding economic and technical comparability—analysis that is entirely lacking from Mr. Perdue's opinion here." [Doc. 245-1 at Page ID # 9506 (reply at p. 3)]. But the industry surveys cited in these cases—"Electrical and Electronics" and "Consumer Goods, Retail, and Leisure" in *Optolum* and "agri-business" in *J&M*—have a much broader starting point than does Mr. Perdue's—"Medical Device/Supply: Prosthetic Appliance Related" and "Prostheses." Contrary to Vincent's argument, the relevant reasoning of these cases is on point to the case at bar, that is, the fact that the licenses relied on by Mr. Perdue "concern a broader category of patentable technology is not sufficient, as a matter of law, to warrant exclusion." *Optolum, Inc.*, 2021 WL 5908939, at *8. The "patient-positioning products" category from *Xodus Medical* is arguably more closely analogous to the categories Mr. Perdue cites to. Vincent emphasizes that

40

the expert in *Xodus Medical* "discuss[ed] and rel[ied] on the technical expert's analysis." [Doc. 245-1 at Page ID # 9507 (reply at p. 4)]. But the *Xodus* opinion does not indicate that such discussion and reliance is strictly necessary. Rather, the discussion was part of a lengthy discussion aimed at differentiating the requirements of Factor 2 and Factor 12, ultimately holding that for Factor 12 purposes, where there is a "discernible link to the claimed technology . . . exclusion would not be justified." 2021 WL 5832785, at *3. In this case, there is undoubtedly a "discernible link" between the Accused Product and "Prostheses" and "Prosthetic Appliances." To the extent Vincent believes the link is weak, it may cross-examine Mr. Perdue at trial. *See id.* ("At best, Plaintiffs' assertions point to potential weaknesses in Mr. Blok's use of the Bittar Agreement, but they do not merit exclusion.").

Vincent also briefly argues about the timing of the licenses cited in Mr. Perdue's report, as well as about Mr. Perdue's citation to non-exclusive licensing agreements and to licensing agreements with research institutions versus with competitors. Consistent with the authorities cited above, the Court finds these issues are better explored through cross-examination, rather than through wholesale pre-trial exclusion of Mr. Perdue's opinion regarding Factor 12 issues and the licenses discussed in his Factor 12 analysis. The Court finds Defendants have sufficiently demonstrated that Mr. Perdue's opinion, including his Factor 12 analysis, is the product of reliable methods and an appropriate foundation. The Court therefore **DENIES** the Perdue Motion [Doc. 248 (sealed); Doc. 227 (redacted)].

III.    <u>**ROUSE MOTION**</u>

Vincent moves to exclude portions of the reports and testimony of Dr. Elliot J. Rouse ("Dr. Rouse"), who prepared a Rebuttal Expert Report Regarding Non-Infringement [Doc. 249-1 (the "Non-Infringement Report," sealed)] and an Expert Report Regarding Invalidity [Doc. 249-2 (the

41

"Invalidity Report," sealed); Doc. 228-1 (Invalidity Report, redacted)]. In response, Defendants stipulated to striking the overwhelming majority of the contested paragraphs, leaving only four at issue [Doc. 232 at Page ID # 9238 (response at p. 2, sealed)]. The following chart reflects the status of the sections raised in Vincent's motion:

| Source | Paragraph(s) | Defendants' Position |
|---|---|---|
| Non-Infringement Report | 40–41 | Stipulate to Exclusion |
| Non-Infringement Report | 89–97 | Stipulate to Exclusion of all paragraphs except 96 |
| Non-Infringement Report | 98–106 | Stipulate to Exclusion of all paragraphs except 106 |
| Non-Infringement Report | 79 | Stipulate to Exclusion |
| Non-Infringement Report | 82–85 | Stipulate to Exclusion |
| Invalidity Report | 53–60 | Stipulate to Exclusion |
| Invalidity Report | 61–69 | Stipulate to Exclusion |
| Invalidity Report | 43 | Stipulate to Exclusion |
| Invalidity Report | 46–49 | Stipulate to Exclusion |
| Invalidity Report | 107–110 | Stipulate to Exclusion of all paragraphs except 107–108 |

The Court therefore **GRANTS** the Rouse Motion [Doc. 249 (sealed); Doc. 228 (redacted)] as unopposed as to all but Paragraphs 96 and 106 of the Non-Infringement Report and Paragraphs 107–108 of the Invalidity Report. The Court will address these four disputed paragraphs below.

