**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| VINCENT SYSTEMS GMBH,<br><br>*Plaintiff*,<br><br>v.<br><br>FILLAUER COMPANIES, INC. and MOTION CONTROL, INC.,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:23-cv-2<br><br>Judge Atchley<br><br>Magistrate Judge Dumitru |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' Objections to the Memorandum Opinion and Order of United States Magistrate Judge Michael J. Dumitru [Doc. 274], Plaintiff's Motion for Reconsideration of the Court's Memorandum Opinion and Order [Doc. 289], and Plaintiff's Motion Requesting Oral Argument on its Motion for Reconsideration [Doc. 294].[1] For the following reasons, Defendants' Objections [Doc. 274] will be **OVERRULED**, and Plaintiff's Motions [Docs. 289, 294] will be **DENIED**.

## I. BACKGROUND

This patent dispute has been raging since 2023 and, over the course of three years, has generated extensive discovery disputes, voluminous motion practice, and numerous substantive rulings. Simply put, the road to trial has not been straightforward. Among the more contentious disputes has been Defendants' Motion for Sanctions and Spoliation of Evidence (the "Sanctions Motion") [Doc. 181], filed on February 13, 2026. There, Defendants accused Plaintiff's counsel

[1] The Court has attempted to provide citations to information that is not under seal in the record when possible. As discussed below, the Court will direct the Clerk to *temporarily* file this Memorandum Opinion and Order under seal in its entirety and allow the parties fourteen days to propose a redacted version suitable for filing in the public record.

of intentionally destroying documents generated by a third party during prior litigation involving the U.S. Patent No. 8,491,666 (the "Asserted Patent") at issue here, arguing that its alleged destruction "compromised the integrity of these proceedings." [*Id.* at 1]. Throughout the Sanctions Motion, Defendants' counsel used language that seriously calls into question the integrity and character of Plaintiff's counsel.

Given the number and complexity of the issues pending before the Court, the undersigned referred the Sanctions Motion to Magistrate Judge Michael J. Dumitru for disposition. [Doc. 225]. Following extensive briefing on the issue, Magistrate Judge Dumitru conducted a hearing on the motion on May 7, 2026. During the hearing, Magistrate Judge Dumitru remarked, "I cannot remember the last time I saw someone come at another lawyer with the sort of allegations I've seen here with anything but an abundance of hard documentary evidence, which I have not seen in this case." [Doc. 269, Tr. of May 7, 2026, Mots. Hr'g at 40:2-10]. Judge Dumitru subsequently issued a forty-six-page Memorandum and Order (the "Magistrate Judge Order") [Doc. 268] denying Defendant's Sanction Motion, denying Plaintiff's Motion to Exclude the Opinion of Defendants' Damages Expert Glenn W. Perdue [Doc. 248], and granting Plaintiff's Motion to Strike and Exclude Portions of the Reports and Testimony of Dr. Elliot J. Rouse on Non-Infringement and Invalidity (the "Rouse Motion") [Doc. 249]. Defendants thereafter filed objections to the portions of the Magistrate Judge's Order denying the Sanctions Motion and excluding portions of Dr. Rouse's testimony. [Doc. 274].

This is not the only significant ruling in dispute in this case. After reviewing the parties' extensive briefing, expert reports, and evidentiary record, the Court issued a thirty-five-page Memorandum Opinion and Order (the "Summary Judgment Order") [Doc. 276] excluding the testimony of Plaintiff's expert, Dr. Steven H. Collins, and granting summary judgment of non-

infringement as to the optimized Gen 1, glued Gen 2, and welded Gen 2 and CX hands (collectively, the "TASKA Hands").[2] The only claim that survived summary judgment was Plaintiff's claim that the pre-optimized Gen 1 hands are reasonably capable of infringement. Plaintiff now moves for reconsideration of the Court's Summary Judgment Order as to the exclusion of certain testimony of its expert Dr. Collins and the Court's entry of summary judgment of non-infringement as to the Gen 2 glued hands. [Doc. 289].

## II. DEFENDANTS' OBJECTIONS MOTION

### A. Standard of Review

When a pretrial matter is not dispositive of a party's claim or defense, a district judge may refer the matter to a magistrate judge to hear and decide. FED. R. CIV. P. 72(a). The magistrate judge must conduct any required proceedings and may, when appropriate, issue a written order stating its decision, to which a party can object within 14 days. FED. R. CIV. P. 72(a). The district judge must consider any timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law. *Id.*; 20 U.S.C.A. § 636(b)(1)(A) (if a party shows the magistrate judge's order is "clearly erroneous or contrary to law," the district judge "may reconsider any pretrial matter" that a magistrate judge has been designated to hear and determine). This standard "provides considerable deference to the determinations" of magistrate judges. *In re Search Warrants Issued Aug. 29, 1994*, 889 F. Supp. 296, 298 (S.D. Ohio 1995) (internal citation omitted).

The district judge reviews factual findings for clear error and reviews conclusions of law de novo. *Bisig v. Time Warner Cable, Inc.*, 940 F. 3d 205, 219 (6th Cir. 2019). A factual finding

---

[2] An in-depth discussion of the facts in this case, including a description of each iteration of the TASKA Hands, can be found in the "Background" section of the Summary Judgment Order. [*See* Doc. 276 at 2–7; Doc. 315 (Redacted Version)].

is clearly erroneous if the Court "is left with the definite and firm conviction that a mistake has been committed." *Id.* A legal conclusion is "contrary to law" if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Id.*

**B. Application**

Defendants object to two central rulings of the Magistrate Judge Order. First, Defendants argue the Magistrate Judge erred as a matter of law and fact in denying its Sanctions Motion. [Doc. 274 at 3–12[3]]. Second, Defendants likewise argue the Magistrate Judge erred as a matter of law and fact in granting the Rouse Motion. [*Id.* at 14–15]. The Court will analyze each objection in turn.