### A. Paragraph 96 of the Non-Infringement Report

96. I have reviewed the '616 patent, and I note that even if one were to replace the worm gearing of the TASKA hand with the bevel gear of the '616 patent (worm gears and bevel gears being long known in any event), the TASKA hand would not infringe the '616 patent, as the '616 patent requires the bevel gearing to be in the first phalanx, and the gearing mechanisms of the TASKA hand are in a gear box assembly in the palm. This is why, unlike what is described in the '666 patent, the TASKA hand is a complete hand, and the fingers cannot be used as a single finger prosthesis.

[Doc. 249-1 at Page ID # 9805–06 (Non-Infringement Report at pp. 26–27, ¶ 96, sealed)].

Defendants argue that (1) the referenced modification represents one of several viable non-infringing alternatives to the Patent; and (2) Dr. Rouse's opinion undermines Vincent's contentions

42

regarding the amount of time and money required to develop a non-infringing alternative [Doc. 232 at Page ID # 9240 (response at p. 4, sealed)]. Vincent responds by noting that this paragraph references a design-around of the '616 patent—which is a different patent not at issue in this case—and is therefore irrelevant. [Doc. 247 at Page ID # 9525 (reply at p. 1, sealed)].

During the Hearing, when given the opportunity, Defendants did not clarify how this paragraph relates to a non-infringing alternative to the Patent at issue in this case. Defendants cited to paragraphs 454 through 463 of the Non-Infringement Report, but these paragraphs do not reference patent '616 or make the connection between '616 and the Patent any more clear. The Court finds Defendants have not demonstrated whether or how the information in this paragraph will assist the trier of fact in understanding the evidence or determining any facts in dispute at trial. *See In re Scrap Metal*, 527 F.3d 517 at 528–29; *see also Univ. of Tenn. Rsch. Found. v. Caelum Biosci., Inc.*, No. 3:19-CV-508-CEA-DCP, 2024 WL 3249314, at *5 (E.D. Tenn. June 28, 2024) ("The party offering the expert has the burden of proving admissibility." (citing *Daubert*, 509 U.S. at 592 n.10)). The Court therefore **GRANTS** the Rouse Motion [Doc. 249 (sealed); Doc. 228 (redacted)] as to Paragraph 96 of the Non-Infringement Report.

### B. Paragraph 106 of the Non-Infringement Report



106. I further understand that prior to entering the settlement agreement, ███████ ██████████████████████████ Össur Dep., 39:7-23, 43:5-57:22, 74:5-11. I understand that neither Vincent nor Össur had provided ████████████████████ However, I understand that under the agreement, ██████████████████ ██████████████████████████████████████ Id.; Össur Dep., Ex. 10 (VINCENT_014919 ██████████████ VINCENT_014925).

[Doc. 249-1 at Page ID # 9807–08 (Non-Infringement Report at pp. 28–29, ¶ 106, sealed)]. Defendants contend this paragraph "reflects Dr. Rouse's expert assessment of the significance of ████████████████████████████████████████████████████████████ [Doc.

43

232 at Page ID # 941]. But there is no expert assessment here. It is simply a recitation of facts Mr. Rouse has learned during the litigation, and Defendants' counsel conceded during the Hearing that this information would also be presented through fact witnesses. The Court therefore **GRANTS** the motion as to Paragraph 106 of the Non-Infringement Report. *See Univ. of Tenn. Rsch. Found,* 2024 WL 3249314, at *6–8 (finding that recitation of "uncomplicated evidence to support [testifying expert's opinion] . . . will not assist the trier of fact").