*i. The Sanctions Motion*

As a preliminary matter, Defendants do not specifically object to the Magistrate Judge's "Background" section setting forth the lengthy and complex factual history relevant to the Sanctions Motion. [Doc. 268 at 2–12]. Although Defendants contend that the Magistrate Judge committed factual errors, their objections, as explained below, largely challenge the inferences and conclusions drawn from those facts rather than facts themselves. Accordingly, in the interest of brevity, the Court adopts and incorporates the Magistrate Judge's thorough factual "Background" section detailing the timeline of this case and Plaintiff's prior litigation history. [*Id.*].

By way of context, the Sanctions Motion centers on an inter partes review ("IPR") petition generated during prior litigation between Plaintiff and third-party Össur Americas, Inc. and Össur hf (collectively, "Össur") in the United States, alleging Össur's prosthetic hands infringed the Asserted Patent ("The Össur American Litigation"). [Doc. 145-8]. In 2020, Plaintiff and Össur

[3] The record in this case is sizeable and includes hundreds of entries, both sealed and unsealed. For purposes of clarity, record citations are to the CM/ECF-stamped document and page number of each filing, rather than to any internal pagination, e.g. the page number of a deposition transcript.

engaged in settlement negotiations, and, [redacted] referencing an "attached IPR petition" (the "Össur IPR"). [Doc. 184-6]. The parties later settled the Össur American Litigation by way of settlement agreement executed on September 24, 2020. [Doc. 184-11].

On August 31, 2022, Plaintiff sent Defendant Fillauer Companies, Inc. ("Fillauer") a cease-and-desist letter, disclosing both the pending TASKA Litigation and the resolved Össur American Litigation, which specifically stated: (1) "Vincent Systems' specific infringement claims regarding the TASKA Hand are set forth in ongoing litigation between Vincent Systems and TASKA [] in Germany[;]" (2) Vincent "has previously enforced its '666 Patent in the US against Össur Americas, Inc., in a complaint filed in the United States District Court for the Central District of California in November 2019[;]" and (3) "[t]hat case was resolved by a Settlement and License Agreement between the parties." [Doc. 185 at 1–2]. As the Magistrate Judge points out, "[t]he record therefore reflects that as of August 31, 2022, Fillauer was aware of both the German TASKA Litigation *and* the existence of the Össur Settlement." [Doc. 268 at 7–8 (emphasis in original)]. Plaintiff then filed suit against Fillauer on January 4, 2023. [Doc. 1].

Over the course of this litigation, the parties engaged in voluminous discovery, but it was not until February 21, 2025, that Defendant Motion Control, Inc. ("Motion Control') first served Össur with a subpoena (the "Össur Subpoena"). [Doc. 229 at 4]. And on March 11, 2025, Motion Control served Plaintiff several additional requests for production aimed at the Össur American Litigation and settlement [Doc. 198-2 (Ex. 3)]. Less than a week later, "Össur serve[d] objections to [the] subpoena representing they either do not have the documents or responding that Motion Control should get them from Vincent." [Doc. 229 at 4]. Importantly, Defendants never followed up with Össur about their objections to the Össur Subpoena. [Doc. 268 at 10].

Plaintiff finally produced redacted versions of the settlement correspondence in the Össur American Litigation on June 26, 2026, that expressly referenced an IPR petition that does not appear to have been redacted. [Doc. 145-17; Doc. 184-7 (Ex. L)]. Regardless of whether Defendants knew at that time of the IPR petition, Defendants, at the very least, knew of it by October 24, 2025, when Plaintiff produced, by Order of the Court, unredacted versions of the Össur settlement documents. [*See* Doc. 169]. Once Defendants discovered the existence of the IPR petition, they requested Plaintiff produce a copy of it, and on October 27, 2025, Plaintiff advised Defendants it no longer possessed it. [Doc. 196-1 at 10–11]. Rather than file a subsequent motion to compel or follow up with Össur, which had objected to the Össur Subpoena on the grounds that Defendants should obtain discovery from Plaintiff first, Defendants' counsel waited until February 13, 2026, more than two months after the close of discovery, to file its Sanctions Motion.

The Magistrate Judge denied the Sanctions Motion on two grounds. First, the Magistrate Judge found the Sanctions Motion to be untimely based on Defendants' "unreasonable delay" in attempting to obtain the IPR petition after they were aware of its existence. [Doc. 268 12–15]. Second, while untimeliness alone was grounds for denial, the Magistrate Judge also denied the Sanctions Motion on the merits based on numerous independent grounds. [*Id.* at 16–31].

Although the Court agrees with the Magistrate Judge that, given the unique circumstances of this case, the Sanctions Motion fails on the merits, the Court concludes that its untimeliness provides an independent and sufficient basis for denying the motion. Because resolving the timeliness issue is dispositive, the Court need not revisit the Magistrate Judge's thorough analysis of the merits and instead limits its discussion to the timeliness issue.

Here, Defendants' own characterization of the IPR petition underscores why their Sanctions Motion is untimely. Defendants describe the IPR petition as "arguably the most

important evidence in this case for the defense" and devotes substantial briefing to portraying Plaintiff's counsel's failure to preserve it as serious discovery misconduct. [Doc. 183 at 25]. Yet their conduct tells a markedly different story. If the IPR petition was truly as important as Defendants now contend, one would expect them to act with some urgency when they learned that it was no longer in Plaintiff's possession. They did not.

At the latest, Defendants knew in late October 2025—approximately two months before the close of discovery—that the IPR petition existed and that Plaintiff no longer possessed it. [Doc. 196-1 at 10–11]. Rather than promptly bring the issue to the Court's attention, such as by filing a fourth motion to compel, Defendants asked Plaintiff's counsel about the petition twice more, who again informed Defendants that Plaintiff no longer had it. [Doc. 184-12; Doc. 184-13]. Notably, Defendants had previously subpoenaed Össur regarding any settlement documents, but Össur objected on the ground that Defendants should first seek the documents from Plaintiff. Having now learned that Plaintiff did not possess the materials, Defendants could have returned to Össur and renewed their request. They did not.