### C. Paragraphs 107–108 of the Invalidity Report

107. Commercially, various products implemented these configurations. One in particular was the i-Limb by Touch Bionics.

108. Touch Bionics' i-LIMB hand launched in July 2007 with individually powered phalanges and myoelectric control, marking a mainstream product to showcase digit-level actuation within a prosthetic hand. See VINCENT_002303 ("iLimb Bionic Hand Now Ready for Market").

[Doc. 228-1 at Page ID # 9121 (Invalidity Report at p. 32, ¶¶ 107–08)]. Defendants assert that these paragraphs reflect a "description and analysis of prior art products" that constitute "paradigmatic expert testimony under Rule 702." [Doc. 242 at Page ID # 9457–58 (response at pp. 5–6)]. Vincent concedes that Dr. Rouse can describe the state of the art relevant to the Patent— which he does in 36 unchallenged paragraphs of Invalidity Report—but asserts these paragraphs must be excluded for two reasons. First, these paragraphs discuss a third-party product that is not at issue in this case and about which Dr. Rouse has no personal knowledge. Second, these paragraphs lack any discernible connection to Dr. Rouse's invalidity opinion; and, to the extent they are mere context, they are more appropriately introduced by percipient witnesses with personal knowledge [Doc. 245-2 at Page ID # 9513 (reply at p. 3)]. The Court agrees and finds these paragraphs should be excluded for each of these reasons.

The Court therefore **GRANTS** the Rouse Motion [Doc. 249 (sealed); Doc. 228 (redacted)] as to Paragraphs 107–108 of the Invalidity Report.

## IV.    <u>CONCLUSION</u>

As set forth above, the Court **DENIES** the Sanctions Motion [Doc. 181], but declines to award Vincent attorney's fees and costs on the current record. The Court **DENIES** the Perdue Motion [Doc. 248 (sealed); Doc. 227 (redacted)]. Finally, the Court **GRANTS** the Rouse Motion [Doc. 249 (sealed); Doc. 228 (redacted)].

The Court acknowledges this Memorandum and Order contains sensitive business information which the Court has previously ordered to be filed under seal, consistent with applicable authority. The Clerk is therefore respectfully directed to file this Memorandum and Order under seal pending further order of the Court. On or before **JUNE 30, 2026,** the parties shall jointly file, under seal, a version of this Memorandum and Order with proposed redactions highlighted. The Court will consider the parties' proposed redactions and prepare a version of this Memorandum and Order that is suitable for filing in the public record.

The parties' joint filing shall be accompanied by a brief explanation regarding why the proposed redactions are necessary. Consistent with the Court's prior orders, where the proposed redaction concerns information identical or similar to information previously ordered sealed, the parties need not submit evidentiary support for the requested redactions. [*See* Doc. 240]. To the extent there is a dispute concerning whether certain information needs to be redacted, the parties shall each submit a brief statement setting forth their respective positions, which must be accompanied by supporting proof. The Court's preference is to redact as little information as possible from this Memorandum and Order, and so the parties are advised to narrowly tailor their proposed redaction(s).

If the parties do not timely propose redactions (or request an extension of time), the Court will presume the parties have waived any such redaction requests and will direct the Clerk to unseal the Memorandum and Order and file it in the public record with no redactions.

As noted in prior orders, no final determinations have been made regarding whether any of the sealed information referenced herein constitutes protected business or financial information that is properly kept under seal. If, eventually, a determination is made that any such information does not so qualify, the parties are **ORDERED** to file a motion to unseal said information without delay.

SO ORDERED.

ENTER:

/s/ _____
MIKE DUMITRU
UNITED STATES MAGISTRATE JUDGE

46