When the Magistrate Judge later pressed Defendants' counsel at the hearing about why they had not done so, the following exchange commenced:

> THE COURT: October 24th is the date on which they produce the unredacted letters. And you all find out for the first time that there was an IPR.
>
> MR. TELSCHER: Correct.
>
> THE COURT: Why not go back to Össur?
>
> MR. TELSCHER: There would be no time.
>
> THE COURT: There's still a month and a half of discovery.
>
> MR. TELSCHER: So I'd have to reserve the subpoena.
>
> THE COURT: I'm not saying what you have to do. I'm just asking -- because you're

asking me to ask them, and I will, why did you or did you not do something. I'm asking you why did you not pick up the phone and call Össur and say I know you said Vincent has it, but now they told me they destroyed it.

THE COURT [sic][4]: You know, Your Honor, it's probably something we could have done. I don't know if they would take my call. They're not on our side by the way. They want us to lose this case.

THE COURT: I'm sure. I'm sure. But you served a legally valid document in the way of a subpoena and they had said as a basis for not giving you the information they have it. And now you have a document from them that says, no, they don't. And it is so important to my case that I will be prejudiced to the point of filing a motion in four months asking the Court to dismiss their case and I need that document from you. But that urgency didn't exist at that time.

MR. TELSCHER: It did, Your Honor. We were in the middle of 13 depositions. And I know that we can go back and look at a file and make that criticism. I think it's a fair criticism. I'm not going to deny it. But I can tell you that we weren't sitting around on our hands.

THE COURT: I know. But what we're doing is going back and looking at files and making criticisms. That's what we're doing here. So my question is, and I'm going to ask them hard questions, too, but my hard question to you is you know Össur's got it.

MR. TELSCHER: We don't know that.

THE COURT: Okay.

MR. TELSCHER: I would think they do. No, I'm with you. I think they do.

THE COURT: Okay. So why not ask Össur for it? Did you ask Össur's corporate representative at deposition anything about the IPR that you knew now existed and didn't at that time?

MR. TELSCHER: What am I going to ask her? I mean, honestly, I mean, there's an IPR that killed the settlement.

THE COURT: How about do you have a copy of the IPR?

MR. TELSCHER: That I could have asked. I think that's a fair question.

THE COURT: Did you?

---

[4] Although the transcript identifies "The Court" as making this statement, it is apparent from the context that Mr. Telscher is the one speaking.

MR. TELSCHER: No, I did not.

[Doc. 269, Tr. of May 7, 2026, Mots. Hr'g at 77:22–80:1]. As the Magistrate Judge further alluded to during this exchange, Defendants deposed two of Plaintiff's corporate representatives and a corporate representative of Össur on December 2, 2025. Defendants, oddly, did not ask any of those witnesses a single question about the IPR petition. [*See* Doc. 268 at 12]. Nor did they seek an extension of the discovery deadline to further pursue this document. When asked why they did not request additional time, Defendants' counsel explained that he assumed the Court would deny such a request. [Doc. 269, Tr. of May 7, 2026, Mots. Hr'g at 82:1–84:9].

In other words, Defendants' explanation for not filing a motion to compel and waiting months after the close of discovery to seek relief appears to rest on two assumptions: (1) that Össur would not assist Defendants even in the face of a legally valid subpoena, and (2) that the Court would not extend the discovery deadline.[5] A party cannot characterize a document as "arguably the most important evidence in this case," accuse opposing counsel of gross misconduct, and then sit on the issue for months because it assumes that available avenues for obtaining the document will prove unsuccessful. The Court agrees with the Magistrate Judge that Defendants were unreasonably dilatory after they had learned that Plaintiff no longer had the IPR petition.

Although it is true that a sanctions motion under Rule 37(e) is not a motion to compel and is not subject to the same discovery deadlines, courts have "routinely held that 'unreasonable delay may render such a motion untimely." *Williams v. Nationwide Ins. Co.*, No. 12-13904, 2014 WL

[5] Such an assumption is difficult to reconcile with the record. As the Magistrate Judge noted, Defendants filed a contested motion to amend the scheduling order on January 16, 2026 [Doc. 173], which the Court ultimately granted [Doc. 178]. Defendants were plainly willing to seek an extension when they believed one was warranted; the Court fails to understand why Defendants did not do so here, particularly given the extreme importance of a potentially case-dispositive piece of evidence.

12659422, at *4 (E.D. Mich. Apr. 29, 2014) (collecting cases); *see also United States v. Stinson*, No, 6:14-cv-1534-Orl-22TBS, 2016 U.S. Dist. LEXIS 185771, at *13 (M.D. Fla. Nov. 22, 2016) ("Rule 37 does not expressly state a time limitation upon which a party must file a motion for sanctions; however, an unreasonable delay will generally result in a waiver of the motion."). This is because "'resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced.'" *Am. Nat'l Prop. & Cas. Co. v. Campbell Ins., Inc.*, No. 3:08-cv-00604, 2011 U.S. Dist. LEXIS 80534, at *6–7 (M.D. Tenn. July 22, 2011) (quoting *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494 (D. Md. 2009)). "'The least disruptive time to undertake this is during the discovery phase, not after it has closed. Reopening discovery, even if for a limited purpose, months after it has closed . . . can completely disrupt the pretrial schedule, involve significant cost, and burden the court and parties.'" [*Id.*].

As a matter of law, Defendants' "mistaken understanding that a motion regarding spoliation of evidence is not a discovery motion is irrelevant to the issue of timeliness." [*Id.* at *10]. The Magistrate Judge appropriately relied on the discovery deadlines to highlight Defendants' unreasonable delay in seeking sanctions. Defendants had several avenues available to pursue the IPR petition during discovery—including filing a motion to compel—when they learned of its existence. *See Harden v. Stangle*, No. 3:18-cv-00981, 2020 U.S. Dist. LEXIS 211624, at *6 (M.D. Tenn. Nov. 12, 2020) ("Even more courts have held that spoliation motions must be brought as such in close proximity to the time when the party becomes aware of the alleged destruction of evidence."). They did not do so.

Defendants also contend the Magistrate Judge erred as a factual matter because they "diligently pursued the evidence." [Doc. 274 at 3–4]. But Defendants merely point to the same dates and events the Magistrate Judge considered in determining the Sanctions Motion untimely.

[*Id.*]. Defendants may disagree with how the Magistrate Judge characterized those facts, but they identify no factual error in his analysis. *Bisig*, 940 F. 3d at 219. As explained above, the record shows that Defendants did not diligently pursue the IPR petition after learning that Plaintiff no longer possessed it: they did not follow up on their subpoena to Össur, ask Össur's corporate representative about the petition, raise the issue with the Court when they learned of the problem in October 2025, or seek relief when they moved to amend the scheduling order in January 2026. Instead, Defendants let the issue sit until they ultimately moved for sanctions on February 13, 2026. [Doc. 181]. Whatever the reason for that delay, the record does support any good cause for it.[6] Reopening discovery now, or otherwise imposing sanctions against Plaintiff, would result in substantial prejudice based on Defendants' own failure to act when the issue first arose.

Accordingly, Defendants' objection regarding the Magistrate Judge's finding of untimeliness is **OVERRULED**.

*ii. The Rouse Motion*

Defendants also object to the Magistrate Judge's Order granting the Rouse Motion. [Doc. 274 at 14–16]. Specifically, Defendants contend that the Magistrate Judge erred in excluding Dr. Rouse's testimony regarding a Design Around in this case and testimony relevant to the State of the Art at the Time of the Invention. The Magistrate Judge excluded paragraphs 96 and 106 of Dr. Rouse's Non-Infringement Report [Doc. 249-1] and paragraphs 107–108 of Dr. Rouse's Invalidity Report [Doc. 228-1]. The Court will analyze each in turn.

[6] The Court recognizes that preparing a motion of this complexity takes times, particularly when accounting for meet-and-confers, holidays, and the necessary research. But Defendants conduct suggests that their focus shifted toward seeking sanctions rather than promptly resolving the underlying discovery issue. Had Defendants sought an extension of discovery or renewed their efforts to obtain the IPR petition from Össur, the Court might have been more sympathetic about the length of time taken to prepare the Sanctions Motion.

1. Paragraph 96 of the Non-Infringement Report

> 96. I have reviewed the '616 patent, and I note that even if one were to replace the worm gearing of the TASKA hand with the bevel gear of the '616 patent (worm gears and bevel gears being long known in any event), the TASKA hand would not infringe the '616 patent, as the '616 patent requires the bevel gearing to be in the first phalanx, and the gearing mechanisms of the TASKA hand are in a gear box assembly in the palm. This is why, unlike what is described in the '616 patent, the TASKA hand is a complete hand, and the fingers cannot be used as a single finger prosthesis.

[Doc. 249-1 at ¶ 96].

The Magistrate Judge excluded this testimony on the basis that Defendants did not explain how this paragraph, and its connection to the '616 patent, relates to a non-infringing alternative to the Asserted Patent at issue in this case. [Doc. 268 at 42–43]. In response, Defendants argue that this testimony is relevant to refute Plaintiff's damages expert's assertion that a non-infringing alternative would take four years and cost millions to develop. [Doc. 274 at 14]. The '616 patent, as Defendants assert, was offered to show that "a specific, mechanically grounded non-infringing alternative existed and was readily achievable." [*Id.*].

Defendants still fail to explain the critical connection between a design-around of the '616 patent and a non-infringing alternative to the Asserted Patent at issue here. They did not explain that connection at the hearing before the Magistrate Judge, and they have not done so in their Objections. Instead, Defendants simply assert that that "configuration described in the '616 patent . . . would not infringe the '616 patent." [*Id.*]. Whether a design avoids infringement of a different patent does not, without more, establish that the design is a non-infringing alternative to the Asserted Patent in this case. Like the Magistrate Judge, the Court therefore finds that the Defendants have not shown how this testimony would assist the trier of fact in resolving any issue relevant to the claims before it. *See Univ. of Tenn. Rsch. Found. v. Caelum Biosci., Inc.*, No. 3:19-CV-508-CEA-DCP, 2024 WL 3249314, at *5 (E.D. Tenn. June 28, 2024) ("The party offering the

expert has the burden of proving admissibility." (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993))).

Accordingly, Defendants' objection to the exclusion of Paragraph 96 of Dr. Rouse's Non-Infringement Report is **OVERRULED.**

2. Paragraph 106 of the Non-Infringement Report

> 106. I further understand that [redacted] Össur Dep., 39:7-23, 43:5-57:22, 74:5-11. I understand that neither Vincent nor Össur had provided [redacted] However, I understand that under the agreement, [redacted] Id.; Össur Dep., Ex. 10 (VINCENT_014919 VINCENT_014925).

[Doc. 249-1 at ¶ 106].

The Magistrate Judge properly excluded this testimony because it is "simply a recitation of facts Mr. Rouse has learned during the litigation." [Doc. 268 at 43–44]. Although Defendants correctly note that an expert may rely on facts made known during litigation, an expert may not simply regurgitate those facts without providing expert analysis, particularly when the facts will be introduced through a percipient fact witness. *Caelum Biosciences*, 2024 U.S. Dist. LEXIS 114495, at *16 ("Even so, [e]xpert testimony which merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness should be excluded." (internal quotations and citation omitted)). Defendants conceded at the hearing before the Magistrate Judge that this information would come in through fact witnesses, which further underscores why this is not "affirmative expert evidence." [Doc. 274 at 15]. In this paragraph, Dr. Rouse is not making any expert opinions on [redacted]. He is merely stating the factual circumstances surrounding it.

Accordingly, Defendants' objection to the exclusion of Paragraph 106 of Dr. Rouse's Non-

Infringement Report is **OVERRULED**.

3. Paragraphs 107-108 of the Invalidity Report

> 107. Commercially, various products implemented these configurations. One in particular was the i-Limb by Touch Bionics.
>
> 108. Touch Bionics' i-LIMB hand launched in July 2007 with individually powered phalanges and myoelectric control, marking a mainstream product to showcase digit-level actuation within a prosthetic hand. See VINCENT_002303 ("iLimb Bionic Hand Now Ready for Market").

[Doc. 228-1 at ¶¶ 107–08].

The Magistrate Judge excluded Paragraphs 107 and 108 of Dr. Rouse's Invalidity Report for two reasons: (1) Dr. Rouse has no personal knowledge of the i-Limb product, and (2) his statements do not form the basis of his invalidity opinion. [Doc. 268 at 44]. Defendants take issue with both reasons, arguing that he does not need personal knowledge of the product and that the testimony is directly relevant as state-of-the-art evidence. [Doc. 274 at 15–16].

Here, irrespective of whether he must have personal knowledge of the third-party product, this particular testimony is purely factual information better introduced through a fact witness. Dr. Rouse himself concedes that his testimony regarding the i-Limb product does not involve any expert analysis and does not form the basis of his invalidity opinion. [*See* Doc. 206-1 at 157:10-19 (Q: "Did you rely on this information in deciding that the '666 Patent is invalid?" A: "I think that's just context.")). When an expert merely presents facts that do not add to his or her opinion, it runs the risk of coming across to the jury with added weight by virtue of the expert's status. Such information can and should be introduced with a percipient fact witness, and there is no reason Defendants cannot do so here. *See In re Davol, Inc.*, 546 F. Supp. 3d 666, 677 (S.D. Ohio 2021) ("A history without any expert analysis or other application of the expert's expertise is simply a factual narrative that should be presented to the jury directly." (quotation marks and citations

omitted)).

Accordingly, Defendants' objection to the exclusion of Paragraphs 107 and 108 of Dr. Rouse's Invalidity Report is **OVERRULED**.

***

In conclusion, Defendants have failed to identify any portion of the Magistrate Judge's Memorandum Opinion and Order [Doc. 268] that is clearly erroneous or contrary to law. As such, Defendants' Objections [Doc. 274] are **OVERRULED**.

## II. PLAINTIFF'S MOTION FOR ORAL ARGUMENT

As to Plaintiff's Motion for Oral Argument, the Court has reviewed the record in this case, the applicable legal authorities, and its arguments. Given the issues at play, the Court finds that oral argument is not necessary for it to resolve Plaintiff's Motion to Reconsider [Doc. 289]. Accordingly, the Motion Requesting Oral Argument on Plaintiff's Motion for Reconsideration [Doc. 294] is **DENIED**.

## III. PLAINTIFF'S MOTION TO RECONSIDER

### A. Standard of Review

"District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Courts will generally reconsider interlocutory orders under three circumstances: (1) an intervening change of controlling law; (2) availability of new evidence; and (3) to correct a clear error or to prevent manifest injustice. *Id.* Motions for reconsideration do not allow parties to "re-argue a case" and hope that the district court will change its mind. *State Farm Mut. Auto. Ins. Co. v. Angelo*, 95 F.4th

419, 435 (6th Cir. 2024). Such motions "should not be used liberally to get a second bite at the apple." *Id.*

**B. Application**

Although Plaintiff contends the Court committed numerous legal and factual errors in its Summary Judgment Order, much of its Motion simply repackages arguments the Court already considered and rejected. Plaintiff is free to believe the Court got it wrong and to pursue that disagreement on appeal. But a motion for reconsideration is not an invitation to relitigate issues merely because a party disagrees with the Court's ruling. That is largely what Plaintiff attempts to do here.

First, Plaintiff devotes substantial attention to its contention that the Court erred in excluding Dr. Collins's testimony insofar as it relied on his Disassembly Testing.[7] The Court, however, carefully reviewed Dr. Collins's testimony, expert report, and testing methodology and addressed those issues at length in its Summary Judgment Order, explaining why his testing *contradicted* the Court's *Markman* Order. [*See* Doc. 276 at 8–12]. Plaintiff now asks the Court to reconsider the same analysis and reach a different conclusion. Second, Plaintiff takes a similar approach to the Court's grant of summary judgment of noninfringement as to the glued versions of the Gen 2 hands, arguing the Court overlooked certain factual issues. As explained below, however, Plaintiff identifies no genuine error warranting reconsideration of either issue.

*i. Dr. Collins's Testing Methodology*

To begin, the Court finds it helpful to briefly reiterate why it excluded Dr. Collins's Disassembly Testing methodology. The Court, in its *Markman* Order, defined claim limitation 1(f)

[7] An in-depth explanation and discussion of Dr. Collins's Disassembly Testing can be found in the "Dr. Collins's Testing Method" section of the Summary Judgment Order. [*See* Doc. 276 at 8–12; Doc. 315 (Redacted Version)].

as, "the threaded screw is able to move along the length of the drive shaft in a straight line direction but is limited in its axial movement by separate guidances." [Doc. 134 at 22]. This design differentiated from prior art models where the threaded screw is "'fixed permanently'" to the drive shaft. [*Id.* at 15 (citing '666 Patent, col. 1:40-41)]. The "essential feature" of the Asserted Patent, unlike the prior art, is that the threaded screw is decoupled from the drive shaft, allowing it to move in the axial direction. [*Id.* at 15, 21–22]. Once again, the Asserted Patent's novelty lies in the fact that the threaded screw is decoupled from the drive shaft, rather than being *fixed permanently* to it.

In order to determine whether the threaded screw is axially movable, Dr. Collins believed it necessary to disassemble the finger by cutting away the motor mount component and removing the load path bearings. [Doc. 210 at ¶¶ 203, 219–20]. Once all the supporting structure was removed, Dr. Collins then directly applied force to the threaded screw until the glue bond broke at 472 N (106 lbs.), allowing the threaded screw to now move axially. [*Id.* at ¶¶ 221–26, 228]. Under Plaintiff's theory, therefore, the TASKA Hands must infringe because they can exhibit axial movement—provided one first disassembles the hand, removes the load-path bearings, and applies direct force to a screw permanently glued to the drive shaft until it breaks. Such an interpretation defies common sense.

Plaintiff argues the Court's reasoning regarding Dr. Collins's Disassembly Testing is "internally consistent" because, although the Court recognized that bond failure would not necessarily render the glued versions of the hands immediately inoperable, the Court nevertheless found that life testing with the hand fully assembled would have been informative. [Doc. 289 at 6–8]. Plaintiff contends that testing the hand in that condition "would prove nothing." [*Id.* at 7]. Respectfully, Plaintiff's argument misses the mark. In fact, fully assembled life testing would have

answered precisely the question that Plaintiff's own expert declined to test. Dr. Collins could have tested the hand under its normal operating conditions and then deconstructed the hand to see whether the bond remained intact. Indeed, Dr. Rouse, Defendants' expert witness, did just that. [*See* Doc. 220-39 at ¶¶ 209–13, 414–21, 424–27]. More importantly, Dr. Collins himself acknowledged that, in his opinion, "I would expect the results of lifetime testing under most conditions not to [] result in axial movement." [Doc. 208-4 at 262:25–264:2]. Thus, Plaintiff cannot simultaneously fault the Court for finding that fully assembled life testing would have been probative and rely on Dr. Collins's own decision not to perform that testing because he expected it to show no bond failure. The proposed testing would have proved *something* for Plaintiff: whether the bond would fail under the hand's normal operating conditions.

Plaintiff also contends the Court misunderstood evidence in the record regarding the amount of force the glue bond would be subjected to under ordinary conditions. [Doc. 289 at 9–11]. Not so. The evidence at issue, a TASKA document titled "Shaft Bonding Details," clearly states that the [redacted] [Doc. 210-4 at 3]. [redacted] [*Id.* [redacted] [*Id.* [redacted])]. Although it is true that the document states [redacted], that does not change the fact that [redacted] Of course, Dr. Collins had an opportunity to dispute this evidence and show

that the glue bond would break during simulated life testing.[8] Dr. Collins, however, removed the load path bearings and applied direct force to the glue bond until it finally broke at 472 N (106 lbs.) of pressure. [Doc. 210 at ¶¶ 203, 219–26, 228]. Such testing does not adequately test the product as designed and does not [redacted]

Moreover, the other TASKA documents cited in Dr. Collins's expert report do not provide a genuine dispute of the estimated axial forces that the glue bond would sustain in its ordinary usage. As Defendants note, these documents reference (1) [redacted], and (2) [redacted] [*See* Doc. 257-1 at ¶¶ 2–6]. Therefore, although Plaintiff is correct that the Court relied on a single piece of evidence in finding that the maximum axial load the glue bond would sustain in its ordinary usage to be [redacted] of force, it does not provide any evidence that creates a genuine dispute of that fact.

Plaintiff's final argument for reconsideration is that the Court misapplied the relevant case law. First, Plaintiff contends that the three cases the Court cited for the proposition that "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim" are distinguishable because they involved different claim limitations. *High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995)

---

[8] Simulated life testing would have at the very least, showed whether the glue bond would be destroyed when subjected to the [redacted] of force over its lifetime or whether, for some other reason, that the glue bond did not survive because it experienced more than [redacted] of force in contradiction to [redacted]. However, Dr. Collins's testing methodology, by removing the load path bearings, does not provide an accurate or relevant data point to dispute TASKA's [redacted] calculation. In fact, his assertion that simulated life testing would likely not result in axial movement, further supports [redacted]

(citing *Hap Corp. v. Heyman Mfg. Co.*, 311 F.2d 839, 843 (1st Cir. 1962)); *Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 649 F. Supp. 3d 780, 807–08 (D. Minn. Jan. 5, 2023); *Piggy Pushers, LLC v. Skidders Footwear, Inc.*, No. 1:10-CV-644, 2012 U.S. Dist. LEXIS 157339, at *10, 14–15 (W.D. Mich. Nov. 2, 2012). But Plaintiff's arguments largely just voice its disagreement with the Court's interpretation of those cases. In any event, the Court did not cite those decisions simply because the products or claim limitations were identical to those at issue here. Rather, they stand for the straightforward principle that a party cannot establish infringement by altering an accused product in a manner inconsistent with its original and intended configuration or operation. *See High Tech*, 49 F.3d at 1555 ("The fact that it is possible to alter the AcuCam so that the camera becomes 'rotatably coupled' to its housing is not enough, by itself, to justify a finding that the manufacture and sale of the AcuCam infringe HTMI's patent rights.").

*High Tech*, which involves a product most similar to the one at issue here, illustrates that point. There, the claim required a camera to be "rotatably coupled" to its housing unit to infringe the asserted patent. *Id.* at 1553. The defendant's product, however, had two set screws that prevented the camera from moving. *Id.* The Federal Circuit rejected the district court's finding that the device satisfied that claim limitation because the screws could be loosened to permit rotation, explaining that doing so required the device to be altered from its "original and intended operating configuration." *Id.* at 1555. The same principle equally applies here. The Court sees no meaningful distinction between loosening the set screws in *High Tech* and removing the load-path bearings here: both require altering the product from the configuration in which it is intended to operate.

Once again, Plaintiff's understanding of the Court's construction of claim limitation 1(f) is fundamentally flawed. Plaintiff is correct that the limitation does not require the threaded screw to actually move axially; it requires only that the screw be capable of such movement even if limited

by separate guidances. [Doc. 134 at 14–22]. But that does not eliminate the Asserted Patent's "essential feature:" the threaded screw is "decoupled" from, rather than "fixed permanently" to, the drive shaft. [*Id.*]. The relevant question, therefore, is whether the accused products satisfy that limitation *as sold and used*. The glue or weld bond may permanently fix the screw to the drive shaft, or it may not. But Dr. Collins's testing does not answer that question. His testing showed axial movement only after the hand was disassembled and the components preventing that movement were removed. That does not demonstrate that the threaded screw is capable of axial movement in the TASKA Hands as sold. Rather, it demonstrates only that it can be made capable of such movement after the product is reconfigured. As *High Tech*, *Willis*, and *Piggy Pushers* make clear, such testing is not a proper comparison of infringement and should be excluded.

Second, Plaintiff, again, cites *Barry v. DePuy Synthes Companies* for the proposition that Dr. Collins's testing is merely an "application" of the Court's claim construction rather than a "contradiction" of it. [Doc. 289 at 11–14 (citing 164 F.4th 896 (Fed. Cir. 2026)); *see also* Doc. 236 at 12]. The Federal Circuit in *Barry*, however, was clear that if "the court finds a genuine contradiction between the expert's opinion and the court's claim construction, the court *must* exclude the expert's opinion." 164 F.4th at 909. Here, it is untenable to suggest that testing a product only after fundamentally altering it from its ordinary configuration does not conflict with the Court's claim construction or the principles recognized in *High Tech*, *Willis*, and *Piggy Pushers*. In *Barry*, the expert witness did not alter the accused product in any way. The dispute was instead one of interpretation—whether the court's claim construction permitted a broader understanding of how the product could be used. *Id.* at 907. Dr. Collins's methodology altered the product entirely before testing. Thus, unlike *Barry*, where the expert's interpretation remained within the bounds of the Court's construction, Dr. Collins's testing depended on a physical

alteration that the Court's claim construction does not permit.

Accordingly, the Court did not err legally or factually in excluding Dr. Collins's Disassembly Testing. Based on his improper testing methods, exclusion is the appropriate remedy to not confuse the jury with improper comparisons. *See Daubert*, 509 U.S. at 595. The Court's ruling as to Dr. Collins's Disassembly Testing will remain unchanged.

*ii. German Testing*

Plaintiff next takes issue with the Court's exclusion of the tests and opinions offered by experts in a prior lawsuit involving Plaintiff in Germany. [*See* Doc. 276 at 14–15]. Plaintiff argues that those expert opinions should not be excluded because, unlike Dr. Collins's test, they performed the tests with the bearings in place. [Doc. 289 at 11–12]. Respectfully, it now appears that Plaintiff's Motion is "internally consistent." Consider that Plaintiff, when discussing why Dr. Collins did not perform testing while the hand was assembled, quipped, "evaluating the finger in that state would prove *nothing*." [Doc. 289 at 7 (emphasis added)]. If the German experts truly tested the finger with the bearings in place, how could they then glean any evidence as to the reliability of the glue bond under Plaintiff's arguments? Whatever the case may be, Dr. Collins directly contradicts Plaintiff's assertion that the bearings were in place during the German experts' testing. [Doc. 210 at ¶ 102 [redacted] (emphasis added))].

In any event, even if a dispute exists regarding whether the bearings were in place, the Court found exclusion appropriate for an additional reason that Plaintiff did not address in its Motion to Reconsider. Namely, this testimony discusses testing that was conducted in the context of foreign litigation, involving different rules of evidence, patent law, and claim construction rules.

In addition, those witnesses will not be subject to cross-examination and are merely used to bolster Dr. Collins's conclusions. *See Stokes v. Xerox Corp.*, No. 05-71683, 2008 U.S. Dist. LEXIS 5805, at *7, 25–26 (E.D. Mich. Jan. 28, 2008) (finding that it would be prejudicial to allow expert to offer opinion relying on another expert who will not be called as a witness at trial); *see also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) (citing *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994) (holding that an expert witness could not bolster his opinion testimony by testifying that a non-testifying expert's conclusions were essentially the same as the expert witness's)). For many of the same reasons why the Court excluded Dr. Collins's testimony relating to Dr. Schulz's opinions, so too should Dr. Collins's testimony about the tests in the German litigation be excluded. Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Carter v. United States*, No. 3:11-0930, 2014 U.S. Dist. LEXIS 56466, at *35–36 (M.D. Tenn. Apr. 23, 2014) (internal citations and quotations omitted). Allowing Dr. Collins to testify about foreign experts' opinions would deprive Defendants of the opportunity to cross-examine them on those issues.[9]

Accordingly, the Court finds that Dr. Collins's reference to the tests performed by the experts in the German litigation references in paragraphs 87 and 102 of Dr. Collins's Infringement Report still warrant exclusion.

*iii. Glued Gen 2 Hands*

Plaintiff's final attempt for reconsideration lies in the Court's finding of summary

---

[9] This concern is particularly salient when Dr. Collins did not perform any testing with the bearings in place for him to form an opinion about its results.

judgment of noninfringement as to the glued versions of the Gen 2 hands. [Doc. 289 at 16–18]. In its Summary Judgment Order, the Court found that, unlike the pre-optimized Gen 1 hands, Plaintiff had failed to produce any evidence showing the unreliability of the glue bonds in the Gen 2 hands. [Doc. 276 at 31–33]. Not only did Plaintiff's expert not test a glued Gen 2 hand, evidence in the record affirmatively demonstrated that the optimized hands did not have the same unreliable bonds the pre-optimized Gen 1 hands had. [*See* Doc. 220-14 (University of Canterbury Test [redacted])]. Other than the improper introduction of evidence it believes creates a dispute of material fact, Plaintiff's arguments are primarily an attempt to voice its disagreements with the Court's reasoning.

Plaintiff now, through an attorney's declaration, presents a TASKA repair log documenting what it believes to be evidence of unreliable bonds in the glued Gen 2 hands. Although Plaintiff had this evidence well before summary judgment briefing, it only now brings it to the Court's attention on a motion to reconsider. [*See* Doc. 318-1 at 208:23–213:7 (Plaintiff asking witness about the repair logs)]. Plaintiff had ample opportunity to present this evidence either in its own motion for summary judgment briefing [Docs. 222, 262] or in its responsive briefing to Defendants' motion for summary judgment [Doc. 254]. Instead of presenting this evidence, Plaintiff asserted, unsuccessfully, that Defendants' arguments regarding the "improved gluing process" for the Gen 2 hands failed on procedural grounds. [Doc. 262 at 11–13].

"A motion to reconsider under Rule 54(b) . . . may not serve as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought." *Owensboro Grain Co., LLC v. AUI Contr., LLC*, No. 4:08CV-94-JHM, 2009 U.S. Dist. LEXIS 18025, at 6 (W.D. Ky. Mar. 10, 2009) (cleaned up); *see also Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A.*, 2008

U.S. Dist. LEXIS 85246, *11 (S.D. Ohio Sept. 24, 2008) ("Evidence is not newly discovered for purposes of motion for reconsideration if it was available to the party before the court issued the decision being challenged."). Moreover, the Court is not obligated to wade through the morass of documents Plaintiff has generated in an attempt to identify evidence that may be supportive of its claims. *ECIMOS, LLC v. Nortek Glob. HVAC, LLC*, 736 F. App'x 577, 585 (6th Cir. 2018) ("Judges are not like pigs, hunting for truffles that might be buried in the record." (citation and punctuation omitted)).

Having failed to introduce this evidence at the appropriate time, the Court declines to reconsider its finding as to the glued Gen 2 hands.[10] *See Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. Appx. 949, 959 (6th Cir. Feb. 6, 2004) ("Since the Fund had the evidence at the time of the court's earlier decision, the district court's refusal to consider this evidence is not clearly unjust.").

Plaintiff's further arguments regarding the optimized Gen 2 hands are nothing more than an attempt to "get a second bite at the apple." *Angelo*, 95 F.4th at 435. For instance, the Court's holdings regarding the Gen 1 and Gen 2 hands are not "inconsistent." [Doc. 289 at 18]. In finding that disputed issues of fact remain as to the pre-optimized Gen 1 hands, the Court noted that the absence of reported bond failures is not necessarily dispositive because the hand can still function

[10] Even considering the evidence, the Court is skeptical that it alone would create a genuine dispute of material fact as to whether the glued Gen 2 hands are "reasonably capable" of infringement. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013). As Defendants point out, Plaintiff uses the declaration of an attorney, who, to the Court's knowledge, is not an expert witness or mechanical engineer, to summarize repair logs and to conclude that the "entries represent evidence of 'possible bonding issues.'" [Doc. 289-1 at ¶ 7]. Evidence of "possible" bond failures in [redacted], premised on attorney speculation, out of a total of [redacted] glued Gen 2 hands sold, is unlikely to establish a genuine dispute about whether they are *reasonably* capable of infringement. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000) ("A mere scintilla of evidence is insufficient, because there must be evidence on which the jury could reasonably find for the [nonmovant]." (cleaned up)).

despite a bond failure. [Doc. 276 at 31]. Plaintiff believes it inconsistent to not apply that same reasoning to the Gen 2 hands. Plaintiff misses, however, that the Court specifically said, "[t]hus, lack of documented customer reports, *standing alone*, does not foreclose Vincent's possibility of prevailing at trial with respect to the pre-optimized Gen 1 hands." [*Id.* (emphasis added)]. The Court even emphasized that such evidence is not necessarily required for Plaintiff to survive summary judgment, "particularly where it has produced evidence that the pre-optimized Gen 1 fingers contained unreliable bonds." [*Id.*]. The same evidence that Court found to demonstrate a genuine dispute of material fact did not exist as to the glued Gen 2 hands. Applying that same logic from above, the Court discussed the affirmative evidence, coupled with the lack of evidence submitted by Plaintiff, to then find that no dispute of material fact existed as to the glued Gen hands. Finally, Plaintiff's remaining arguments, like this one, merely reargue the Court's initial finding and do not present any reason sufficient to justify reconsideration.

***

Accordingly, Plaintiff's Motion for Reconsideration of the Court's Memorandum Opinion and Order [Doc. 289] is **DENIED**.

## IV. CONCLUSION

For the reasons above, Defendants' Objections [Doc. 274] are **OVERRULED**, and Plaintiff's Motions [Docs. 289, 294] are **DENIED**.

The Court acknowledges this Memorandum Opinion and Order contains sensitive business information which the Court has previously ordered to be filed under seal, consistent with applicable authority. The Clerk is therefore respectfully directed to file this Memorandum Opinion and Order under seal pending further order of the Court. On or before **August 31, 2026**, the parties shall jointly file, under seal, a version of this Memorandum Opinion and Order with proposed

redactions highlighted. The Court will consider the parties' proposed redactions and prepare a version of this Memorandum Opinion and Order that is suitable for filing in the public record.

The parties' joint filing shall be accompanied by a brief explanation regarding why the proposed redactions are necessary. Consistent with the Court's prior orders, where the proposed redaction concerns information identical or similar to information previously ordered sealed, the parties need not submit evidentiary support for the requested redactions. [*See* Doc. 240]. To the extent there is a dispute concerning whether certain information needs to be redacted, the parties shall each submit a brief statement setting forth their respective positions, which must be accompanied by supporting proof. The Court's preference is to redact as little information as possible from this Memorandum Opinion and Order, and so the parties are advised to narrowly tailor their proposed redaction(s).

**SO ORDERED.**

/s/ *Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**